# COPY OF TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

KENDRICK SLAUGHTER                 PLAINTIFF

VERSUS            CAUSE NO. 4:05CV162TSL-AGN

COUNTY OF NOXUBEE, MISSISSIPPI, RODERICK D.
WALKER, IN HIS OFFICIAL CAPACITY AS NOXUBEE
COUNTY ATTORNEY, TERRY GRASSEREE, IN HIS
OFFICIAL CAPACITY AS A NOXUBEE COUNTY
SHERIFF'S DEPUTY AND IN HIS INDIVIDUAL
CAPACITY, ALBERT WALKER, IN HIS OFFICIAL
CAPACITY AS SHERIFF OF NOXUBEE COUNTY AND
IN HIS INDIVIDUAL CAPACITY           DEFENDANTS

---

## *DEPOSITION OF KENDRICK SLAUGHTER*

---

*APPEARANCES*:

> *KIMLA C. JOHNSON, ESQUIRE*
> *RON L. WOODRUFF, ESQUIRE*
> Waide & Associates
> 332 North Spring
> Tupelo, Mississippi  38804
>
> *REPRESENTING THE PLAINTIFF*
>
> *J. LAWSON HESTER, ESQUIRE*
> Page Kruger & Holland
> 10 Canebrake Boulevard, Suite 200
> Jackson, Mississippi  39232
>
> *REPRESENTING NOXUBEE COUNTY*
> *& RODERICK WALKER*



(601) 825-6339     Fax (601) 825-1154
P. O. Box 1731, Jackson, MS 39215
www.sharronallen.com

EXHIBIT
1

1      Q.   Did they have any in-house training or
2    manuals or procedures that they taught to you?
3      A.   No, sir.
4      Q.   Okay.  How did you know how to do your job?
5    On-the-job training?
6      A.   Yes, sir.  And let me correct that.  It had
7    to be like 2000.
8      Q.   Okay.  Were you working full time with them,
9    or were you --
10     A.   Auxiliary.  Part-time auxiliary.
11     Q.   And about how much time a week were you
12   working with them?
13     A.   Maybe about two to three days a week.
14     Q.   All right.  While you were with them, did you
15   attend any kind of continuing education or law
16   enforcement education seminars?
17     A.   No, sir.
18     Q.   Okay.  How long were you with Brooksville PD?
19     A.   I would like to say about 2 -- 2 -- 2 months,
20   something like that.
21     Q.   All right.  From there, where was your next
22   experience in law enforcement?
23     A.   Noxubee County Sheriff's Department.
24     Q.   And do you recall the approximate date that
25   you started there?

1    Q.    And what was the usual percentage?

2    A.    Five percent.

3    Q.    Of whatever the ultimate recovery was?

4    A.    Yes, sir.

5    Q.    And how did you come in contact with

6    prospective clients for lawyers?

7    A.    Well, they contact me to go out there and

8    take statements and take pictures of incident.

9    Q.    Would you come into contact with people

10   during your law enforcement duties and somebody had

11   been in a wreck or something like that and say maybe

12   you need to go see a lawyer?

13   A.    No, sir.

14   Q.    All right.  Are you still with Aberdeen

15   Police Department?

16   A.    Yes, sir.

17   Q.    Okay.  What's your rank?

18   A.    Patrolman.

19   Q.    What's your schedule?

20   A.    Work 12 hours.  So 14 days out of a month.

21   Q.    And that shift gets varied up, changed up?

22   A.    Yes, sir.  We change every month.  We go to

23   nights.  And when they -- when the months that we go to

24   night, so we switch.

25   Q.    Any plans to leave Aberdeen right now?

1    *Q.*   Other than Robey, did you do ride- along with
2    anybody else?

3    *A.*   Yes, sir.

4    *Q.*   Who else did you ride along with?

5    *A.*   Terry Grasseree.

6    *Q.*   Okay.  Same sort of situation?  Kind of
7    getting you into the routine and showing you the ropes?

8    *A.*   Well, at the time I should be asleep, Terry
9    would come by the house and get me and say, man, let's
10   roll, so, you know, which all the time, you know, I was
11   observing.

12   *Q.*   All right.  And were y'all friends at that
13   time?

14   *A.*   Oh, yes, sir.

15   *Q.*   Had y'all been friends before you came on
16   with the sheriff's department?

17   *A.*   No, sir.

18   *Q.*   The first knowledge y'all knew of each other
19   was once you came on to the sheriff's department?

20   *A.*   No, sir.  Well, he told me he always wonder
21   who Shawn Slaughter was, you know, but we -- first time
22   I really just met Terry was like at the DHS officer.
23   My sister was down there having a little problem.  He
24   came up, and I showed up and that was my first --

25   *Q.*   Okay.  But as far as what I would say knowing

1    A.    Yes, sir.

2    Q.    -- do you know of any occasion where that's

3    happened?

4    A.    No, sir.

5    Q.    I want to go to the time -- about the time

6    that, you know, you make the decision I'm going to run

7    for alderman, and I'm talking about at a time before

8    you tell anybody else when you're just thinking about

9    it in your head.

10        When is the first time that you decided maybe

11   it's a good idea or maybe I ought to run for alderman?

12   A.    Probably November of 2004.

13   Q.    Okay.  When's the first time you told anybody

14   else?

15   A.    November.  I mean that's when everything

16   coming out that I going to run.

17   Q.    I'm going to run in the spring?

18   A.    For the next election, city election, in May.

19   Yeah.

20   Q.    Okay.  When's the first time you told anybody

21   at the County, you know, like anybody at the sheriff's

22   department, anybody that worked for the County that you

23   were going to run?

24   A.    I never told anybody from the County.  Just,

25   you know, once I qualified, I mean, you know.

1    Q.   All right.  When was the first time that

2    there wasn't -- everything wasn't okay -- between that

3    time when you say I'm declaring for the election when

4    was the first time after that everything wasn't okay

5    between either you and the sheriff or you and Terry?

6    A.   Everything was fine.  I just know that I went

7    to a meeting.  They called me for a meeting, and all

8    the deputies was there.  We had a little like a curfew

9    meetings there for the teenagers.

10   Then after that meeting, he told me to come

11   back a little later on they going to give me the

12   meeting about returning back to work, and that was

13   after the election and all that, but --

14   Q.   Okay.

15   A.   Let me jump back.  Before that, I know

16   Terry -- I was at the courthouse, and Terry came to me

17   and telling me about withdraw for the -- from ward 4

18   about running, you know, and he was like, man, I know I

19   can get you $3,000 if you, you know, get out of there

20   because what you going to do you're going to split the

21   black votes and let the white woman get in, you know,

22   but I can get you $3,000 if you -- if you come out so I

23   got to thinking like, you know, I ain't going to go

24   around -- you know, because I usually go around and

25   talk them this and that so I just I'm not going to go

1          *A.*    That never -- that never took place.  Like I

2     said, he telling me to do a good job.  If I get in

3     there, win or lose, I have my job back.

4          *Q.*    Okay.

5          *A.*    But at the time, I don't know what time that

6     was.

7          *Q.*    All right.  When he said you had your job

8     back, it was your understanding you had to be off

9     during the election period?

10         *A.*    Yes, sir.  That's what he told me.

11         *Q.*    Okay.  When he told you that, did it appear

12    that he was being ugly or rude to you?

13         *A.*    Oh, no, sir.  He just said that I was the

14    first one being a deputy every going to run for office

15    and being a deputy so he think it be the best that, you

16    know, I set the car down and, you know -- because he

17    said that he don't want to think nobody that I'm

18    campaigning in the car.

19         *Q.*    Okay.

20         *A.*    And he was nice about it, you know.

21         *Q.*    All right.  But he told you that it was his

22    position that while you needed -- while you were

23    running and campaigning and through the election that

24    you didn't need to be doing your law enforcement

25    activities because people might think you were

1    campaigning while on the job?  Is that fair to say?

2         A.   In a deputy position on the streets because I

3    was still working security.

4         Q.   Okay.  So as an auxiliary deputy, that was

5    something you had either a leave of absence from or you

6    were just off during the period of the election and

7    campaign period?

8         A.   I'm thinking he gave me just leave off until

9    after everything was over with.  After -- until after

10   the election was over with.

11        Q.   Okay.

12        A.   Because he had told me if I win or lose I

13   come back.

14        Q.   All right.  And was he talking about the

15   primary or the general election or do you know?

16        A.   May.  Primary election.  It was just me,

17   Mrs. Barbara, and Willie Man Dixon Democrat.

18        Q.   Okay.  And did he appear to encourage you to

19   run or discourage you to run?

20        A.   Oh, no, sir.  No, sir.

21        Q.   I mean, he seemed okay with it to you?

22        A.   He ain't had no said so about it.  He just

23   said that do a good job.  You -- when you -- if you win

24   or lose, you got your job.  You know, you come back.

25        Q.   But what I'm saying is:  It didn't appear to

1    at the door where the metal detector was.

2         Q.   And tell me exactly what was said to the best

3    of your recollection.

4         A.   Well, he came in.  He said, Shawn, you heard

5    about that white woman.  I said, what about her?  He

6    said, you know that white woman got in y'all's race

7    now, you know.  I said, she did?  He was, like, yeah.

8    Man, I'm telling you.  I can get you -- I can get you

9    $3,000 if you get out of the Ward 4.  Get out of that

10   election.

11        Q.   And what did you say?

12        A.   I'm like, man, I don't know, man.  I really

13   don't know like that.

14        Q.   Okay.  Then what did he say?

15        A.   He was just saying, man, I'm telling you.  I

16   can get you $3,000.  If you just get out, you know.

17   After a while, he went on to the sheriff's office.

18        Q.   Okay.  And that's all that was said?

19        A.   That was all that was said.

20        Q.   It was a brief conversation?

21        A.   Nods affirmatively).

22        Q.   Was it a brief conversation?

23        A.   Yes, sir.

24        Q.   Did he make any threats to you?

25        A.   No, sir.

1   town on Jefferson Street in front of the post office.
2   He turned his blue lights on, and we were meeting head
3   on -- I mean, not head on.  He was in his lane.  I was
4   in my lane.  So I stopped, and he pulled up beside me.
5   He was like, hey, meet -- come on down to the jail.
6   Meet me at the jail.  And I was okay.  So I went down
7   to the jail, and he pulled up at the gas pump, and he
8   had one of the inmates to come pump the gas in his car,
9   and I pulled up at the -- in front of the jail and he
10  told me to come on over so, I went over to his car, and
11  he said shut the door.  So I shut the door.  He was
12  like look here, man.  Don't deal with the department of
13  justice.  They ain't no good to fool with.
14      Q.   Okay.  At the time, I mean, when he flipped
15  his blue lights at you, that's just officers
16  communicating?
17      A.   Well, basically, yes, sir.  Speaking or --
18  yes, sir.
19      Q.   I mean, I've seen two law enforcement
20  vehicles pass on the road, and one of them will hit the
21  lights to the other one kind of like saying, hey, you
22  know, or something like that.
23      A.   Right.
24      Q.   Did you have the occasion that y'all would do
25  that as law enforcement officers to just get each

1    other's attention and say, hey, in the county?

2          A.   We haven't -- we haven't did that but that

3    day there.

4          Q.   Okay.

5          A.   You know, that was the first time he threw

6    his lights on me at that day.

7          Q.   Okay.  But at the time, you didn't think he

8    was arresting you that day or anything, did you?

9          A.   Oh, no, sir.  No, sir.

10         Q.   Just to get your attention?

11         A.   Right.

12         Q.   And he got your attention, and y'all both

13    pulled off close to each other and were able to talk?

14         A.   Right.

15         Q.   Okay.  You didn't think there was anything

16    unusual about, that did you?

17         A.   No, sir, I didn't.

18         Q.   Now, at the time that you were off during the

19    election, you wouldn't have been in a patrol car.  The

20    conversation you're telling me about just then when you

21    followed him to jail, your were in your Navigator?

22         A.   Yes, sir.  I was in my truck.

23         Q.   Okay.  At the time that you went off, as I

24    take it from your former testimony, you didn't think

25    you were fired during the election or anything like

1    Q.    Who did?

2    A.    Darryl Mitchell.  Officer Darryl Mitchell for

3    the City of Macon.

4    Q.    Darryl Mitchell told you that he saw --

5    A.    No, no, no.  No, sir.  Darryl -- he said

6    Darryl Mitchell came back and told me that he saw me

7    talking with the department of justice.

8    Q.    Okay.  Terry said that?

9    A.    Right.

10   Q.    And was there any other knowledge that you

11   were able to glean that Terry had about you and the

12   Feds?  Is it okay if I say Feds and mean department of

13   justice and/or FBI?

14   A.    Okay.  But what are you asking, though?

15   Q.    Okay.  Well, I'll get that, but that --

16   A.    Okay.

17   Q.    Are we okay with that?

18   A.    I mean, that's fine.  Yes, sir.

19   Q.    The Feds?

20   A.    Yes, sir.

21   Q.    From y'all's conversation, you and Terry's

22   conversation, were you able to understand that he knew

23   anything other than what Darryl told him about your

24   cooperation with the Feds?

25   A.    I really can't answer that.  I just know

1    that's what he had told me, that Darryl Mitchell, you

2    know.

3         Q.   How long did that conversation last?

4         A.   Not long.

5         Q.   All right.  He got in -- you got in the car

6    with him?

7         A.   Yes, sir.

8         Q.   And he said -- did he say, you know, Darryl

9    told me that you were talking to the department of

10   justice or --

11        A.   Pretty much, yes, sir.

12        Q.   Okay.  And what did you tell him?

13        A.   I basically like, man, Darryl ain't see me

14   nowhere talking to no department of justice.  Where he

15   get that from, you know.

16        Q.   Okay.

17        A.   Then he was like, well, he say he saw you

18   down at the city hall talking with department of

19   justice.

20        Q.   All right.  Had you talked to the department

21   of justice at that time?

22        A.   Yes, sir.  I think I -- yes, sir.  Yes, sir.

23        Q.   Had you talked to the FBI at that time?

24        A.   Department of justice is the FBI.  Correct?

25        Q.   No.  They are separate bureaus that work

1  Terry you were talking to the --

2      A.   Darryl Mitchell.

3      Q.   After you said, well, Darryl didn't see me

4  doing anything anywhere, what did Terry say?

5      A.   He basically just said, man, just don't deal

6  with the department of justice.  They ain't no good to

7  fool with.

8      Q.   Okay.  Did he tell you why they weren't good

9  to fool with?

10     A.   No, sir.

11     Q.   Did he tell you I'm ordering you not to talk

12  to them?

13     A.   He just told me not to fool with the

14  department of justice, they not no good to fool with.

15     Q.   Okay.  But, I mean, did he tell you anything

16  about what would happen if you did?

17     A.   No, sir.

18     Q.   Did he threaten you in any way?

19     A.   Only thing he said do not fool with the

20  department of justice.  They are not good to fool with.

21     Q.   Okay.  But did he tell you what would happen

22  if you did in any way?

23          MR. WOODRUFF:  Object to the form.

24  BY MR. WILSON:

25     Q.   You know, if you talked to them again,

1      A.   Right.  Well, he was like do you understand.

2  I said, yes, sir.  Now you -- what you do, you keep

3  your gun and then the belt and stuff and -- because I

4  still want you to work security.

5      Q.   Okay.

6      A.   Like that.

7      Q.   Did he say you couldn't -- you weren't going

8  to be able to come back to the sheriff's department?

9      A.   Yes, sir.  He always -- also said that, look

10  here, I want you to take a few months off to think

11  about what you can do for the county, put it on a

12  letter, and give it back to me.

13      Q.   Okay.  Do you know why he wanted you to think

14  about what you could do for the county?

15      A.   No, sir, I don't.

16      Q.   Okay.  Did he ever say, you know, when you

17  come back I want you to be dedicated to this job?

18      A.   He just told me to take the months off.

19      Q.   All right.

20      A.   And to have it in a letter when I get -- you

21  know, bring it to him on a letter.

22      Q.   Okay.  What was your understanding of why he

23  wanted you to write a letter about what you could do

24  for the county?

25      A.   I don't know.  You have to ask him that.

1      *Q.*   Okay.  You can't tell us what his desires

2  were or anything he said to you about why he wanted

3  that done?

4      *A.*   You have to ask him on that, sir.

5      *Q.*   Okay.  So that would have to come from him?

6      *A.*   You've got to ask him, sir.

7      *Q.*   Okay.  Did Terry say anything?

8      *A.*   No, sir.

9      *Q.*   He never mentioned any -- he never spoke?  He

10  just was observing the meeting?

11      *A.*   He was just there, and Sheriff just said only

12  way I got Boo here because Boo is the president of --

13  William Boo Oliver -- he said only why I got William

14  Boo Oliver here because he's the president and he wants

15  to support the sheriff with the moneywise.  That's why

16  I've got him there -- here.

17      *Q.*   Because it's county business, and he's on the

18  county board of supervisors?

19      *A.*   He just told me only way he got William Boo

20  here because he -- he's -- he provide the money to the

21  sheriff's department.

22      *Q.*   For their operating budget?

23      *A.*   Yes, sir.

24      *Q.*   Okay.  Did Mr. Oliver ever say anything?

25      *A.*   No, sir, he didn't.

1    Q.    He never opened his mouth?

2    A.    No, sir.

3    Q.    Terry never opened his mouth?

4    A.    No, sir.

5    Q.    And the only things that the sheriff said,

6    from what I understand, is he said you ran and made it,

7    you know, more likely that a white person would get

8    elected by splitting the black vote?  He said that?

9    A.    He said that.

10   Q.    Okay.  And he said I want you to take a

11   couple of months off, or did he say a specific time?

12   A.    He told me like two or three months.  I want

13   you to take two or three months off and put in a letter

14   what you can do for the county.

15   Q.    Okay.  And that's all he said?

16   A.    I think so, yes, sir.  I think that about

17   all.  Yes, sir.

18   Q.    So this is a fairly short meeting?

19   A.    Yes, it was.

20   Q.    Okay.  And --

21   A.    Like I say, he did tell me that -- to keep

22   the -- the gun belt and the gun because he still wanted

23   me to do security work at the courthouse.

24   Q.    Okay.  After that time, did you do any

25   security work?

1    A.    I can't recall.  I can't.

2    Q.    All right.  Did you agree that you would stay

3 on and do security work?

4    A.    Yes, sir, I did.

5    Q.    Okay.  And did you plan to -- to figure out

6 what you could do for the County and report back to

7 him?

8    A.    I never thought of it.

9    Q.    Okay.  I mean, did you have any plan in that

10 regard of what you were going to do?

11    A.    Well, I did have in my mind that, look here,

12 I got to go get me a job.

13    Q.    Okay.  He didn't say you're fired, did he?

14    A.    No, sir, he didn't.

15    Q.    He wanted you to continue with your leave of

16 absence on the -- as the auxiliary unpaid deputy until

17 you came back to him and told him what you could do for

18 the County?  Based on your understanding of what he

19 told you, that was his desire?

20    A.    Correct, sir.

21    Q.    Okay.  And -- but he did want you to stay on

22 in your paid position of courthouse security?

23    A.    Yes, sir.  He told me to keep the equipment

24 and work security.  Yes, sir.

25    Q.    All right.  Did he say anything like I'm

1      A.    No, sir.

2      Q.    And you've never discussed any of that with

3  Albert Walker?

4      A.    No, sir.

5      Q.    You don't know whether or not Albert Walker,

6  do you, had any knowledge of you talking to the --

7  either the FBI or department of justice?

8      A.    I don't know, sir.

9      Q.    All right.  Now, at the time period that you

10  had that meeting with the sheriff and Oliver and

11  Grasseree, did the sheriff ask you to work a certain

12  date for courthouse security?

13      A.    Well, I know he be writing on a piece of

14  paper the days that he want me to work, but I don't --

15      Q.    Did he give that piece of paper to you?

16      A.    In the past, I know he have.

17      Q.    Okay.  Did he at that meeting or shortly

18  thereafter tell you when you needed to work?

19      A.    No, sir.

20      Q.    All right.  And so this is at the end of June

21  that that conversation took place.

22            Had you already applied at Aberdeen at that

23  point?

24      A.    I applied Aberdeen some time in June, last of

25  June, but, no, sir, it was after that meeting.

1      Q.    Okay.  So did you know Aberdeen was looking

2   for folks prior to that time?

3      A.    Louella Stephenson told me.  At that time,

4   no, sir.  It was after.

5      Q.    You've alleged that Terry Grasseree is an

6   ally, a political ally, of Ike Brown.  Tell me what

7   proof you have of that.

8              MR. WOODRUFF:  Object to the form.

9   BY MR. WILSON:

10     Q.    What do you know about that?  I mean, do you

11  know that to be true?

12     A.    Well, I just know one -- one Saturday morning

13  sheriff called me to do the security up there at the

14  courthouse because it was something -- after some

15  election, and I remember seeing Terry, Ike Brown, and a

16  couple more peoples at the board -- at the table.  He

17  was on some kind of committee, Democratic committee.

18  Him and Ike Brown.

19     Q.    Okay.  And you've been in the election game a

20  little bit.  Do you know that sometimes if there's an

21  election contest or there's some issues regarding an

22  election that afterwards the party committee will meet

23  to discuss those issues and contemplate those issues?

24     A.    No, sir.  That was my first one.

25     Q.    Okay.

1          A.    They was in up at the courthouse, and they

2    was sitting behind a table like this one, and people

3    that ran got up and spoke and said this and that and --

4          Q.    All right.  So this was a meeting between the

5    candidates for office and the political executive

6    committee?

7          A.    Yes, sir.

8          Q.    That was held at the courthouse?

9          A.    Yes, sir.

10         Q.    And the sheriff wanted a deputy there working

11   security in case anything got out of hand or they

12   needed security?

13         A.    Yes, sir.  Right.

14         Q.    Okay.  And he asked you to do it?

15         A.    Yes, sir.

16         Q.    Okay.  You saw Terry was on the Democratic

17   committee at that time?

18         A.    Yes, sir.

19         Q.    When did that happen?

20         A.    I want to say it was around -- I want to say

21   2003.  It was around that time.  I'm not -- you know.

22   2003, I'll say.

23         Q.    Okay.  And were Ike Brown and Terry talking

24   to the side by themselves?

25         A.    All of them doing talking.  All of them was

1    one that -- the one that Grasseree and Clanton were in?

2        A.    Yes, sir.

3        Q.    Okay.  And you were in what car?

4        A.    I was in my Navigator.  Lincoln.

5        Q.    You still got that car today?

6        A.    Yes, sir.

7        Q.    Okay.  Tell me what happened from that point.

8        A.    Okay.  I was seeing the patrol car.  They

9    throwed the blue lights on.  I throwed my hand up out

10   the window speaking, and so once I turned off on

11   Magnolia Drive and I was head like -- I was still on

12   Magnolia Drive like heading towards -- going to go to

13   town -- downtown and I looked in my mirror I seen the

14   patrol car back behind me again with the lights going,

15   the blue lights going, so I pulled over, and then I

16   noticed Terry stepping out.  Then I seen Boogerman.

17   Boogerman John Clanton.  They call him boogerman and so

18   Terry came over to my side.  He was like --

19       Q.    Boogerman or Booker?

20       A.    I just say Boogerman, I know him.

21       Q.    You don't know if it's with a K or a G?

22       A.    I really don't know.

23       Q.    Okay.

24       A.    And Terry came on my side.  I let the window

25   down.  He said, look here, I'm going around to the

1    other side because I don't want to get hit by no car, I

2    said okay, so I let the passenger window.  He said,

3    look here, you need to go see the sheriff.

4        Q.   Okay.  Let's stop right there before y'all

5    start talking.

6             I mean, did you feel like you were being

7    arrested at that point?

8        A.   No, sir.  At that time, no, sir.

9        Q.   Okay.  I mean, was it your understanding and

10   your belief that this was just a fellow officer wanted

11   to pull you over and talk or you to pull over so y'all

12   could talk?

13       A.   Like I say, I thought he just pulling over

14   just hollering at me about something.

15       Q.   Yeah.  You know, either -- whether it's to

16   talk to you about something specific or just to talk?

17       A.   Just to holler at me.  Just to --

18       Q.   Yeah.  Okay.  As you would expect a friend or

19   somebody you worked with when you see them out

20   somewhere, you know, I would do that to one of my

21   friends.  Did you think it was anything different than

22   that?

23       A.   Only thing I know, he just pulled me over,

24   and I'm thinking it was just -- you know, just to

25   holler at me or something like that.

1    Q.    And did he come up to your passenger side?

2    A.    Yes, sir.

3    Q.    All right.  And who talked first?

4    A.    He did.  He said, look here, man.  You need

5    to go see the sheriff.

6    Q.    Did he say why?

7    A.    No, sir.

8    Q.    Just said you need to go see the sheriff?

9    A.    Yes, sir.

10   Q.    Have you read your testimony from the hearing

11   that was down in Jackson?

12   A.    No, sir.

13   Q.    Okay.  Then what did you say in response to

14   him?

15   A.    I like, well, I go see him, but right now, I

16   got to take care of some business.  He said, no.  You

17   need to go see the sheriff now.  I said, hold up, man.

18   I'm a grown, man.  I said, I'm going to go see the

19   sheriff when I get a chance to.  I tell you what.  I'm

20   going to give you to 10:00 to go see the sheriff.  I

21   said I tell you what.  You go tell the sheriff it will

22   be after ten before I see him, you know.  Motherfucker,

23   you don't know me.  You don't, motherfucker, know me.

24   I pull you out of this goddamn truck and kill you.

25   Then he went in front of my truck and hit my hood.

1    Motherfucker, I pull you out of this goddamn truck, and

2    he came back around to the passenger side.  I said, do

3    what you got to do.  Do what you going to do, you know.

4    Motherfucker, you better leave before I do something to

5    you.  I pulled off.  Then I looked in my mirror.

6        Q.   Let's stop right there.

7        A.   Okay.

8        Q.   From what you've told me, it wasn't anything

9    else said that you can remember?

10                MR. WOODRUFF:  Object to the form.

11   BY MR. WILSON:

12       Q.   I mean, you told me what the conversation was

13   from start to finish.  Were those all the statements

14   that you can remember by either Terry Grasseree or

15   yourself?

16       A.   That was -- that was -- at that moment,

17   that's all he had said -- that we were saying.

18   Motherfucker, this.  I kill you.  I pull you out of

19   this goddamn truck.

20       Q.   Did you ever use a curse word?

21       A.   No, sir.  I said do what you got to do.  Do

22   what you got to do.

23       Q.   Okay.  Was he in uniform?

24       A.   I'm thinking he was dressed in his slacks,

25   slacks and a --

1   getting out from under the steering wheel.

2       Q.   And I'm not trying to bug you about it or

3   anything.  I just want to make sure I know everything

4   that you're going to say everybody said.

5       A.   Yes, sir.

6       Q.   Other than the statements you've relayed to

7   me, was there anything said by either you or by Terry

8   Grasseree between the time that you got -- you pulled

9   over and the time that your vehicle started moving

10  forward?

11      A.   That was about all.  He was just basically

12  saying what he was saying that motherfucker I do this

13  to you.  Motherfucker, I kill you.  I pull you out of

14  this goddamn truck and I'm like do what you got to do.

15  Go on.  Do what you going to do, you know.

16  Motherfucker, you better leave before I do something to

17  you.

18      Q.   Okay.

19      A.   And then I pulled off.

20      Q.   And what happened next?

21      A.   Okay.  When I was heading on Magnolia Drive,

22  went around a little curve to hit Washington.

23  Washington?  Yes, sir.  I'm thinking it was Washington,

24  so as I was going down Washington, that's when I seen

25  the blue lights coming, blue lights, so what I did, I

1    Q.    And then you take a right onto Washington?

2    A.    Yes, sir.

3    Q.    All right.  And at that point when you're on

4    Washington, you're headed south?

5    A.    Correct, sir.

6    Q.    And, boy, don't worry about correcting me

7    because I'm bad with directions.  I just want to make

8    sure we're all heading the same direction.

9    A.    Yes, sir.

10   Q.    All right.  Before you turned onto Washington

11   headed south, did you ever see the vehicle that Clanton

12   and Grasseree were in?

13   A.    No, sir.  When I was pulling off, I looked in

14   my mirror.  They was -- he had his arm fold talked to

15   John Clanton just looking doing this right here, you

16   know.

17   Q.    What's the speed limit out there on Magnolia?

18   A.    Speed limit have to be like 30 miles per

19   hour.

20   Q.    Okay.  Did you exceed the speed limit at any

21   time --

22   A.    I'm not for sure on that, but I'm thinking it

23   was 30.  I know I wasn't going, you know, over 30.

24   Q.    Okay.  When you took off, did you spin your

25   wheels at all?

1      A.   No, sir.

2      Q.   All right.  Did you -- they didn't disturb

3   gravel and throw gravel when you took off?

4           MR. WOODRUFF:  Object to the form.

5      A.   No, sir.

6   BY MR. WILSON:

7      Q.   Did it ever make a screech noise?

8      A.   No, sir.

9      Q.   All right.  Now, how long was it after you

10  turned on Washington that you realized or -- that the

11  police car or the sheriff's department car was still

12  behind you or had its blue lights on?

13     A.   Well, I got on down a good little piece when

14  I seen the blue lights -- the car coming with the blue

15  lights on.  So what I did, it turned off on -- I don't

16  know the name of the street.  Anyway, I turned off.

17     Q.   To the left?

18     A.   To the left.

19     Q.   And you would have been headed east at that

20  point?

21     A.   Okay.  And once I got to that stop sign, I

22  turned a right at another block, and so when I seen

23  them coming behind me, now they behind me, and so what

24  I did, I took another right to go back and hit

25  Washington, so I took the left to get on Washington.

1    By the time I got to the stop sign behind Bill's Dollar

2    store, that's when he bumped my truck.

3        Q.    Okay.  Let's stop there and catch up.  Why

4    did you turn off of Washington and back -- you know,

5    why did you do the U off of it and come back on?

6        A.    Basically, I said I'm going to get out of

7    this guy's way.  You know, then I noticed he was just

8    coming behind me.  You know, I said, I better go on to

9    the courthouse.

10          By the time I got to the stop sign behind

11   Bill's Dollar Store, that's when he bumped my truck.

12              MR. WILSON:  Off the record.

13                  (OFF THE RECORD)

14       A.    So after that I said, uh-uh, go on to the

15   courthouse, so I went on and parked behind the

16   courthouse right on Washington, and when I was getting

17   out of my truck, Terry running toward me.  He like come

18   on, come on, you going to go with me.  I said no I'm

19   going to go in here and talk to the sheriff.  You

20   talking about killing me out here.  I'm going to go

21   talk to the sheriff.

22              No.  You got to come on.  I'll talk to you at

23   the jail.  You come on.  Then Boogerman grabbed me and

24   said that -- John Clanton said that, Shawn, just come

25   on.  Just come on.

1    Q.   Before the time -- that time when you got to

2  the courthouse and in between that and when you were

3  pulled over, did anybody tell you not to raise your

4  voice?

5    A.   No, sir.

6    Q.   At any point in time, did you ever put your

7  vehicle in reverse between the time that you pulled off

8  from Magnolia and the time that you got to the

9  courthouse?

10   A.   No, sir.

11   Q.   All right.  Now pick me up at -- we're at the

12 courthouse.

13   A.   Okay.  We was at the courthouse, and I was

14 opening my door to get out.  Terry Grasseree ran over

15 there, you know, and I said, no.  I'm going to talk to

16 the sheriff.  You talking about killing me out here.

17 I'm going to go talk to the Sheriff.

18         No.  You just come on.  I talk to you at

19 jail, you know.  Just come on with me.

20         And John Clanton like, Shawn, just come on.

21 So they got me and just put me in the back of the

22 police car.

23   Q.   Did they cuff you?

24   A.   No, sir.

25   Q.   Did he hit you?

1   Q.   But your were let go on your own
2   recognizance?
3   A.   On $100.
4   Q.   And you had to pay a $100, which is an
5   administrative fee for the tickets as I understand it?
6   25 per ticket?
7   A.   No.  I'm thinking they called $25 a charge
8   for turning a key or something they have to do.  The
9   bond fee was $100.
10   Q.   All right.  But you didn't have to come out
11   of your pocket or nobody came out of their pocket with
12   $2,000?
13   A.   A hundred dollars.
14   Q.   All right.  Who all goes with you to Albert
15   Walker's office?
16   A.   Lashanda Beaman.  Lashanda Hoskins and
17   Louella Stephenson.
18   Q.   And once you reach that office, who's the
19   first person to talk?
20   A.   I did.
21   Q.   Who you talking to?
22   A.   Sheriff Albert Walker.
23   Q.   And what did you say to Sheriff?
24   A.   I was like, Sheriff, they say you wanted to
25   see me, so he was like well, I just -- well, Slaughter,

1  only thing I wanted was you -- to let you know I had a

2  check for you which I turned it back in to the

3  accountant and that see if you're still going to work

4  for the security.

5          I said hold on, sheriff.  All this and I just

6  went to jail and all this and Terry behavior.  What

7  about Terry behavior?

8          I ain't got nothing to do with Terry.  I

9  ain't got no control over Terry behavior.

10     Q.   Okay.

11     A.   Then -- then Louella Stephenson was like,

12  well, who in control then?  You or either Terry?

13     Q.   Well, let me ask you this:  Is that his exact

14  words?

15     A.   That's what he said, sir.

16     Q.   Give me his exact words.

17     A.   I just told you, sir.  He just said -- he was

18  like --

19     Q.   Yeah.  But you said it two times a little bit

20  different.

21     A.   Okay.

22          MR. WOODRUFF:  Object to the form.

23  BY MR. WILSON:

24     Q.   Tell me what he said.

25     A.   Basically, he was like, Slaughter, I just

1      *Q.*   All right.  Well, you've alleged that there's
2   a conspiracy, that people got together and planned
3   ahead of time to intimidate you from talking with
4   federal officials.
5          That's what you've said in your lawsuit, so I
6   guess one -- my first question about that is:  Who are
7   the people that you think got together and formed an
8   agreement to try to intimidate you?
9      *A.*   I feel like Noxubee County Sheriff's
10  Department.
11     *Q.*   Okay.  And specifically who within that?
12     *A.*   I mean, Sheriff Walker, Albert Walker, and
13  Terry Grasseree, and also Ike Brown.
14     *Q.*   Who?
15     *A.*   Ike Brown.
16     *Q.*   Okay.  And so my next question would be:
17  What are the facts that you rely -- what makes you
18  think that they got together on the front end and
19  decided to try to intimidate you?
20     *A.*   I think they tried -- they tried to get me
21  out of that alderman race, and he offered me the $3,000
22  to withdraw because I'm going to split the black votes.
23     *Q.*   Okay.  But that all happened long before your
24  arrest.  Right?
25     *A.*   Um-hum.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

| | | |
|---|---|---|
| KENDRICK SLAUGHTER | ) | Case No._____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF NOXUBEE, MISSISSIPPI; | ) | |
| RODERICK D. WALKER, in his official | ) | |
| capacity as Noxubee County Attorney, | ) | |
| TERRY GRASSEREE, in his official capacity as | ) | |
| a Noxubee County Sheriff's Deputy and in his | ) | |
| individual capacity, ALBERT WALKER, in his | ) | |
| official capacity as Sheriff of Noxubee County and | ) | |
| in his individual capacity | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |

## VERIFIED COMPLAINT

### I. PRELIMINARY STATEMENT

1.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 that challenges the

constitutionality of the action of the Noxubee County Sheriff's Department and other officials that

resulted in the arrest, detention and incarceration of Plaintiff Kendrick Slaughter. Criminal charges,

amounting to five (5) misdemeanors, were levied against Plaintiff because of his communication

with the United States Department of Justice, Civil Rights and Voting Section (hereinafter "Justice

Department"), in a case that is attempting to prosecute certain Noxubee County officials and party

bosses. In other words, police retaliated against Plaintiff because he exercised his First Amendment

right to speak with the Justice Department concerning matters of great public importance.  The

criminal charges are presently pending in the Justice Court of Noxubee County, Mississippi

EXHIBIT
tables'
2

(hereinafter "County").

2.      This action is also brought pursuant to 42 U.S.C. § 1985 and alleges that Defendants conspired to deter, by force, intimidation or threat, Plaintiff from communicating and/or testifying as a witness for the Justice Department. Further this action alleges that Defendants levied five (5) baseless criminal charges against Plaintiff for the purpose of impeding, hindering, obstructing, and/or defeating, in any matter, the due course of justice in the State of Mississippi. Defendants conspired and intended to deny Plaintiff of his civil rights, specifically his First Amendment and Due Process rights. In other words, Defendants conspired to intimidate Plaintiff, via the deprivation of his civil rights, from taking the witness stand to testify in the matter of *United States v. Ike Brown, et al.*, Civil Action No. 4:05cv33TSL-AGN.

3.      Plaintiff seeks temporary, preliminary and permanent  injunctive relief against further prosecution of the pending criminal charges, as well as a declaration that the actions of the sheriff's department violated his constitutional rights. Plaintiff also seek nominal, actual and punitive damages against Defendants for the flagrant, wilful, knowing, violation of Plaintiff's First, Fourth and Fourteenth Amendment rights, as well as the costs of this litigation, including reasonable attorney' fees.

## II. JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343(3)(4), which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities as stated herein. The Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. § 2201 and 2202. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

### III. VENUE

5.     Venue is proper in the United States District Court for the Southern District of Mississippi, Eastern Division, pursuant to 28 U.S.C. § 1391(b), because the claims arise in Noxubee County, Mississippi.

### IV. IDENTIFICATION OF PLAINTIFFS

6.     Plaintiff Kendrick Slaughter is a citizen of the United States and is an adult, resident of Noxubee County.

### V. IDENTIFICATION OF DEFENDANTS

7.     Defendant County of Noxubee, Mississippi, is a political subdivision organized and existing under the laws and Constitution of the State of Mississippi.  The County operates and maintains the Noxubee County Sheriff's Department.

8.     Defendant Roderick D. Walker (hereinafter "Walker"), County Attorney for the County of Noxubee, is the chief law enforcement officer for the said County.  He is sued in his official capacity.

9.     Defendant Terry Grasseree (hereinafter "Grasseree") is the Chief Deputy for the County of Noxubee.  Upon information and belief he is a resident of Macon, Mississippi. He is sued in his official and individual capacity.

10.     Defendant Albert Walker (hereinafter "Walker") is Sheriff of the County of Noxubee.  Upon information and belief, he is a resident of Macon, Mississippi. He is sued in his official and individual capacity.

### VI. STATEMENT OF FACTS

11.     Plaintiff is a former sheriff's deputy for the County of Noxubee, Mississippi.

12.     Plaintiff is presently a police officer for the City of Aberdeen, Mississippi.

## United States Department of Justice Files Suit

13.     On or about February 17, 2005, the Justice Department filed a lawsuit in the

Southern District of Mississippi alleging that certain Noxubee County officials and party bosses had

violated federal election laws. *See Complaint*, attached hereto as Exhibit "1."

14.     Specifically, the Justice Department alleged that certain election practices and

procedures in Defendant County violated Sections 2 and 11(b) of the Voting Rights Act of 1965,

as amended, 42 U.S.C. § 1973. *Id.* The Justice Department also alleged violations of the Fourteenth

and Fifteenth Amendments to the United States Constitution. *Id.*

15.     The Complaint alleges that Ike Brown, the Noxubee County Democratic

Executive Committee and others acting in concert with them violated the Voting Rights Act by

engaging in race-based voting discrimination, which had the purpose and result of denying white

voters, white candidates and those supporters the right to participate fully in the electoral process.

*Id.*

16.     Defendant Grasseree has been, in the past and as recently as 2003, a member of

the Democratic Executive Committee for Defendant County and is a political ally of Ike Brown.

17.     Due to the fact that Plaintiff has witnessed Defendant Grasseree serving as a

member of the Noxubee County Democratic Executive Committee, Plaintiff believes that Defendant

Grasseree is a defendant in the Justice Department's case.

## Defendant Grasseree Attempts to Muscle Plaintiff out of the May 2005 Election

18.     Defendant Grasseree's hostility towards Plaintiff stems from the May 2005 election

campaign held in the City of Macon, Mississippi.

19.     In the May 2005 race, Plaintiff entered an Alderman's race with one black candidate

and one white candidate.  Plaintiff was informed by Defendant Graseree that his candidacy would

split the black vote and make it more likely that the white opponent would win.  Defendant
Grasseree offered Plaintiff $3,000.00 to withdraw from the race.

20.      Plaintiff refused Defendant Grasseree's bribe and kept his hat in the ring.

21.      Plaintiff was employed in the Noxubee County Sheriff's Department for
approximately two years before the 2005 election.  Because Plaintiff was a candidate in a race for
a public office.  Plaintiff was not permitted to continue his employment while he was a candidate
for elected office.

22.      At the conclusion of the election, Plaintiff met with William (Boo) Oliver of the
Noxubee Board of Supervisors, Defendant Albert Walker,  Defendant Grasseree to discuss re-
assuming his position with the Noxubee County Sheriff's Department.  Defendant Albert Walker
informed Plaintiff that there were too few blacks in office and Plaintiff's candidacy made it more
likely that a white candidate would be elected. Therefore, Defendant Albert Walker informed
Plaintiff that he could not have his job back at this time, but was to use the time off to think about
what he could do for the county.

### Defendants Grasseree tells Plaintiff not to talk to the Justice Department

23.      After the May 2005 elections came to a close, Defendant Grasseree's attitude
towards Plaintiff became increasingly hostile after Defendant Grasseree thought Plaintiff was talking
to attorneys from the Justice Department, on or about May 17, 2005.

24.      This hostility further increased when Defendant Grasseree learned that Plaintiff
was also speaking to agents from the Federal Bureau of Investigation.

25.      While Plaintiff was driving his vehicle, sometime between mid-May and early
June, Defendant Grasseree activated his blue lights and signaled for Plaintiff to pull his vehicle over.

26.      Plaintiff complied.

27.     Defendant Grasseree then asked Plaintiff to follow him to the Noxubee County Jail.

28.     When Plaintiff arrived at the jail, Defendant Grasseree signaled for Plaintiff to get in his patrol car.

29.     Plaintiff, once again, complied.

30.     Once Plaintiff was inside the vehicle, Defendant Grasseree told Plaintiff, "don't fool with those Justice Department people. Don't fool with them because they ain't no good to fool with. Don't deal with the Justice Department."

31.     Plaintiff's impression of that conversation was that Defendant Grasseree had ordered that Plaintiff no longer have any further communications with anyone from the Justice Department staff.

### Justice Department Provides its Rule 26(a) Disclosures

32.     Shortly thereafter, on July 15, 2005, Defendant Grasseree become openly hostile to Plaintiff and instigated criminal proceedings against Plaintiff.

33.     The July 15, 2005 incident between Plaintiff and Defendant Grasseree occurred two days after the Department of Justice served their Rule 26(a) disclosures which specifically listed Plaintiff as a party who may have information pertaining to the Justice Department lawsuit.

34.     Upon information and belief, Defendant Grasseree was shown the Justice Department's Rule 26(a) disclosures and, therefore, was aware that Plaintiff had been communicating with the attorneys from the Justice Department in direct violation of Defendant Grasseree's order.

### Plaintiff is falsely arrested, detained and incarcerated by Noxubee County Sheriff's Department because of his cooperation with the Justice Department and the exercise of his constitutionally protected rights

35.     On or about July 15, 2005, Plaintiff was driving southbound on U.S. Highway 45

when a marked patrol car driven by Defendant Grasseree passed Plaintiff heading northbound on U.S. Highway 45.

36.    As Defendant Grasseree's vehicle passed Plaintiff's vehicle, Defendant Grasseree briefly activated his patrol car's blue lights and then quickly turned them off.

37.    As stated above, Plaintiff is a former deputy sheriff for the Defendant County. Plaintiff believed that Defendant Grasseree activated his blue lights in an effort to communicate a greeting or acknowledgment.

38.    In response to Defendant Grasseree quickly activating and turning off his blue lights, Plaintiff waved at Defendant Grasseree as he passed his vehicle heading in the opposite direction.

39.    After Defendant Grasseree passed Plaintiff's vehicle, Plaintiff continued on his regular course of business.

40.    Shortly thereafter, Plaintiff turned right off of U.S. Highway 45 onto Magnolia Drive, heading towards the City of Macon, Mississippi.

41.    Plaintiff was traveling at the posted speed limit.

42.    Plaintiff traveled on Magnolia Drive for approximately three (3) miles. Plaintiff then checked his rear-view mirror and noticed that Defendant Grasseree's patrol car was behind him.

43.    Defendant Grasseree had activated his vehicle's blue lights.

44.    Due to the fact Defendant Grasseree did not turn off the blue lights this time, Plaintiff pulled his vehicle over to the side of the road.

45.    Defendant Grasseree exited his vehicle and approached Plaintiff. Defendant Grasseree then informed Plaintiff that the reason he had "pursued" Plaintiff was to notify Plaintiff that Defendant Walker had wished to speak with Plaintiff.

46.     Defendant Grasseree did not provide any other reason for stopping Plaintiff.

47.     Plaintiff informed Defendant Grasseree that he had certain obligations he needed to attend to and would make sure to visit with Defendant Walker afterwards.

48.     At this point Defendant Grasseree became agitated.  He responded to Plaintiff "no, you need to see him [Defendant Walker] now.  I'll tell you what, you have got until 10:00 a.m. to go see him."

49.     Plaintiff then informed Defendant Grasseree that it would be after 10:00 a.m. before he could visit with Defendant Walker.

50.     At this point, Defendant Grasseree became even more agitated and began to exhibit hostile tendencies.  Defendant Grasseree also began swearing and using profane language.

51.     Defendant Grasseree then walked in front of Plaintiff's stopped vehicle.

52.     Defendant Grasseree then stated, "mother f***er, I 'll pull you out of this d**n truck and kill you."

53.     Plaintiff, in shock by Defendant Graseree's display of hostile and violent actions, stated, "well, just do what you go to do."

54.     Defendant Grasseree then told Plaintiff he better leave before Defendant Grasseree did something to Plaintiff.

55.     Believing the "something" was a direct reference to violence and believing that he was free to go, Plaintiff took Defendant Grasseree at his word and left.  Plaintiff then saw Defendant Grasseree having a conversation with Noxubee County Sheriff Deputy John Clanton.

56.     As Plaintiff continued to drive towards downtown Macon, Plaintiff, once again, noticed Defendant Grasseree was behind his vehicle.

57.     When Plaintiff stopped his vehicle at a stop sign, Defendant Grasseree hit Plaintiff's

Page 8 of 18

vehicle with his patrol car.

58.     Plaintiff, now even more concerned by Defendant Grasseree's rash behavior, continued to the Noxubee County Courthouse, where he parked his vehicle.

59.     As Plaintiff attempted to exit his vehicle, Defendant Grasseree and Deputy Clanton immediately placed Plaintiff under arrest.

60      Defendant Grasseree then told Plaintiff that Plaintiff "was going with me [Defendant Grasseree] to the jail and talk." As Plaintiff was led to the jail, Grasseree snapped at Plaintiff and yelled "I don't want you to say a mother f***ing thing in my jail, not a word!"

61.     Plaintiff was informed that he was being charged with driving on the right half of the roadway, reckless driving, disorderly conduct - failure to comply with a request or command of law enforcement, disorderly conduct - breach of peace and failure to yield to blue lights.

62.     All of the charges levied against Plaintiff were baseless and without probable cause.

63.     Plaintiff was taken to jail were he had to post a $2000.00 bond and was released on a $100.00 appearance bond.

64.     Shortly thereafter, Plaintiff learned that Defendant Walker had only requested Plaintiff's presence because Defendant Walker wanted Plaintiff to assist with security in the Noxubee County Courthouse on a future date. Defendant Walker also wanted to inform Plaintiff that he had a paycheck waiting for him that was related to previous security work he had done at the courthouse.

65.     Under normal circumstances, such information would have been communicated via a telephone call from the clerk.

66.     Plaintiff confronted Defendant Walker about Defendant Grasseree's behavior and Defendant Walker informed Plaintiff that there was nothing he could to about Defendant Grasseree.

67.     Due to the fact that the Justice Department's lawsuit is still ongoing and Plaintiff is cooperating and communicating with the Justice Department, Plaintiff remains in fear of future retaliatory measures that may be undertaken by Defendants.

### Justice Department moves the Court for an Injunction prohibiting Ike Brown and the Noxubee County Democratic Executive Committee from Threatening, Harassing or Intimidating its Witnesses.

68.     On or about September 22, 2005, the Justice Department filed for an injunction in federal court, which would prohibit Ike Brown and/or the Democratic Executive Committee from threatening, harassing or intimidating its witnesses in the matter of *United States v. Ike Brown, et al.*, Civil Action No. 4:05cv33TSL/AGN.

69.     One of the motivating factors for the Justice Department's motion were the events that took place on July 15, 2005, in which Plaintiff, because of his cooperation with the Justice Department, was threatened, harassed and intimidated by Defendant Grasseree. *See United States Memorandum of Law in Support for an Injunction*, attached hereto as Exhibit "2."

### Plaintiff Faces Irreparable Injury Absent Immediate Injunctive Relief

70.     The actions of Defendants have violated Plaintiff's First, Fourth and Fourteenth Amendments rights, 42 U.S.C. § 1985, and Plaintiff's right to be free from intimidation and harassment.

71.     Plaintiff is now faced with an October 18, 2005 trial date in the Justice Court for Noxubee County on the charges of: disorderly conduct - failure to comply with a lawful order; disorderly conduct - breach of peace; failure to yield to blue lights; driving on the right half of roadway; and reckless driving.

72.     The aforementioned charges are baseless.

73.     Plaintiff's constitutional rights will be irreparably harmed unless this Court enjoins

the trial.

## VII.  ALLEGATIONS OF LAW

74.    All acts of the Defendants were conducted under the color and pretenses of the ordinances, policies, practices, customs, regulations, usages and/or statutes of the County of Noxubee and/or the State of Mississippi.

75.    Defendant Walker, in his official capacity as Sheriff of Noxubee County, was a final policy maker, capable of ratification for the Defendant County.

76.    The unlawful actions of Defendants, as alleged herein, were taken or ratified by final policy makers for the Defendant County and thus constitute policies, practices and usages sufficient to impose liability.

78.    It is the policy, practice or custom of the Defendant County to suppress the First Amendment rights of those citizens seeking to cooperate in a federal investigation of the election practices of the said county.

79.    It is the policy, practice or custom of the Defendant County to make arrests without probable cause and unlawfully detain individuals who are seeking to cooperate in a federal investigation of the said county.

80.    It is the policy, practice or custom of the Defendant County to violate the procedural and substantive due process rights of those individuals seeking to cooperate in a federal investigation of the said County.

81.    It is the policy, practice or custom of the Defendant County to violate the equal protection rights of those individuals seeking to cooperate in a federal investigation of the said county.

82.    Defendants conspired to deter Plaintiff, by force, intimidation and/or threat from

cooperating and testifying in the matter of *United States v. Ike Brown, et al.,* Civil Action No. 4:05cv33TSL/AGN.

83.    Defendants' actions, as alleged herein, were made in bad faith and were designed and intended to retaliate for and to deter Plaintiff from expressing his viewpoint, which was unfavorable to Defendants.

84.    The actions of the Defendants, as alleged herein, were made with actual malice and/or constituted wilful misconduct.

85.    The actions of Defendants, as alleged herein, were conducted in bad faith for the purpose of retaliating for or deterring the exercise of constitutionally protected rights.

86.    At all times relevant herein, Plaintiff's constitutional right to communicate and cooperate with the Justice Department was clearly established.

87.    Plaintiff has suffered, is suffering and will continue to suffer injury to his constitutional rights to be free from false arrest and unreasonable seizure.

88.    As a result of Defendants' actions, Plaintiff has suffered injury to his constitutional rights to be free from false arrest and unreasonable seizure.

89.    As a result of Defendants' action, Plaintiff has been denied his right to exercise his First Amendment rights, absent government interference and/or retaliation.

90.    At all times alleged herein, Defendants acted with deliberate indifference.

91.    As a result of Defendants' actions, Plaintiff has been denied his substantive and procedural due process rights.

92.    As a result of Defendants' action, Plaintiff has been denied his equal protection rights.

93.    As a result of Defendants' conduct, Plaintiff has suffered battery, false arrest, false

imprisonment, humiliation, inconvenience, embarrassment and loss of reputation in the community.

94.    Loss of constitutional rights for even minimal periods of time unquestionably constitutes irreparable harm.

## VIII.  FIRST CAUSE OF ACTION - 42 U.S.C. § 1983
### (Retaliation for Exercise of First Amendment Rights)

95.    Paragraphs #1-94 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

96.    The unlawful actions of Defendants, as alleged herein, were made in bad faith and in retaliation for Plaintiff's exercise of his constitutionally protected rights to free speech and free association.

97.    The unlawful actions of Defendants, as alleged herein, were made in bad faith and in retaliation for Plaintiff's cooperation and communication with the Justice Department.

98.    As a direct and proximate cause of Defendants' bad faith retaliatory actions, Plaintiff was injured in his rights to free speech and free association as guaranteed by the First and Fourteenth Amendments, as well as the right to be free from illegal seizure as guaranteed by the Fourth and Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

## IX.  SECOND CAUSE OF ACTION - 42 U.S.C. § 1983
### (Free Speech/Free Assembly Hybrid)

99.    Paragraphs #1-98 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

100.    Plaintiff's attempts to communicate and cooperate with the Justice Department were protected by the Free Speech Clause of the First Amendment.

101.    Plaintiff's attempts to communicate and cooperate with the Justice Department

were protected by the Free Association Clause of the First Amendment.

102.    The actions of the Defendants, as described herein, were designed and intended to suppress Plaintiff's free speech and to hinder and deter Plaintiff from communicating and cooperating with the Justice Department.

103.    As a direct and proximate cause of Defendants' actions, Plaintiff was injured in his rights to free speech and association as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

## X.  THIRD CAUSE OF ACTION - 42 U.S.C. § 1983
### (Unreasonable Seizure)

104.    Paragraphs #1-103 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

105.    Defendants' actions in arresting, restraining, detaining and incarcerating Plaintiff constituted an unreasonable seizure for the purpose of the Fourth and Fourteenth Amendments to the United States Constitution.

106.    Defendants' actions in arresting, restraining, detaining and incarcerating Plaintiff was unreasonable in light of the surrounding circumstances.

107.    As a direct and proximate cause of Defendants' actions, Plaintiff was injured in his Fourth and Fourteenth Amendment rights.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

## XI.  FOURTH CAUSE OF ACTION - 42 U.S.C. §1983
### (Failure to Train and/or Supervise)

108.    Paragraphs #1-107 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

109.    Defendants have failed to provided adequate training to law enforcement officers.

110.    Defendants have failed to supervise law enforcement officers.

111.    Specifically, Defendants have failed to train and/or supervise their deputies from retaliating against citizens exercising their constitutional rights.

112.    Defendants' failure to train and/or supervise was the proximate cause of Plaintiff's injuries.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

## XII.   FIFTH CAUSE OF ACTION - 42 U.S.C. § 1985
### (Conspiracy to Interfere with Civil Rights)

113.    Paragraphs #1-96 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

114.    Defendants' action, as alleged herein, resulted in a conspiracy to deter Plaintiff by force, intimidation and/or threat from cooperating and/or communicating with the Justice Department, as well as testifying in the matter of *United States v. Ike Brown, et al.*, Civil Action No. 4:05cv33TSL/AGN.

115.    The actions of the Defendants also resulted in a conspiracy to impede, hinder, obstruct and/or defeat, in any manner, the due course of justice in the State of Mississippi.

116.    As a direct and proximate cause of Defendants' actions, Plaintiff was injured in his constitutional rights.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

## XIII.   SIXTH CAUSE OF ACTION - Supplemental State Claim
### (Battery)

117.    Paragraphs #1-116 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

118.    Defendants Walker, Grasseree and County ordered, consented and/or agreed to the physical restraining of Plaintiff without Plaintiff's consent. Specifically, Defendant Grasseree seized Plaintiff and led him to the Noxubee County Jail. Such a restraining constitutes harmful and offensive bodily contact.

119.    As a direct and proximate cause of the intentional conduct of Defendants Walker, Grasseree and County in ordering, consenting or agreeing to Plaintiff's arrest, Plaintiff was battered. Further, actions of Defendants Walker, Grasseree and County caused Plaintiff to be humiliated, embarrassed and feel degraded and inferior.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

### XIV.   SEVENTH CAUSE OF ACTION - Supplemental State Claim
### (False Imprisonment)

120.    Paragraphs #1-119 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

121.    Defendants Walker, Grasseree and County ordered, consented and/or agreed to Plaintiff's arrest, physical restraint, transporting to jail, detention, and incarceration. Plaintiff was physically restrained, transported to jail, detained, and incarcerated without his consent.

122.    Defendants' actions in confining Plaintiff were unlawful.

123.    As a direct and proximate result of the intentional conduct of Defendants Walker, Grasseree and County in ordering, consenting, and/or agreeing to Plaintiff's confinement, Plaintiff was falsely imprisoned. Further, actions of Defendants Walker, Grasseree and County caused Plaintiff to be humiliated and embarrassed and to feel degraded and inferior.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

### XV.   EIGHTH CAUSE OF ACTION - Supplemental State Claim
### (Intentional Infliction of Emotional Distress)

124.     Paragraphs #1-123 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

125.     Plaintiff is a police officer with the City of Aberdeen.

126.     Due to the fact that Plaintiff is a police officer, he fears that the charges brought against him by Defendant Grasseree may harm him by imperiling his employment with Aberdeen Police Force.

WHEREFORE, Plaintiff prays for relief against all Defendants as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

a.     Assume jurisdiction over this action;

b.     Declare that Defendants' actions as herein described violated Plaintiff's constitutional rights under the First, Fourth and Fourteenth Amendments to the United States Constitution;

c.     Enter an order enjoining the County of Noxubee, Mississippi and County Attorney Roderick D. Walker from prosecuting Plaintiff on criminal charges stemming from Plaintiff's constitutionally protected activities;

d.     Award Plaintiff nominal and actual damages for Defendant County's violation of Plaintiff's constitutional rights;

e.     Award Plaintiff nominal, compensatory and punitive damages against Defendants Walker and Grasseree for the wilful violation of Plaintiff's clearly established rights;

f.     Award Plaintiff nominal, compensatory and punitive damages against Defendants Walker and Grasseree for conspiring to deprive Plaintiff his civil rights;

g.    Award Plaintiff compensatory and punitive damages against Defendants Walker and

Grasseree for the torts of battery, false imprisonment and intentional infliction of

emotional distress;

h.    Award Plaintiff his costs of litigation, including reasonable attorneys' fees and

expenses, pursuant to 42 U.S.C. § 1988; and

I.    Grant such other relief to which Plaintiff may be entitled or as this Court deems

necessary and proper.


Respectfully submitted,

WAIDE & ASSOCIATES, P.A.


JOSEPH R. MURRAY, II
MS BAR # 101802
JIM WAIDE
MS BAR # 6857


WAIDE & ASSOCIATES, P.A.
ATTORNEYS AT LAW
POST OFFICE BOX 1357
TUPELO, MISSISSIPPI 38802
TELEPHONE:  662/842-7324
FACSIMILE: 662/842-8056
EMAIL: waide@waidelaw.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Joseph R. Murray, II, one of the attorneys for Plaintiff, do hereby certify that I have this day delivered, via facsimile, followed by U.S. mail, a true and correct copy of the above and foregoing to the following:

Mr. Roderick D. Walker
P.O. Box 427
Macon, Mississippi 39341
(facsimile - 662/726-9750)

Sheriff Albert Walker
Deputy Sheriff Terry Grasseree
Courthouse
505 South Jefferson Street
Macon, Mississippi 39341
(facsimile – 662/726-4166)

County of Noxubee, MS
c/o Mary Ruth Shelton, Chancery Court Clerk
505 South Jefferson Street
Macon, Mississippi 39341
(facsimile – 662/726-2272)

THIS the 10th day of October, 2005.

JOSEPH R. MURRAY, II

## VERIFICATION

STATE OF MISSISSIPPI
COUNTY OF LEE

PERSONALLY APPEARED BEFORE ME the undersigned authority in and for said county and state, the within named, KENDRICK SLAUGHTER, being first duly sworn by me, did affirm that the above and foregoing Complaint is true and correct as therein stated.

_____
KENDRICK SLAUGHTER

SWORN TO AND SUBSCRIBED before me this the 10th day of
_____, 2005.

_____
NOTARY PUBLIC

(S E A L)

My Commission Expires:

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES FEB. 16, 2006
BONDED THRU STEGALL NOTARY SERVICE

135.1

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                )
     Plaintiff,              )
                                )
       v.                  )
                                )
IKE BROWN, individually and   )
in his official capacities   )
as Chairman of Noxubee County )
Democratic Executive         )
Committee and Superintendent  )   CIVIL ACTION NO.
of Democratic Primary       )   4:05cv33TSL-AGN
Elections; NOXUBEE COUNTY    )
DEMOCRATIC EXECUTIVE         )
COMMITTEE; CARL MICKENS,     )
individually and in his     )
official capacities as      )
Circuit Clerk of Noxubee    )
County, Superintendent      )
of Elections,              )
Administrator of Absentee    )
Ballots, and Registrar of   )
voters; NOXUBEE COUNTY      )
ELECTION COMMISSION;        )
NOXUBEE COUNTY, MISSISSIPPI;  )
and those acting in concert, )
                                )
     Defendants.           )
_____)

## FIRST AMENDED COMPLAINT OF THE UNITED STATES

The United States of America, Plaintiff herein, alleges:

1. The Attorney General files this action seeking

injunctive and declaratory relief pursuant to Sections 2 and

11(b) of the Voting Rights Act of 1965, as amended, 42 U.S.C.

Section 1973, and 42 U.S.C. Section 1973i(b), and to enforce

rights guaranteed by the Fifteenth Amendment to the Constitution



of the United States.

2.  This Court has jurisdiction of this action pursuant to
28 U.S.C. Section 1345 and 42 U.S.C. Section 1973j(f).

3.  Defendant Noxubee County is a county within the State of
Mississippi and is governed by the laws of that State.

4.  Defendant Noxubee County Election Commission has
statutory powers, duties, and responsibilities concerning the
conduct of elections in Noxubee County.

5.  Defendant Noxubee County Democratic Executive Committee
is a body with duties, powers, and responsibilities concerning
the conduct of Democratic primary elections held in Noxubee
County.

6.  Defendant Ike Brown is the Chairman of the Noxubee
County Democratic Executive Committee and in that capacity is the
superintendent of Democratic primary elections. Defendant Brown
is a resident of Noxubee County and is sued in his individual and
official capacity.

7.  Defendant Carl Mickens is the Circuit Clerk of Noxubee
County, and as such, he exercises statutory duties, powers, and
responsibilities as superintendent of non-primary elections, as
the administrator of absentee ballots for all elections, and as
registrar of voters in Noxubee County. Defendant Mickens is a
resident of Noxubee County and is sued in his individual and
official capacity.

-2-

8.   According to the 2000 Census of Population, Noxubee County has a total population of 12,548 persons and a voting-age population of 8,697 persons.  Noxubee County has a total white population of 3,667 persons representing 29.2% of the county's total population.  There are 2,826 white persons of voting age, representing 32.5% of the county's voting age population.

9.   Voting in Noxubee County is racially polarized, especially in those elections in which black and white candidates oppose each other.  Whites and blacks tend to vote as a cohesive bloc, making it possible to readily identify candidates that are white-preferred and black-preferred.

10.   White voters, white candidates and those voters who have supported various white candidates have in Noxubee County experienced recent and relentless voting-related racial discrimination at the direction of Defendants Brown and Mickens and others acting in concert with them.  This pattern of discriminatory actions has resulted in the denial or abridgement of the rights of these citizens of Noxubee County to vote on account of race or color, in violation of Section 2 of the Voting Rights Act.  These acts of voting-related discrimination include, but are not limited to the following:

a.   Defendant Brown has recruited and qualified black candidates from outside of Noxubee County and from outside of candidates' election district to run against white candidates

- 3 -

where Defendant Brown knew these candidates did not qualify under state residency laws to hold the offices for which they had been qualified to run;

b.   Defendant Brown has excluded whites from participation in Democratic Executive Committee affairs by excluding them from Committee meetings relating to primary election matters and by excluding them from Democratic caucuses;

c.   Defendant Mickens has himself manipulated and has permitted Defendant Brown and those acting in concert with them to manipulate the voter registration rolls in an unlawful manner, by moving voters from one district to another in order to affect the racial percentages of voters in particular districts and in an attempt to alter the outcome in certain black-on-white elections;

d.   Defendant Brown and those acting in concert with him have attempted to prohibit a number of white voters from voting in Democratic Primary elections even though those white voters were legally entitled to vote in those primary elections;

e.   Defendant Brown and those acting in concert with him have participated in numerous racial appeals during primary and general campaigns and have criticized black citizens for supporting white candidates and for forming biracial political coalitions with white candidates on account of the race of those white candidates;

- 4 -

f.   Defendant Brown and those acting in concert with him have rejected the absentee ballots cast by whites on ground that they were defective under state law while counting absentee ballots cast by black voters that contained similar or more serious defects under state law;

g.   Defendants Brown and Mickens and those acting in concert with them have discriminated against white candidates in failing to provide those candidates information concerning absentee ballots in the same way these Defendants have provided this information to black candidates;

h.   Defendants have discriminated against whites in the selection of persons to work as poll managers and poll workers in elections in the county;

i.   Defendants Brown and Mickens and those acting in concert with them have discriminated against white candidates by not allowing them and their supporters to observe the disposition of challenges to absentee ballots;

j.   Defendant Brown and those acting in concert with him have discriminated against white candidates and their supporters in enforcing the fifty-foot, anti-campaigning law that is applicable at polling places in Mississippi;

k.   Defendants Brown and Mickens and those acting in concert with them have allowed non-resident black persons to vote in Noxubee County elections, and black persons who were non-

-5-

residents of districts to vote in those districts;

1. Defendants Brown and Mickens and those acting in concert with them have required white students and teachers who are legally entitled to vote in Noxubee County elections because they are residing outside of the county for educational or pedagogical purposes to vote in person, while allowing similarly situated black teachers and students to cast an absentee ballot by mail.

11. In conducting elections in Noxubee County, Defendants Brown, Mickens, and those acting in concert with them have systematically misapplied the Mississippi absentee ballot procedures. This practice has disproportionately burdened white voters, white candidates, and those voters who support white candidates and has denied them an equal opportunity to participate in the political process and to elect representatives of their choice in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. 1973.

12. The actions which contribute to this denial include Defendants' racially disparate application of state laws that govern when and how absentee ballots are mailed to voters, how ballots are cast, and the process by which poll officials decide whether these ballots will be counted.

13. The lawful procedure by which an eligible elector may obtain and cast an absentee ballot in Mississippi is set forth in

- 6 -

the Mississippi Code of 1986.

14.   Section 23-15-715 of the Mississippi Code requires that electors who wish to cast an absentee ballot must first request a ballot, and then must cast it during a prescribed period before the election at the county courthouse, unless they fit into one of several categories of voters who are eligible to vote by mail due to age, temporary residence outside of the county, or disability.

15.   Sections 23-15-715(b) and 23-15-721 of the Mississippi Code require that electors who are eligible to cast absentee ballots by mail must first request those ballots, then must mark their ballots in secret before an official authorized to administer oaths, fold the ballot, deposit it in an envelope, seal it, and swear to an elector's certificate which appears on the back of the envelope.

16.   Sections 23-15-639 and 23-15-641 of the Mississippi Code govern the examination and rejection of absentee ballots after they are received in their proper precincts on election day.  Among other things, these sections of the Mississippi Code require that poll managers examine the envelopes containing the absentee ballots, compare the signatures on the envelopes with the signatures on the application for the absentee ballots, and check whether the absentee elector has voted in person during the election day.  All of this is to be done before the envelope is

- 7 -

opened and the ballot removed.  These sections also permit any person present at the polls to make challenges to the absentee ballots that are being examined.

17.  Section 23-15-579 of the Mississippi Code governs the method of challenging votes and requires that if an absentee ballot is challenged, the ballot must be marked on the back with the word "challenged" and placed in a separate envelope, where it will be counted apart from the unchallenged ballots.

18.  Defendants have systematically manipulated and misapplied the state absentee ballot procedures described above in paragraphs 13-17.  This manipulation and misapplication includes, but is not limited to, the following actions:

a.  Defendants Mickens and Brown and those acting in concert with them have mailed absentee ballots to persons without receiving a request from those persons for an absentee ballot;

b.  Notaries, who are political allies of Defendant Brown, coordinate with Defendant Mickens to retrieve the absentee ballots that were sent to the homes of voters, and involve themselves in the marking of those ballots.  Often the notaries deny the voter privacy in the marking of his or her ballot, and even deny the voter his or her choice of candidates in order to ensure that the ballots are marked in the manner preferred by the notaries, by Defendant Brown and by those acting in concert with them;

- 8 -

c.   Poll officials, working under the direction of Defendant Brown, routinely tear open absentee ballot envelopes without first examining the signatures on the ballots or attempting to determine whether the voter appeared at the polls during the day to vote, and without allowing poll watchers for the candidates a reasonable opportunity to make challenges to absentee ballots in accordance with Mississippi law;

d.   Defendant Brown has personally interfered with the lawful absentee ballot examination and challenge process by ordering whole groups of absentee ballots, such as those voted at the courthouse, to be counted notwithstanding unresolved challenges that were made to the ballots;

e.   Defendants Brown, Mickens, and those acting in concert with them have directed poll officials, by the placement of yellow stickers on certain absentee ballots or by other means, to reject various absentee ballots in violation of the procedure provided for in Mississippi law that directs that the determination whether a challenged absentee ballot will be accepted or rejected is to be made at the polls by poll officials;

f.   This mis-administration of absentee ballots has caused a number of absentee ballots that were challenged and should have been rejected in accordance with Mississippi law to have been counted, and as a result thereof the value or weight of

legally cast ballots by white voters and for white candidates has been significantly reduced;

g.  This mis-administration of absentee ballots has resulted in substantial numbers of unused absentee ballots not being accounted for in some primary and general elections. Further, ballots have been found in inappropriate locations after the votes were tabulated and ballots were supposed to be under seal, including an incident in at least one election where a number of absentee ballots were found in a drawer in Defendant Mickens's office instead of being located in sealed precinct boxes.

19.  Under the totality of the circumstances that exist in Noxubee County, which include a climate of racially polarized voting, a recent history of voting-related discrimination against whites, and overt racial appeals in campaigns, Defendants' conduct, including the manipulation and misapplication of Mississippi's absentee ballot procedures, has the effect of denying white voters, white candidates and those voters who support them, an equal opportunity to participate in the political process and to elect candidates of their choice in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 1973.

20.  In addition to this racially discriminatory result, these actions are also undertaken with the purpose of

-10-

discriminating against white voters, white candidates, and those voters who support them, in further violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 1973, and thus denying rights guaranteed by the Fifteenth Amendment of the Constitution of the United States.

21.   Proof of this racial purpose is evident from the fact that the absentee ballot procedures followed by Defendants Brown, Mickens, and others acting in concert with them, are clearly disproportionately burdensome toward white voters, white candidates, and those voters who support these white candidates. Such actions systematically have skewed election results in closely contested elections against white-preferred candidates and appear to have actually determined the result in some elections.   Thus, the absentee ballot procedures followed by Defendants have denied white voters, white candidates and those voters who support them, a meaningful opportunity to participate in their own local government.

22.   Defendant Mickens and those acting in concert with him, as officials authorized to administer oaths under Mississippi law, have engaged in coercion, threats and intimidation of voters in violation of Section 11(b) of the Voting Rights Act of 1965, 42 U.S.C. Section 1973i(b).

23.   Such acts of intimidation and coercion include, but are not limited to:

a.   During the absentee in-person voting period before the 2003 primary election, Defendant Mickens received an absentee ballot that had been voted in the courthouse by an eligible voter.  After receiving the ballot from this voter, Mickens set it aside without placing it in a sealed envelope as required by law.  When this voter objected and asked that the unsealed ballot be spoiled and that she be allowed to vote a new ballot, Defendant Mickens loudly and abusively berated the voter and complained to the voter that she had cast her ballot for Defendant Mickens' white opponent.  As a result of this experience, this voter has resolved never to cast another absentee ballot at the courthouse as long as Defendant Mickens remains Circuit Clerk;

b.   Prior to the August 2003 primary election, Defendant Mickens and others acting in concert with him coerced a voter to vote by absentee ballot, failed to provide that voter privacy in which to cast his absentee ballot at the Circuit Clerk's office, then instructed the voter on what candidates the voter should vote for, including Defendant Mickens, and looked on during the voting process to make sure that the voter followed the instruction.

24.   Defendant Brown and those acting in concert with him, and the Noxubee County Democratic Executive Committee, have engaged in coercion, threats and intimidation of voters in

- 12 -

violation of Section 11(b) of the Voting Rights Act of 1965, 42 U.S.C. Section 1973i(b).

25. Such acts of intimidation and coercion include, but are not limited to:

a. Brown and the Noxubee County Democratic Executive Committee announcing and advertising in local newspapers that certain named white individuals would be prevented from voting and would not be welcome at the polls to vote in the Democratic Primary;

b. Brown, and those acting under Brown's direction, and the Noxubee County Democratic Executive Committee monitored the approach of voters to polling sites and impaired, contested or coerced voters attempting to exercise their right to vote. Upon identifying voters attempting to vote in person who had previously voted by absentee ballot and sought to cancel their absentee ballot, Brown and those acting under Brown's direction intimated voters and sought to prevent their exercise of the franchise.

c. Brown, and those acting under Brown's direction, and the Noxubee County Democratic Executive Committee have sought to intimidate voters both prior to and subsequent to their exercise of their right to vote.

## FIRST CAUSE OF ACTION

26.   Plaintiff hereby realleges and incorporates by reference ¶¶ 1 -25 above.

27.   Section 2 of the Voting Rights Act prohibits Defendants from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" which results in a denial or abridgement of the right to vote on account of race or color.  42 U.S.C. Section 1973(a).

28.   The totality of circumstances of Defendants' actions, as described in ¶¶ 1-24, has resulted in white voters, white candidates and those voters who support them having "less opportunity than other members of the electorate to participate in the political process and to elect the representatives of their choice."  42 U.S.C. Section 1973.

29.   Unless enjoined by this Court, Defendants will continue to violate Section 2 of the Voting Rights Act, 42 U.S.C. Section 1973, by enforcing standards, practices, or procedures that deny white voters, white candidates and those voters who support them, the opportunity to participate effectively in the political process on an equal basis with other members of the electorate.

-14-

SECOND CAUSE OF ACTION

30.  Plaintiff hereby realleges and incorporates by reference ¶¶ 1 -25 above.

31.  Section 2 of the Voting Rights Act prohibits Defendants from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" which has the purpose or has the effect of denying or abridging the right to vote on account of race or color.  42 U.S.C. Section 1973.

32.  Defendants knowingly and purposefully participated in numerous actions, including misapplication of Mississippi's absentee ballot procedures as described above, with the intent of denying white voters, white candidates, and those voters who support them, an equal opportunity to participate in the political process and to elect their candidates of choice in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 1973, thus denying rights guaranteed by Section 2 and by the Fifteenth Amendment to the Constitution of the United States.

33.  Unless enjoined by this Court, Defendants will continue to violate Section 2 of the Voting Rights Act, 42 U.S.C. Section 1973, thus denying rights guaranteed by the Fifteenth Amendment by participation in actions that deny white voters, white candidates, and those voters who support them, an opportunity to participate effectively in the political process on an equal

- 15 -

basis with other members of the electorate.

THIRD CAUSE OF ACTION

34.   Plaintiff hereby realleges and incorporates by reference ¶¶ 1 - 25 above.

35.   Section 11(b) of the Voting Rights Act provides that: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce . . . any person for voting or attempting to vote."   42 U.S.C. Section 1973i(b).

36.   Defendant Mickens and those acting in concert with him have violated Section 11(b) by treating voters in a hostile and intimidating manner when they come into the courthouse to vote absentee ballots.   Specifically, voters who might not wish to vote for candidates preferred by Defendants, are targeted with hostile treatment, are denied privacy in the voting process, and are instructed in a coercive manner to vote for candidates preferred by Defendants rather than candidates preferred by the voter.

37.   Unless enjoined by this Court, Defendant Mickens and those acting in concert with him will continue to violate Section 11(b) of the Voting Rights Act by continuing to use coercion, threats and intimidation to ensure that voters cast ballots in a manner preferred by Defendants, rather than in the manner preferred by voters casting those ballots.

- 16 -

FOURTH CAUSE OF ACTION

38.   Plaintiff hereby realleges and incorporates by reference ¶¶ 1 - 25 above.

39.   Section 11(b) of the Voting Rights Act provides that: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce . . . any person for voting or attempting to vote."   42 U.S.C. Section 1973i(b).

40.   Defendant Brown, those acting in concert with him and the Noxubee County Democratic Executive Committee have violated Section 11(b) by treating voters in a hostile and intimidating manner when they attempt to vote.   Specifically, voters who have previously voted absentee, quite possibly at Brown's insistence, are prevented from cancelling their absentee ballot by voting in person.   Brown, and those working at Brown's direction, have commanded voters to leave the premises prior to casting their ballot.   Brown and the Noxubee County Democratic Executive Committee have made statements and published advertisements which sought to intimidate white voters by informing those voters that they would not be welcome at the polls if they sought to vote in the Democratic Primary.   Brown, and those acting at his direction, have sought to intimidate and coerce voters in and around polling locations in Noxubee County elections.

41.   Unless enjoined by this Court, Defendant Brown and those acting in concert with him will continue to violate Section

11(b) of the Voting Rights Act by continuing to use coercion, threats and intimidation to ensure that voters cast ballots in a manner preferred by Defendants, rather than in the manner preferred by voters casting those ballots.

WHEREFORE, the Plaintiff, United States of America, prays for an order:

(1)  With respect to Plaintiff's First Cause of Action:

(a)  Declaring that Defendants have violated Section 2 of the Voting Rights Act, 42 U.S.C. Section 1973, because their actions have resulted in white voters, white candidates and those voters who support white candidates, having less opportunity than other members of the electorate to participate in the political process and to elect the representatives of their choice; and

(b)  Preliminarily and permanently enjoining Defendants, their agents and successors in office, and all persons acting in concert with them, from implementing practices and procedures which have the result of denying white citizens, white candidates and those voters who support them, an opportunity to participate effectively in the political process on an equal basis with other members of the electorate;

(2)  With respect to Plaintiff's Second Cause of Action:

(a)  Declaring that Defendants have violated Section 2 of the Voting Rights Act, 42 U.S.C. Section 1973, and the Fifteenth Amendment by actions taken with the intent of denying white

voters, white candidates and those voters who support them, an equal opportunity to participate in the political process and to elect candidates of their choice; and

(b)  Preliminarily and permanently enjoining Defendants, their agents and successors in office, and all persons acting in concert with them, from purposefully implementing practices and procedures with the intent of denying white voters, white candidates and those voters who support them, an opportunity to participate effectively in the political process on an equal basis with other members of the electorate in violation of Section 2 of the Voting Rights Act, 42 U.S.C. Section 1973; and

(3)  With respect to Plaintiff's Third Cause of Action:

(a)  Declaring that Defendants have violated Section 11(b) of the Voting Rights Act, 42 U.S.C. Section 1973i(b), by coercing, threatening, and intimidating persons in the voting process; and

(b)  Preliminarily and permanently enjoining Defendants, their agents and successors in office, and all persons acting in concert with them, from coercing, threatening, or intimidating or attempting to coerce, threaten, or intimidate persons for voting or attempting to vote, in violation of Section 11(b) of the Voting Rights Act, 42 U.S.C. Section 1973i(b).

(4)  With respect to Plaintiff's Fourth Cause of Action:

(a)  Declaring that Defendants have violated Section

- 19 -

11(b) of the Voting Rights Act, 42 U.S.C. Section 1973i(b), by coercing, threatening, and intimidating persons in the voting process; and

(b)  Preliminarily and permanently enjoining Defendants, their agents and successors in office, and all persons acting in concert with them, from coercing, threatening, or intimidating or attempting to coerce, threaten, or intimidate persons for voting or attempting to vote, in violation of Section 11(b) of the Voting Rights Act, 42 U.S.C. Section 1973i(b).

(5)  Plaintiff further requests that this Court:

(a)  Award Plaintiff the costs and disbursements associated with the filing and maintenance of this action;

(b)  Award such other equitable and further relief as the Court deems just and proper to ensure that elections in Noxubee County are held in a racially fair manner.

Respectfully Submitted,

                         ALBERTO R. GONZALES
                         Attorney General

                         BRADLEY J. SCHLOZMAN
                         Acting Assistant Attorney General
                         Civil Rights Division

DUNN O. LAMPTON          JOHN K. TANNER
United States Attorney,  Chief, Voting Section
Southern District of
Mississippi

- 20 -

CHRISTOPHER COATES
Principal Deputy Chief,
      Voting Section
KAREN L. DITZLER
J. CHRISTIAN ADAMS
Attorneys, Voting Section
Department of Justice
Civil Rights Division
Voting Section
950 Pennsylvania Ave. NW
Room 7255 - NWB
Washington, D.C.  20530
(202) 307-2932

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2005, I electronically filed the foregoing First Amended Complaint of the United States with the Clerk of Court using the ECF system which sent notification of such filing to Wilbur O. Colom, Esq. and Kerri Woodrick, Esq. of the Colom Law Firm, LLC, 200 6th Street, North, Suite 102, Columbus, Mississippi, 39701, Ellis Turnage, Esq., Post Office Box 216, 108 North Pearman Avenue, Cleveland, Mississippi, 38732, and, Christopher D. Hemphill, Esq., Dunn, Webb and Hemphill, P.A., 214 5th Street South, Columbus, Mississippi, 39701.

J. Christian Adams

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br><br>v. )<br><br>IKE BROWN, individually, and in his )<br>official capacities as Chairman of Noxubee )<br>County Democratic Executive Committee )<br>and Superintendent of Democratic Primary )<br>Elections; NOXUBEE COUNTY )<br>DEMOCRATIC EXECUTIVE )<br>COMMITTEE; CARL MICKENS, )<br>individually, and in his official capacities )<br>as the Circuit Clerk of Noxubee County, )<br>Superintendent of Elections, Administrator )<br>of absentee ballots and Registrar of voters; )<br>the NOXUBEE COUNTY ELECTION )<br>COMMISSION; NOXUBEE COUNTY, )<br>MISSISSIPPI; and those acting in concert, )<br><br>Defendants. ) | CIVIL ACTION NO. 4:05-CV-33 (TSL/AGN) |

UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN
INJUNCTION, *PENDENTE LITE*, PROHIBITING DEFENDANTS IKE BROWN AND
THE NOXUBEE COUNTY DEMOCRATIC EXECUTIVE COMMITTEE FROM
THREATENING, HARASSING, OR INTIMIDATING ITS WITNESSES

I.    INTRODUCTION

The United States filed its Complaint against the above named Defendants on February

17, 2005, alleging that various election practices and procedures in Noxubee County, Mississippi

violate Sections 2 and 11(b) of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973, and


EXHIBIT
1

the guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution.

As alleged in the Complaint, Defendants Ike Brown, the Noxubee County Democratic Executive Committee, and others acting in concert with them, have violated the Voting Rights Act by engaging in race-related voting discrimination, which has had the purpose and the result of denying white voters, white candidates, and those who support them, an equal opportunity to participate in the election processes in Noxubee County. Pursuant to Fed. R. Civ. P. 26(a), the United States filed its initial disclosures on July 12, 2005. These disclosures contained a list of 110 names of persons in or around Noxubee County, who are potential witnesses in the present case. Some three days later, on July 15, Kendrick Lashawn Slaughter, a potential witness named in the United States' disclosures, was subjected to intimidation, threats and unjustified arrest by Noxubee County Deputy Sheriff Terry Grasserree, who, in the past and as recently as 2003, has been a member of the Defendant Noxubee County Democratic Executive Committee and is a political ally of Defendant Ike Brown. Mr. Slaughter believes that the hostile treatment to which he was subjected, was calculated to intimidate him into ceasing his cooperation with the Department of Justice's investigation and with the prosecution of this case. The United States believes that unless enjoined by this Court, Defendants will continue to threaten, harass, and intimidate persons who are potential witnesses in the on-going litigation and that such witness intimidation will irreparably harm the United States' case.

The United States submits this Memorandum of Points and Authorities in support of its Motion for an Injunction, *pendente lite*, prohibiting Defendants Ike Brown and the Noxubee County Democratic Executive Committee, and those acting on their behalf or in concert with them, including Terry Grasseree, from harassing, threatening, or intimidating persons who are potential witnesses for the United States in this case.

## II.     FACTUAL BACKGROUND

Kendrick Lashawn Slaughter is currently employed as a police officer with the Aberdeen, Mississippi Police Department. He was formerly a Noxubee County Deputy Sheriff. Declaration of Kendrick Lashawn Slaughter ¶ 11, attached to this Motion and identified as Exhibit A. During the May 2005 Democratic Primary election, Slaughter was a candidate for the Macon City Board of Aldermen. While Slaughter was employed as a Noxubee County Deputy Sheriff, Deputy Grasseree offered Slaughter $3,000 to end his 2005 Aldermanic campaign because, as Grasseree explained, Slaughter's candidacy would split the black vote and make it more likely for a white candidate to win. Id. ¶ 10. Slaughter refused the offer and remained in the race. Id. His employment with the Noxubee County Sheriff's office was terminated as a result. Id. ¶ 11. During the course of his participation in various Noxubee County affairs, including his time as a Sheriff's deputy and as a candidate for public office, the United States believes that Slaughter has acquired information that is relevant to the litigation that is on-going before this Court in this case. As a result, Slaughter has been contacted by Department of Justice attorneys and investigators. Deputy Grasseree has expressly warned Slaughter that he should not speak to attorneys or investigators who are with the United States Department of Justice. Id. ¶ 13.

The United States served initial disclosures on Defendants Ike Brown and the Noxubee County Democratic Executive Committee, through counsel, on July 12, 2005. In these disclosures, Slaughter was named as a person likely to have information relating to the case before this Court. United States Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a) at 15. On July 15, 2005, Slaughter was arrested by Noxubee County Deputy Sheriff Terry Grasseree. Grasserree has, as recently as 2003, been a member of the Defendant Noxubee County

3

Democratic Executive Committee and is known to be a close political ally of Defendant Brown.
Decl. ¶4.

On July 15, 2005, three days after counsel for Defendants Ike Brown and the Noxubee
County Democratic Executive Committee were served with the United States' Fed. R. Civ. P.
26(a) disclosures, naming Slaughter as a potential witness for the United States, Grasseree
assaulted and threatened to kill Slaughter, damaged his vehicle, and arrested him. Id. ¶¶ 2, 5-7,
14. During this incident on July 15, while driving a Noxubee County Sheriff's patrol car,
Grasseree stopped Slaughter on a Macon city street and informed him that Noxubee County
Sheriff Albert Walker wished to speak with him immediately. Id. ¶ 5. Slaughter informed
Grasseree that he was busy but that he would speak with the Sheriff later that day. Id. Grasseree
then struck Slaughter's vehicle and said, "m__ f __ [profanity], I'll put you out of this d__
[profanity] truck and kill you." Id. At this point, Slaughter was not placed under arrest, so he
drove away. Id.

Moments later, Grasseree, who was now accompanied by Noxubee County Sheriff's
Deputy John Clanton, drove his patrol car into the back of Slaughter's vehicle, causing significant
damage to the rear of the vehicle. Id. ¶ 6. Slaughter then drove to the Noxubee County
Courthouse and was there arrested by Grasseree and was charged with disorderly conduct,
resisting arrest, failure to yield to a blue light, and dangerous driving.[1] Id. ¶ 7.

Slaughter believes that Grasseree arrested him because Slaughter was seen speaking with

---

[1] Slaughter later spoke with Sheriff Walker and was told that he merely wished to inform
Slaughter that his paycheck for serving as part-time security at the county courthouse, was
available. Id. ¶ 8. Walker also inquired about Slaughter's availability for additional part-time
security work. Id. This information had customarily been conveyed to Slaughter through a
telephone call from a clerk. Id.

attorneys from the Department of Justice. <u>Id.</u> ¶ 13. Moreover, he believes that Grasseree is inclined to cause him further harm because information he possesses will be disadvantageous to Grasseree and the Defendants in this case, including Defendant Ike Brown and members of the Noxubee County Democratic Executive Committee. <u>Id.</u> ¶ 15.

### III.  DISCUSSION

This Court has the inherent power to issue the injunctive relief requested by the United States in order to protect federal court litigants from violence, intimidation, and harassment that is designed to deter use of the federal courts. The late Judge A. Leon Higginbotham, Jr. of the U.S. District Court for the Eastern District of Pennsylvania, aptly described the origin and purpose of such inherent powers, when he issued an order enjoining defendants in a Title VII employment discrimination lawsuit from threatening, harassing, or intimidating plaintiffs in that case. <u>See</u> <u>Commonwealth</u> v. <u>Local Union No. 542, Int'l Union of Operating Eng'rs</u>, 347 F. Supp. 268, 285 (E.D. Pa. 1972). Judge Higginbotham explained at the outset that "the power of a federal court to issue an injunction to protect litigants from acts of violence cannot be realistically questioned." <u>Id.</u> at 286. In doing so, he summoned the words of former Chief Justice of the U.S. Supreme Court John Marshall: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of the government is to afford him that protection." <u>Id.</u> (quoting <u>Marbury</u> v. <u>Madison</u>, 1 Cranch 137, 163 (1803)). The injunction issued in <u>Local Union</u> was broad and precluded defendants from:

> 1. Threatening, intimidating, harassing, assaulting, injuring, or otherwise interfering in any manner with the named and class plaintiffs' federal statutory and Constitutional rights to be free from retaliation because of

their instituting and processing the instant employment discrimination lawsuit; and

2.      Doing any and all other acts which in any manner interfere with named and class plaintiffs' federal statutory and Constitutional rights to institute and process the instant employment discrimination lawsuit.

Local Union, 347 F. Supp. at 302-03.[2]

Many courts, including those in the Fifth Circuit, have recognized the necessity that government provide federal litigants with the protection of law and with a forum to hear grievances. Such recognition has led these courts to issue injunctions for the purpose of preserving the opportunity of federal litigants to defend their rights under the Constitution and laws of the United States. See e.g., Bell v. Hood, 327 U.S. 678, 684 (1946) ("where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief."); and United States v. Farrar, 414 F.2d 936, 938 (5th Cir. 1969).

In Farrar, the Fifth Circuit Court of Appeals ruled that the district court below had erred when it failed to grant the injunctive relief requested by African-American parents who offered substantial evidence that they had been harassed and intimidated by whites in retaliation for attempting to send their children to integrated public schools. See Farrar, 414 F.2d at 942. The court concluded that "[i]njunctive relief against all appellees (defendants) . . . should have been granted by the District Court to counteract the harassment and retaliation against Negro citizens

---

[2] After Judge Higginbotham's death, the Local Union decision was looked upon favorably by his colleagues and stood out as one of the Judge's most exemplary legal opinions. United States Supreme Court Justice William Brennan observed in a tribute to Judge Higginbotham, that the Local Union decision highlights some of Judge Higginbotham's best attributes, "a mastery of doctrine, . . . subtleties, . . . law's capacity to solve problems, and a desire to place legal results in context." See, Richard W. Rose, A Tribute to Judge A. Leon Higginbotham, Jr.: Farewell to a Giant, 4 Roger Williams U. L. Rev. 387, 392 (1999).

for exercising rights guaranteed to them as free Americans." Id. Similarly, in the present case, the requested injunctive relief is appropriate to prevent the harassment and intimidation of the United States' witnesses, which is unlikely to cease without this Court's intervention.

In the context of federal criminal cases, Congress expressly recognized the need to create a statutory cause of action for injunctive relief to prevent the harassment of victims and witnesses. It did so notwithstanding the fact that the All Writs Act, 28 U.S.C. §1651(a), already conferred on all Federal courts, the general power to issue injunctions. See, 36 C.J.S. Federal Courts § 24. The Victim and Witness Protection Act, 18 U.S.C. § 1514, sets forth a specific process by which prosecutors may seek a civil injunction to protect victims and witnesses in a criminal case. It is perhaps not surprising that Congress did not at that time see the need to create a similar cause of action to protect witnesses in federal civil cases. Most likely this is because civil litigation less frequently involves party defendants who are prone to violent acts and who are likely to resort to harassing, threatening, or intimidating other litigants. However, history has shown that there are certain kinds of civil cases, which have sparked violence, even as some litigants have attempted to have such violence averted by choosing the peaceful forum of federal litigation. Again, Judge Higginbotham aptly suggested in 1972 that civil rights cases were the sort of cases where violence was more likely to be stirred. See Local Union, 347 F. Supp. 268, 284 (E.D. Pa. 1972). In recognizing the power to enjoin violence between the litigants in the civil case before him, he warned:

> In a nation which has been so often rocked with violence, our challenge is to develop alternatives to violence. The most appropriate alternative is evolving rules of law where disputants seek to resolve their differences in court rather than to riot on the streets. Fortunately and appropriately, the black plaintiffs have chosen the non-violent method by pursuing their disputes in federal court.

7

However, if defendants' violence is not precluded by federal law, certainly, some blacks who are named or class plaintiffs might feel uncertain about their future physical security if the federal courts are remediless to thwart that violence which is directed against federal litigants.

Id.  It is similarly important in the present case that this Court exercise its inherent power to protect witnesses of the United States and to preserve the peaceful forum which the Plaintiff has now chosen to have it be fairly and appropriately decided whether the federally protected voting rights of Noxubee County citizens have been violated by Defendants.

## IV.   CONCLUSION

On the basis of the above showing, and the attached Declaration of Kendrick Lashawn Slaughter, the United States submits that its Motion for An Injunction, *Pendente Lite*, prohibiting Defendants Ike Brown and Noxubee County Democratic Executive Committee, and all those acting on their behalf or in concert with them, including Terry Grasserree, from harassing, threatening, or intimidating any person who were identified by the United States in its initial disclosures pursuant to Fed. R. Civ. P. 26(a), or any other person who is believed to have information in any way related to the matters at issue in this case, should be GRANTED.

Respectfully submitted,


BRADLEY J. SCHLOZMAN
Acting Assistant Attorney General
Civil Rights Division


3

DUNN O. LAMPTON
United States Attorney,
Southern District of
Mississippi

JOHN K. TANNER
Chief, Voting Section

_Ken L. Ditzler_

CHRISTOPHER COATES
Principal Deputy Chief
Voting Section

KAREN L. DITZLER
J. CHRISTIAN ADAMS
Attorneys, Voting Section
Department of Justice
Civil Rights Division
Voting Section
950 Pennsylvania Ave. NW
Room 7255 - NWB
Washington, D.C. 20530
(202) 307-2932

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2005, I filed the foregoing using the ECF system, which sent notification of such filing to Wilbur O. Colom, Esq. of the Colom Law Firm, LLC 200 6th Street North, Suite 102, Columbus, Mississippi 39701; Ellis Turnage, Esq. P.O. Box 216, 108 North Pearman, Cleveland, Mississippi 38732; and Christopher D. Hemphill, Esq., Webb, Dunn, and Hemphill, P.A., 214 5th Street South, Columbus, Mississippi 39701.

_Ken L. Ditzler_
Karen L. Ditzler

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 4:05-cv-33 (TSL/AGN) |
| | ) | |
| | ) | |
| IKE BROWN, individually, and in his | ) | |
| official capacities as Chairman of Noxubee | ) | |
| County Democratic Executive Committee | ) | |
| and Superintendent of Democratic Primary | ) | |
| Elections; NOXUBEE COUNTY | ) | |
| DEMOCRATIC EXECUTIVE | ) | |
| COMMITTEE; CARL MICKENS, | ) | |
| individually, and in his official capacities | ) | |
| as the Circuit Clerk of Noxubee County, | ) | |
| Superintendent of Elections, Administrator | ) | |
| of absentee ballots and Registrar of voters; | ) | |
| the NOXUBEE COUNTY ELECTION | ) | |
| COMMISSION; NOXUBEE COUNTY, | ) | |
| MISSISSIPPI; and those acting in concert, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF KENDRICK LASHAWN SLAUGHTER

Comes now the declarant, Kendrick Lashawn Slaughter, pursuant to 28 U.S.C. §

1746, and declares under penalty of perjury the following:

1.      I am a resident of Noxubee County.

2.      That on July 15, 2005 at approximately 8:30 a.m. I was driving southbound on

U.S. Highway 45 when a marked patrol car driven by Macon County Chief Deputy

Sheriff Deputy Terry Grasseree (hereafter, "Grasseree") passed me heading northbound

on U.S. Highway 45. As the two vehicles passed, Grasseree briefly activated the blue

lights of the patrol car and then turned them off. Grasseree did not activate any audible
warning such as a siren.

3.      I am a former Macon County Deputy Sherriff and presumed that Grasseree was
communicating a greeting or acknowledgement to me. So I waved at Grasseree as he
passed. I then turned right off of U.S. Highway 45 onto Magnolia Drive towards Macon.

4.      Because I witnessed him serving in this capacity, I believe that Grasseree is a
member of the Noxubee County Democratic Executive Committee, a defendant in this
case.

5.      After turning onto Magnolia Drive, approximately three miles after seeing
Grasseree for the first time, I noticed that he was behind me with his blue lights on.
Deputy Grasseree then told me that the reason he pursued me was to tell me that
Noxubee County Sheriff Albert Walker wished to speak with me. Grasseree did not
provide any other reason for pursuing and stopping me. I informed Grasseree that I had
business to take care of and I would see the Sheriff afterwards. Grasseree responded,
"no, you need to go see him now. I'll tell you what, you have until 10:00 a.m. to go see
him." I informed Grasseree that it would be after 10:00 a.m. before I could see the
Sheriff. At this point Grasseree raised his voice and began swearing and using
profanity. Grasseree walked in front of my vehicle and hit the hood and said, "m_____
f_____ [profanity], I'll pull you out of this d____ [profanity] truck and kill you." I said,
"well just do what you got to do." Grasseree told me that I better leave before Grasseree
did something to Slaughter. He said that I had better leave before he did something to
me.

6.      I was free to leave and drove away. I saw Grasseree having a conversation with Deputy John Clanton. As I continued to drive towards downtown Macon, and near Bill's Dollar Store, I noticed Grasseree again behind me. When I stopped my vehicle at a stop sign, Grasseree hit the back of my vehicle with his vehicle.

7.      I continued to drive to the Noxubee County Courthouse and parked. Grasseree and Deputy John Clanton placed me under arrest when I stepped out of my vehicle. Grasseree told me "you are going with me to the jail and talk." When I was led into the jail, Grasseree said, "I don't want you to say a m____ f____ [profanity] thing in my jail, not a word!" I was informed that the charges against me would be disorderly conduct, resisting arrest, failure to yield to a blue light and dangerous driving. I posted a $2,000 bond and was released on a $100 appearance bond.

8.      I thereafter learned from Sheriff Walker that he merely wished to ask me to assist with security in the Noxubee County courthouse on a future date and also that I had a county paycheck waiting to be picked up. The paycheck was for similar work at the courthouse. Normally, this information is conveyed to me through a telephone call from a clerk. I informed Sheriff Walker about the behavior of Deputy Grasseree. Sheriff Walker responded that there was nothing he could do about Deputy Grasseree's behavior.

9.      I am currently a city police officer in Aberdeen, Mississippi. The charges brought by Deputy Grasseree may harm me by imperiling my employment as a police officer.

10.     Deputy Grasseree's behavior and attitude towards me first became negative and hostile during the Macon City election campaign in 2005 when I ran against an

incumbent alderman in the Democratic Primary. I was told my candidacy would make it more likely for the white candidate to be elected and Deputy Grasseree offered me $3,000 to withdraw my candidacy. I refused.

11.     I was employed as a deputy in the Noxubee County Sheriff's Department for approximately two years prior to the 2005 election. When I refused to withdraw my candidacy, I was not permitted to continue my employment during the election. After the election, I met with Deputy Grasseree and other officials to discuss returning to work at the Sheriff's Department. My candidacy for alderman was raised and it was stated that there are too few blacks in office and that my candidacy had made it more likely that a white candidate would be elected. I was told that I could not have my job back at that time. Instead, I was told to take a few months and think about what I could do for the county, and put in this writing for them after the months past. I am no longer seeking employment with the Sheriff's Department because of my treatment.

12.     Deputy Grasseree's hostile behavior and threatening attitude towards me intensified after the elections on May 3 and May 17, 2005. Moreover, various Macon residents informed me that Deputy Grasseree thought he had seen me speaking with an attorney from the Department of Justice on May 17, 2005. I also was told that my niece, Tiffany Slaughter was seen speaking with attorneys from the Department of Justice.

13.     After the May 17, 2005 election and before the June 7, 2005 election in Macon, Deputy Grasseree saw me driving in the City of Macon. He flashed his lights and waved for me to stop my vehicle. When I stopped my vehicle, he asked me to follow him to the jail in Macon. I complied. Deputy Grasseree pulled his police car up to the fuel pump and an inmate began to pump gas into his police car. Deputy Grasseree invited me into

his police car to talk   Inside the police car, Deputy Grasseree said to me, "don't fool with those Justice Department people.  Don't fool with them because they ain't no good to fool with.  Don't deal with the Justice Department."  My clear impression was that Deputy Grasseree was asking me to have no further conversations with Department of Justice staff.

14.    Suddenly, and without provocation, on Friday, July 15, 2005, Deputy Grasseree became openly hostile, violent and threatening towards me during the incident herein described.

15.    I fear that Deputy Grasseree remains capable and inclined to cause me further harm because of his belief that I have information regarding elections in Noxubee County, which if shared with the Department of Justice and this court will be disadvantageous to him and to the defendants in United States v. Ike Brown, et. al.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on _____, 2005


                                        _____
                                        Kendrick Lashawn Slaughter

# STATE OF MISSISSIPPI, NOXUBEE COUNTY

BEFORE ME, _____, Justice Court Clerk of

Noxubee County, _Terry M Loessaree_____ makes affidavit

that _Kendrick Shaw Slaughter_ on or about the _15th_ day of _July_

20_05_, in the county aforesaid did willfully and unlawfully _with intent to provoke a break_
_of peace refuse to comply with the command of their_
_Deputy Terry m Loessaree a law enforcement officer_
_who had the Authority to then and there arrest any person_
_for a violation of the law. (would not Stop his veh._
_when told to while Driving Off And riding down the Hwy.)_

_Disorderly Conduct - falure to comply w/request or command_
_of law enforcement Officer  97-35-7 (i)_

against the peace and dignity of the State of Mississippi.

Sworn to and subscribed before me this _26th_ day of _July_____, A. D., 20_05_.

Justice Court Clerk _PS_

DEMENT-MERIDIAN 59-3995



EXHIBIT

3

# STATE OF MISSISSIPPI, NOXUBEE COUNTY

BEFORE ME, _Betty Ch_____ , Justice Court Clerk of

Noxubee County, _Chief Deputy Terry M. Grassgree_____ makes affidavit

that _Kendrick S. Slaughtee_____ on or about the _15_ day of _July_

20_05_ in the county aforesaid did willfully and unlawfully _Cause act strubance at_

_magnole DC Hwy._ __by yelling and not closing when_

_he was told to do. would not quit yelling_____

_____

_____

_____

_____

_Disodely Conduct - Breach of peac_____

                              _97-35-3 (i)(b)_

against the peace and dignity of the State of Mississippi.

Sworn to and subscribed before me this _26th_ day of _July_____ , A. D., 20_05_.

                                                _Betty Ch_____
                                                Justice Court Clerk

DEMENT-MERIDIAN 59-8384

# STATE OF MISSISSIPPI, NOXUBEE COUNTY

BEFORE ME, _Patty Clay_ _____ Justice Court Clerk of

Noxubee County, _the Dep. Tom F. Lacrosse_ _____ makes affidavit

that _Kentrell Steven Stephase_ on or about the _15_ day of _July_

20 _05_ in the county aforesaid did willfully and unlawfully _while driving a motor vehicle_

_fail to stop the vehicle in compliance with a visible (+/or_

_audible) signal given by a law enforcement officer acting_

_in the lawful performance of duty and who had a reasonable_

_suspicion to believe that the driver had committed a_

_crime. The signal to stop was given by emergency_

_light (+ or +) siren to his view + audio head._

_Failure To stop Motor vehicle when officer signal_

_97-9-72 (A)_

against the peace and dignity of the State of Mississippi.

_Tom Armour_ _____

Sworn to and subscribed before me this _27th_ day of _July_ _____, A. D. 20 _05_.

_Patty Clay_ _____
Justice Court Clerk _DS_

## STATE OF MISSISSIPPI, NOXUBEE COUNTY

BEFORE ME, _Betty Oke_ _____, Justice Court Clerk of

Noxubee County, _Chief Deputy Tom M. Brasseuc_ _____ makes affidavit

that _Kendrick Shawn Slaughter_ on or about the _15th_ day of _July_

20 _05_ in the county aforesaid did willfully and unlawfully _While driving a motor vehicle_

_fail to drive his motor vehicle on the right half of_

_the roadway on Washington St._

_____

_____

_____

_Right Half Driving On Road way   63-3-601 )_

_____

against the peace and dignity of the State of Mississippi.

Sworn to and subscribed before me this _26th_ day of _July_____, A. D., 20_05_.

_____
Justice Court Clerk

CEMENT-MERIDIAN 59-6284

# STATE OF MISSISSIPPI NOXUBEE COUNTY

BEFORE ME, _Betty Che_ _____, Justice Court Clerk of

Noxubee County, _Chief Depty, Terry M Lassecce_ _____ makes affidavit

that _Kedrick S. Jamshion_ _____ on or about the _15th_ day of _July_

20 _05_, in the county aforesaid did willfully and unlawfully _drive a motor vehicle_

_in such a manner as to indicate a wanton disregard_

_for the safety of persons or property on or about_

_magnola date and washington st by driving on both_

_sides of the streets, backing up in the street_

_Driving at a high rate of speed_

_Reckless driving (l 63-3-1201)_

against the peace and dignity of the State of Mississippi.

_Terry M Arnanor_

Sworn to and subscribed before me this _27th_ day of _July_ _____, A. D., 20 _05_.

_Betty Che_

Justice Court Clerk _Dy_

DEMENT-MERIDIAN 59-8384