UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

UNITED STATES OF AMREICA　　　PLAINTIFFS

VS.　　　CIVIL NO. 4:05cv33LN

IKE BROWN, ET AL　　　DEFENDANTS

AND

KENDRICK SLAUGHTER　　　PLAINTIFFS

VS.　　　CIVIL NO. 4:05cv162

NOXUBEE COUNTY, ET AL　　　DEFENDANTS

MOTION FOR TEMPORARY RESTRAINING ORDER

BEFORE THE HONORABLE TOM S. LEE
UNITED STATES DISTRICT JUDGE
NOVEMBER 7, 2005
JACKSON, MISSISSIPPI

REPORTED BY: CHERIE GALLASPY BOND
Registered Merit Reporter
Mississippi CSR #1012

245 E. Capitol Street, Room 120
Jackson, Mississippi 39201
(601) 965-4410

APPEARANCES:
FOR THE UNITED STATES:　　MR. CHRISTOPHER COATES and
　　　　　　　　MR. CHRISTIAN ADAMS

FOR KENDRICK SLAUGHTER:　MR. JIM WAIDE and
　　　　　　　　MR. JOSEPH MURRAY
FOR MR. IKE BROWN:　　MR. WILBUR COLOM
FOR MR. RODERICK WALKER:　MR. RODERICK WALKER

Page 3

VOLUME 1
KENDRICK SLAUGHTER　　　12
　Direct Examination By Mr. Coates　.......　12
　Direct Examination By Mr. Murray　.......　35
　Cross-Examination By Mr. Colom　..........　38
　Cross-Examination by Mr. Walker　.........　46
　Redirect Examination By Mr. Coates　.....　48
　Redirect Examination By Mr. Murray　.....　50
BOB HADAWAY　　　51
　Direct Examination By Mr. Adams　........　51
　Direct Examination By Mr. Murray　.......　57
　Cross-Examination By Mr. Colom　.........　57
　Redirect Examination By Mr. Adams　......　58
JOHNNY SLAUGHTER　　　61
　Direct Examination By Mr. Murray　.......　61
　Cross-Examination By Mr. Colom　.........　64
　Exhibit P-1 through P-5　..............　68
JOHN CLANTON　　　69
　Direct Examination By Mr. Waide　........　69
　Cross-Examination By Mr. Colom　.........　78
　Redirect Examination By Mr. Waide　.....　80
　Cross-Examination By Mr. Colom　......... 85
　Exhibit P-6 through P-9　..............　86
IKE BROWN　　　86
　Direct Examination By Mr. Colom　........　86

Page 4

　Cross-Examination By Mr. Coates　........　94
　Cross-Examination By Mr. Waide　.........　113
　Redirect Examination By Mr. Colom　......　120
　Further Cross-Examination By Mr. Coates　123

**EXHIBIT 3**

1 (Pages 1 to 4)

Cherie G. Bond　　　(601) 936-4466
U.S. Court Reporter

Page 5

1  THE COURT: There are before the Court this morning
2  two cases, which are United States versus Ike Brown, Noxubee
3  County Democratic Executive Committee, Carl Mickens and Noxubee
4  County Election Commission of Noxubee County, Number 4:05-33;
5  and the other case is Number 4:05-162, Kendrick Slaughter
6  versus Noxubee County, Roderick D. Walker, Terry Grasseree and
7  Albert Walker. It's unusual to set two cases for one time, but
8  my review of the pleadings and the applications for temporary
9  restraining order and motion for injunction indicate that both
10  of these proceedings -- the injunction proceedings are based on
11  essentially the same factual allegations. I will hear from
12  counsel as to how you propose that the hearing proceed.
13  Mr. Slaughter is plaintiff, United States is plaintiff. Have
14  you talked as to how you want to present this?
15      MR. WAIDE: Yes, we have, Your Honor.
16      THE COURT: All right.
17      MR. WAIDE: Your Honor, from our point of view and
18  also from talking to the government last night, I believe we
19  agree that it should be consolidated, all go forward at the
20  same time. I believe that's what the government indicated last
21  night.
22      MR. COATES: The United States has no opposition to
23  consolidation of these matters for the hearings we're about
24  today, Your Honor.
25      THE COURT: All right, sir.

Page 6

1  THE COURT: And with that representation, how do you
2  propose to proceed?
3      MR. WAIDE: Your Honor, the United States' allegations
4  will all encompass ours. They'll have some things beyond what
5  we have, so we think it will be more orderly for them to
6  present their proof first; and then if we have anything they
7  haven't covered, we would put ours next.
8      THE COURT: And, presumably, you plan to offer live
9  testimony.
10      MR. WAIDE: Yes, Your Honor.
11      THE COURT: Who is the witness or who are the
12  witnesses?
13      MR. WAIDE: Your Honor, Mr. Slaughter is the main
14  witness. He's the chief witness. There are a number of other
15  corroborating witnesses, but Mr. Slaughter is the chief
16  witness. And our proposal is to let the government put on
17  whatever proof they want; and if they don't put on some that we
18  think ought to be put in, we would then put that proof in.
19      THE COURT: Mr. Colom, what position do you take?
20      MR. COLOM: Well, Your Honor, I do not represent
21  Noxubee County. I only represent Mr. Brown and the executive
22  committee.
23      THE COURT: All right.
24      MR. COLOM: There appears to be no lawyer here
25  representing the county. You're going to have to --

Page 7

1      MR. WALKER: Yes, sir. My name, Your Honor, is
2  Roderick D. Walker. I'm a named defendant in the Slaughter
3  case. I'm also here to make an appearance for myself and for
4  Noxubee County for the limited purposes of this hearing. We
5  had turned the information over to the insurance company.
6  There is one insurance company that handles the elected
7  officials, but the sheriff's department has a separate
8  insurance company. And so Noxubee County and my insurance
9  company is the same, but for some reason it was sent to the
10  wrong office and they couldn't get an attorney here. So I'm
11  actually a defendant, but I'm just here to answer for those two
12  defendants in the case in the limited purposes of this hearing
13  this morning.
14      THE COURT: Limited to the extent that you are -- are
15  or are not going to offer witnesses or your own testimony or
16  what?
17      MR. WALKER: I'm here as a witness if I was called,
18  Your Honor, but I have no other proof or witnesses to put on of
19  any kind.
20      THE COURT: All right. So, then, Mr. Colom represents
21  Ike Brown and the executive committee. And is there -- I've
22  read the papers, the pleadings, so is there anything that any
23  of you need to tell me before we get underway with the proof?
24      MR. COLOM: Your Honor, it's just one additional
25  thing.

Page 8

1      THE COURT: Incidentally -- excuse me. Let me mention
2  this: I don't have a response in the Slaughter case.
3      MR. COLOM: Your Honor, we did file a response. I
4  don't know if it got to you, but we -- I have a -- in fact, we
5  have a response with affidavits.
6      THE COURT: Okay. In the Brown case.
7      MR. COLOM: In the Brown case. I don't think the
8  Slaughter case has any response.
9      THE COURT: Okay. Your clients are not defendants in
10  the Slaughter case.
11      MR. COLOM: Yes, sir. That's correct.
12      THE COURT: Okay.
13      MR. COLOM: Just one additional matter, though. There
14  was one issue raised. My associate had filed an affidavit
15  stating that she had not provided the witness list to
16  Mr. Brown. The government raised the issue of whether or not
17  that I may have provided the witness list to him, and I'd like
18  to make a representation so I will not have to take the stand
19  as an officer of the court that I did not provide a copy of the
20  witness list to Ike Brown until August of this year and that,
21  in fact, I did not see the witness list. It only went through
22  my associate, Carrie Woodrick up until this Slaughter matter
23  was filed in court.
24      THE COURT: All right, sir. Okay. Proceed, then, for
25  the government.

Page 9

1  MR. COATES: Yes, sir. Thank you, Your Honor. My
2  name is Chris Coates, and I represent the United States in this
3  matter; and assisting me here today will be Christian Adams who
4  also -- both of us work in the voting section of the Civil
5  Rights Division in Washington.
6  We would respectfully request to call several witnesses:
7  Kendrick Slaughter, the person who we allege to have been the
8  victim of the harassment and intimidation; Bob Hadaway who will
9  be a corroborating witness to the incident of July 15th, 2005.
10  We have Joanne Suzama, who is a paralegal in our office, who,
11  if need be, can testify about when the initial disclosures were
12  mailed out and received. I'm not sure that that matter is in
13  dispute. We also would like to refer the Court to one
14  deposition that we took last week that we believe bears on the
15  evidence here. It has not — we've taken nine depositions in
16  the case in the last two weeks, and that deposition has not
17  been transcribed and would ask the Court to hold the record
18  open on our motion until that deposition can be filed if the
19  Court feels that it's necessary.
20  THE COURT: Who is the deponent?
21  MR. COATES: Peggy Brown.
22  THE COURT: All right.
23  MR. COATES: And we would request to be allowed to put
24  in our evidence and then and if the Court so please to be heard
25  for about five to ten minutes in summation at the conclusion to

Page 10

1  discuss the evidence and legal authorities if the Court is so
2  inclined to hear us.
3  THE COURT: All right, sir. How long -- of course,
4  you can estimate only as to your direct testimony, but how long
5  do you think it will take you to put on your case?
6  MR. COATES: I think that Mr. Slaughter's direct will
7  take about 20 to 25 minutes. Mr. Hadaway will take about five
8  minutes. Ms. Suzama will take two or three minutes. And then
9  we will, of course, have some cross-examination if the
10  defendants call witnesses.
11  THE COURT: All right. At 11:30 or right at 11:30 it
12  will be my only chance to get a flu shot. That's the last time
13  to get one today, so I'm going to take a recess at that time
14  and I hope for not over five minutes.
15  MR. COATES: All right, sir.
16  THE COURT: Mr. Colom, you're standing. Do you want
17  to say anything?
18  MR. COLOM: I want to speak with him before he sat
19  down.
20  THE COURT: Okay.
21  (Short Pause)
22  MR. COATES: As to the last witness, I don't think
23  there will be any dispute about when the documents were
24  received in Mr. Colom's office. So probably just two
25  witnesses.

Page 11

1  THE COURT: All right, sir. Proceed with your first
2  witness.
3  MR. WAIDE: Your Honor, if the Court please, on behalf
4  of Mr. Slaughter, we would invoke the rule and ask that all the
5  witnesses we subpoenaed leave the courtroom except for
6  Mr. Walker. We'll waive the rule as to Mr. Walker.
7  THE COURT: Do you have witnesses other than the
8  defendants, Mr. Colom?
9  MR. COLOM: None, Your Honor.
10  THE COURT: All right. There are two witnesses for
11  the plaintiffs. And Mr. Walker is in the courtroom. And
12  there's no one else? You're a prospective potential witness --
13  defendant I might say, so you're not subject to the rule.
14  MR. WALKER: But I've not been subpoenaed as a witness
15  in either matter.
16  THE COURT: Yes, sir.
17  MR. WAIDE: I'm sorry, Your Honor. I thought he had
18  been. We have several witnesses we have subpoenaed in the
19  courtroom.
20  THE COURT: Oh, witnesses that you plan to call, then.
21  MR. WAIDE: That we might call depending on what the
22  proof shows.
23  THE COURT: All right. List them and they can leave
24  the courtroom now.
25  MR. WAIDE: Mr. Clayton, Ms. Beemer, Mr. Johnny

Page 12

1  Slaughter, Mr. Douglas Triplett. That is all, Your Honor. I'm
2  sorry. Ms. Jackie Sherrod.
3  THE COURT: Marshal, will you show them to the witness
4  room, please, sir.
5  MR. COATES: We have one witness in the courtroom,
6  Mr. Bob Hadaway.
7  THE COURT: All right. Let him go to -- out of the
8  courtroom also. Proceed.
9  MR. COATES: Thank you, Your Honor. At this time we
10  would call Mr. Kendrick Slaughter.
11  KENDRICK SLAUGHTER,
12  Having first been duly sworn, testified as follows:
13  DIRECT EXAMINATION
14  BY MR. COATES:
15  Q. Would you state your full name for the record, please, sir.
16  A. Kendrick Lashan Slaughter.
17  Q. Mr. Slaughter, where do you live?
18  A. Macon, Mississippi.
19  Q. And have you had an occasion in the past to work as an
20  auxillary deputy sheriff for the Noxubee County Sheriff's
21  Department?
22  A. Yes, sir.
23  Q. And during what period of time did you work in that
24  capacity?
25  A. The time?

Page 13

1 Q. Yes, sir.
2 A. Around about 2002 to 2005.
3 Q. Okay.
4     MR. COATES: Your Honor, in the declaration that we
5 filed in support of our motion, there are a couple of mistakes
6 that were made, and it's the city of Macon and Noxubee
7 County -- and Noxubee County. And we made the mistake in the
8 declaration of labeling it Macon County rather than Noxubee
9 County. I just wanted to call that to the Court's attention.
10     THE COURT: All right, sir. That error is noted.
11     MR. COATES: Thank you, sir.
12 BY MR. COATES:
13 Q. As an auxiliary deputy sheriff, Mr. Slaughter, what type of
14 duties did you carry out in the two- to three-year period that
15 you worked for the sheriff's department?
16 A. I was a deputy patrolman, dispatch, and part-time security
17 officer at the courthouse.
18 Q. Okay. And are you presently employed by any law
19 enforcement agency now?
20 A. Yes, sir.
21 Q. What law enforcement agency is that?
22 A. Abderdeen Police Department.
23 Q. And in what position do you work there?
24 A. On patrolman.
25 Q. And when did you commence your employment with the Aberdeen

Page 14

1 Police Department?
2 A. I think July 5th.
3 Q. Of 2005?
4 A. Yes, sir.
5 Q. And when did your employment as an auxillary deputy sheriff
6 with the Noxubee County Sheriff's Department end?
7 A. This year. I know it was this year. I don't know exactly
8 what date.
9 Q. Okay. Do you remember approximately what time of year your
10 employment with the sheriff's department --
11 A. I think it was around about May. Between May and June.
12 Q. Mr. Slaughter, in 2005, did you have an occasion to offer
13 for public office in the city of Macon?
14 A. Can you repeat that, sir?
15 Q. Yes, sir. In 2005, did you have an occasion to run for any
16 office --
17 A. Yes. I ran --
18 Q. -- in the city of Macon?
19 A. I'm sorry. Yes. I ran for alderman, Ward 4.
20 Q. Okay. And is that aldermanic position elected from a
21 district or at-large?
22 A. Ward. It was a ward.
23 Q. It was a ward?
24 A. Yes, sir.
25 Q. So only the people who live in that ward could vote in your

Page 15

1 election?
2 A. Correct.
3 Q. And did other people offer in Ward 4 in the 2005 election
4 for -- to be the alderman from Ward 4?
5 A. Can you repeat, that, sir?
6 Q. Did other people run against you?
7 A. Yes, sir. It was three in the ward.
8 Q. And was there an incumbent who ran in that race?
9 A. Yes, sir.
10 Q. What was that person's name?
11 A. Mr. Willie Dixon.
12 Q. Okay. And is he a white person or is he African-American?
13 A. African-American.
14 Q. And was he the incumbent in Ward 4?
15 A. Yes, sir.
16 Q. And was there someone other than you and Mr. Dixon running
17 in that election?
18 A. Yes, sir.
19 Q. Who was that?
20 A. Ms. Barbara Huxley.
21 Q. And is Ms. Huxley a black person or a white person?
22 A. She's a white female.
23 Q. Okay. Had Ms. Huxley been elected previously?
24 A. Sir?
25 Q. To your knowledge, had Ms. Huxley ever been elected to the

Page 16

1 Macon City Council?
2 A. No, sir.
3 Q. Did you have an occasion to have a conversation with Chief
4 Deputy Terry Grasseree about whether or not you should be
5 involved in the city election?
6 A. Yes, sir.
7 Q. And where did that conversation take place?
8 A. At the courthouse.
9 Q. And was this a conversation that took place before or after
10 the election?
11 A. Before.
12 Q. Okay. And what -- were you familiar with Deputy Grasseree
13 at that time?
14 A. Yes, sir.
15 Q. Okay. Y'all had worked together?
16 A. Yes, sir.
17 Q. And what did Mr. Grasseree say to you at that time?
18 A. Basically, he was telling me that the white lady running --
19 you know, that came out in Ward 4 running -- that I should
20 take $3,000 to withdraw my candidacy.
21 Q. Did Mr. -- did Mr. Grasseree describe to you any reason or
22 reason why he felt that you should withdraw?
23 A. Yes, sir, because Ms. Barbara Huxley was a white female.
24 That me and the black -- Mr. Willie "Man" Dixon was black, tha
25 we would split the vote. Willie "Man" Dixon. That we will

Page 17

1  split the vote and let the white lady get in.
2  　　　MR. COATES: Madame Court Reporter, as I understand
3  it, the nickname is man, m-a-n.
4  BY MR. COATES:
5  Q. Is that correct?
6  A. That's correct.
7  Q. So it's Willie "Man" Dixon. Did you accept Deputy
8  Grasseree's offer to withdraw from the race?
9  A. I refused.
10 Q. And did you run on -- on or about May 5th, 2005, were you
11 on the ballot when the first Democratic primary election was
12 held in the city of Macon?
13 A. Say that again, sir.
14 Q. When the first Democratic primary election -- not the
15 runoff but the first election was held on or about May 5th of
16 2005, did your name appear on the ballot?
17 A. Yes, sir.
18 Q. And did you still have an active candidacy?
19 A. Yes, sir.
20 Q. And you were defeated in that election. Correct?
21 A. Yes, sir.
22 Q. And Mr. Dixon got a majority of the votes in the first
23 election?
24 A. Yes, sir.
25 Q. Now, did you have any conversations with any Noxubee County

Page 18

1  officials about whether or not you were going to be allowed to
2  continue your employment as an auxiliary deputy sheriff after
3  your election in the city of Macon?
4  A. Yes.
5  Q. Tell us about that, please, sir.
6  A. I got a call in a meeting with Sheriff Albert Walker, Chief
7  Deputy Terry Grasseree, and the board president William Oliver.
8  And when I first got in, the sheriff is like, Well, it's not
9  all about the election. Then he started on it's just a few
10 blacks in office. We don't need nobody to try to split votes
11 so your white person can be in office.
12 Q. And where did this conversation take place?
13 A. In the sheriff's office.
14 Q. What was said concerning your ability to continue to run --
15 I'm sorry, to continue to work for the sheriff's department?
16 A. At then close to the end he was like, I want you to take
17 three months to think about what can you do for the county. I
18 want you to put it in a letter and get it back to me; but in
19 the meantime, I want you working part-time security at the
20 courthouse. And I said, "Yes, sir, I will."
21 Q. Okay. Did Mr. Walker give any elaboration on why he had
22 felt that your candidacy was bad for black elected officials in
23 the city or the county?
24 A. Yes, sir.
25 Q. And did you have an occasion to work any more for the

Page 19

1  Noxubee County Sheriff's Department?
2  A. No, sir. I haven't never got a call from no one. They
3  already called me to come to work, pick up a check or something
4  like that. I ain't never got a call.
5  Q. Okay. And so you went and sought employment with the
6  Aberdeen Police Department?
7  A. Yes, sir.
8  Q. Are you -- does your financial condition require you to
9  have some type of steady employment?
10 A. Yes, sir.
11 Q. Okay. And again, the meeting that you talked about with
12 Sheriff Albert Walker, Mr. William "Boo" Oliver was in
13 attendance?
14 A. Yes, sir, he was there.
15 Q. And he is the president or the chairman of the Noxubee
16 County Board of Supervisors?
17 A. Yes, sir.
18 Q. And Chief Deputy Terry Grasseree was there?
19 A. Yes, sir.
20 Q. Now, do you remember when the runoff election was held on
21 or about May 17, 2005?
22 A. Yes, sir.
23 Q. And had you and I ever talked before that day?
24 A. No, sir.
25 Q. And did we have an occasion to talk that day?

Page 20

1  A. Yes, sir.
2  Q. And where did we talk?
3  A. At the city hall.
4  Q. And is the -- where is the polling place for city elections
5  for the city of Macon?
6  A. It's like in the city courtroom.
7  Q. And how far away is the city courtroom from the city hall?
8  A. It will be right there in the same building.
9  Q. Okay. And during the day when you and I first talked, was
10 Mr. Grasseree present at the city hall and the polling place?
11 A. Yes, sir. He was parked in front of the voting place.
12 Q. Okay. And do you know Mr. Ike Brown, a defendant in this
13 case?
14 A. Yes, I know him.
15 Q. And was Mr. Brown present --
16 A. Yes, he was.
17 Q. -- at the polling place on the day that we first met and
18 talked?
19 A. Yes, sir, he was there also.
20 Q. Now, between -- do you remember the time period between the
21 runoff on or about the 17th and when the general election was
22 held in June in Macon?
23 A. Yes, I remember.
24 Q. Did you have an occasion to have any conversation with
25 Chief Deputy Terry Grasseree concerning your inclination to

Cherie G. Bond　　　(601) 936-4466
U.S. Court Reporter

Page 21

1 talk with people from the Department of Justice?
2 A. Yes, sir.
3 Q. Tell us about that, please, sir.
4 A. I was going downtown south and he was travelling north, and
5 he throwed the lights on me and throwed his hand out. So I
6 stopped. We stopped, like, in front of the post office. And
7 he was, like, "I need to talk to you. Come down to the jail."
8 So what I did, I turned around and I traveled to the jail. He
9 pulled up to the --
10 Q. Let me stop you right there. Is there -- is it correct to
11 say that this is after your employment with the sheriff's
12 department as an auxiliary deputy had ceased?
13 A. Repeat that, sir.
14 Q. Is it correct to say that the conversations that you're
15 going to tell us about now took place after your employment as
16 an auxiliary deputy stopped?
17 A. No, sir.
18 Q. This is still employed?
19 A. Well, during -- when I was getting ready to run in the
20 election, the sheriff told me to park the patrol car.
21 Q. So you were still doing some security?
22 A. I was still -- yes, sir, I was basically still with them.
23 Q. Okay. And the sheriff's office is located in the Noxubee
24 County courthouse?
25 A. Yes, sir.

Page 22

1 Q. Is that where Deputy Grasseree told you to go?
2 A. No, sir. He flagged me down in front of the post office.
3 He told me to meet him at the jail.
4 Q. Where is the jail located in proximity to the courthouse?
5 A. I think it was like West Pearl Street. It's like --
6 probably like two and a half miles or something from the
7 courthouse.
8 Q. Okay. And did you follow Mr. Grasseree down there?
9 A. Yes, sir. I turned around and went on to the jail.
10 Q. And was Mr. Grasseree -- what did Mr. Grasseree do while
11 you and he were at the jail?
12 A. Okay. Well, he pulled up to the gas pump in the patrol
13 car, and the inmate came out there and started pumping gas. So
14 when I pulled up in front of the jail, he told me to come over
15 there where he was. So I got in the car and he started
16 talking. He was like, "Look here, Man, don't fool with the
17 Justice Department. They ain't no good to fool with." And
18 then he told me that -- Richard told him about he saw me
19 talking to the Justice Department people and plus my niece
20 Tiffany Slaughter.
21 Q. Did Mr. Grasseree tell you why the Justice Department were
22 not people that you should fool with?
23 A. He said they wasn't no good to fool with.
24 Q. Anything else?
25 A. No, sir, that's about it.

Page 23

1 Q. And did the conversation end?
2 A. Yes, sir.
3 Q. Now, have you had a conversation to talk with Attorney
4 Christian Adams?
5 A. Yes, sir.
6 Q. And do you recall when you have talked with him?
7 A. It was during -- I think it was the last part of the
8 election.
9 Q. Okay. Would that be the general election in June?
10 A. Yes, sir.
11 Q. And where did you talk with Mr. Adams?
12 A. It was like in front of the voting -- outside from the --
13 it was outside from where they were voting at.
14 Q. On general election day?
15 A. Correct.
16 Q. And do you remember whether or not Mr. Ike Brown was
17 present --
18 A. He was there also.
19 Q. -- at the polling place that day?
20 A. Yes, sir, he was there also.
21 Q. And was Mr. Terry Grasseree there?
22 A. Yes, sir. He also parked in front of the voting poll.
23 Q. Now, you and I talked inside. Correct?
24 A. Correct.
25 Q. Where did you and Mr. Adams talk?

Page 24

1 A. Basically, we spoke on the outside.
2 Q. Now, Mr. Slaughter, directing your attention to the morning
3 of July 15th of 2005, did you have an occasion to be travelling
4 southbound on U.S. Highway 45?
5 A. Yes, I was.
6 Q. And is U.S. 45 in that part -- was this in Noxubee County?
7 A. Yes, sir, it was in Noxubee County.
8 Q. Is it a two-lane road or a four-lane road?
9 A. Four lane.
10 Q. Did you have an occasion to see Deputy Grasseree?
11 A. Yes, sir, a patrol car.
12 Q. And tell us about when you first saw Deputy Grasseree on
13 the morning of July 15th.
14 A. I was travelling south on 45, and I met a patrol car in the
15 northbound lane. They throwed their lights on me and turned
16 them back off, so I throwed my hand up just speaking. And I
17 said like -- I turned off on Magnolia Drive. So like three or
18 four miles later, I looked in my rearview mirror and I seen the
19 patrol car come behind me with the lights on. I pulled over on
20 Magnolia Drive. The patrolman pulled behind me, and then
21 Deputy -- Chief Deputy Terry Grasseree got out. I let my
22 driver window down. He said, "I'm going to step on the
23 passenger side because I don't want to get hit by the traffic."
24 So I let my passenger window down. And he said, "Look here,
25 you need to go see the sheriff."

6 (Pages 21 to 24)

Page 25

1  Q. Let me ask you, when you -- which way did you turn off of
2  US45 onto Magnolia Drive?
3  A. I went in the yield to the right going towards Macon.
4  Q. You were going south on Magnolia towards the city of Macon?
5  A. Correct. And he pulled behind me. I pulled over; he
6  pulled up behind me. And he said -- I let the window down.
7  He's like, Well, I'm going to the passenger side because I
8  don't want to get hit by the traffic. So I let --
9  Q. Let me stop you right there. When you say that he put the
10 lights on you, are you talking about flashing headlights or the
11 blue patrol car lights at the top of the car?
12 A. He throwed the blue lights on me.
13 Q. So you pulled off onto the shoulder of Magnolia Drive?
14 A. Yes, sir.
15 Q. Then tell us what occurred.
16 A. He came to the passenger door. And he was like, "Look
17 here, the sheriff needs to see you." I said, "Okay. Right now
18 I'm trying to take care of some of my business, and I'll go see
19 him a little later on."
20    "No, you need to go see him now."
21    I said, "Hold up, now." I said, "I'm a grown man. I'm
22 going to go see him when I get a chance to."
23    "Well, I tell you what, I'm going to give you until ten
24 o'clock to go see the sheriff."
25 Q. What did you say when Mr. Grasseree said that you had until

Page 26

1  ten o'clock to go see the sheriff?
2  A. I told him, I said, "I tell you what, you go tell the
3  sheriff it will be after ten when I see him."
4    MR. COATES: Your Honor, the next transaction is going
5  to involve some pretty gross profanity, and I have never
6  practiced in front of you. So should we do it verbatim or --
7    THE COURT: Yes, sir, whatever the language was would
8  be -- in order to make a record of it here.
9    MR. COATES: Thank you, Your Honor.
10 BY MR. COATES:
11 Q. What transpired next, Mr. Slaughter?
12 A. He was like, motherfucker, you don't know who I am I'll
13 pull your ass out of this goddam truck.
14    Then I said, "You do what you've got to do."
15    Then he went in front of my truck and hit the hood of it.
16 "motherfucker, you don't know me. I'll pull you out of this
17 goddam truck and kill you," you know. Then he came back
18 around, "motherfucker, you better leave before I do something
19 to you." I pulled off.
20 Q. Did you have any -- when the profanity started and the
21 threats, did you have any conversation with Mr. Grasseree
22 during that time period?
23 A. No, sir. I was just like, "Well, you do what you've got to
24 do."
25 Q. Did you see any other officers at that time?

Page 27

1  A. Yes, sir.
2  Q. Who did you see besides Chief Deputy Grasseree?
3  A. Deputy John Clanton.
4  Q. Where was Deputy John Clanton standing?
5  A. He was like at the -- on the right side at the back door at
6  the back of my truck.
7  Q. So what did you do next?
8  A. I pulled off. And when I pulled off, I looked in my
9  rearview mirror and I seen him. He was standing there with his
10 arms fold talking to John Clanton.
11 Q. So you then proceeded down Magnolia Lane towards the city
12 of Macon?
13 A. Yes.
14 Q. How did you -- how did you go? Just tell us how you went
15 next.
16 A. Okay. I was travelling on, you know, 45; and I pulled off
17 on Magnolia Drive. Once I started leaving Magnolia Drive, I
18 pulled off and then I was travelling on Washington Street.
19 Q. You went onto Washington?
20 A. Yes, sir.
21 Q. And Washington is a street in the residential area of the
22 city of Macon?
23 A. Yes, sir.
24 Q. Where did you go on Washington?
25 A. Well, when I was travelling on Washington, I turned left on

Page 28

1  8th Street.
2  Q. Okay. And you went one block?
3  A. Yes, sir, onto Wayne.
4  Q. Which way did you turn on Wayne?
5  A. Left on Wayne -- I mean right on Wayne. I turned left on
6  8th, and at that first stop sign I took a right on Wayne.
7  Q. And then what was the next intersection you came to?
8  A. It was on North Street. And I took the right on North
9  Street to get back on Washington.
10 Q. Okay. And when -- how many blocks did you travel on North
11 Street?
12 A. I just turned that left to get back on Washington.
13 Q. How many blocks did you travel on North before you turned
14 left onto Washington?
15 A. Just one.
16 Q. Okay. And so you left -- you left Washington, and you went
17 8th Street one block, Wayne Street one block, North Street one
18 block, and back to Washington?
19 A. Correct.
20 Q. Why did you do that loop?
21 A. Well, on down North, he was getting a little piece behind
22 me; and I seen he had the lights on, like coming up, you know,
23 on the side of Washington. That's why I said I'm going to try
24 to get out of the way of them because he already said he was
25 going to try to kill me. So that's why I tried to get out of

Page 29

1 the way.
2 Q. And when you turned left onto Washington, what happened
3 next?
4 A. Okay. I was coming up to a stop sign. He was just dead up
5 on me. When I stopped, he, like, tapped my truck with the
6 patrol car. So at that time I was like, shit, I better go on
7 to the courthouse.
8 Q. What corner was that?
9 A. That was on Washington and Pulaski.
10 Q. And is Pulaski -- after you turned left off of North and go
11 one block, is that the corner of Pulaski and Washington Street?
12 A. Correct.
13 Q. How far is that from the court -- from the Noxubee County
14 courthouse?
15 A. Not far at all. Not far at all.
16 Q. Two to three blocks?
17 A. About two blocks. About two blocks.
18 Q. What kind of vehicle were you driving then?
19 A. I was driving my Navigator.
20 Q. And did the bump that you described that you received from
21 Deputy Sheriff Grasseree's car do damage to your car?
22 A. Yes, sir.
23 Q. And what was on the right-hand side when you were sitting
24 on Washington Street when you got bumped at the corner of
25 Pulaski and Washington Street?

Page 30

1 A. Bill's Dollar Store.
2 Q. Bill's Dollar Store?
3 A. Yes, sir.
4 Q. And did you proceed to the courthouse after the bump?
5 A. Yes, sir. I went on to the courthouse.
6 Q. Where did you go when you got to the courthouse?
7 A. When I was at the courthouse, I was getting out of my
8 truck; and he ran up to my truck, so I was fixing to get ready
9 to shut my door.
10 Q. Just a minute. When you say "he," who do you mean?
11 A. Chief Deputy Terry Grasseree was running towards my truck
12 when I parked; so I shut my door; and then he jumped in front
13 of my truck. So I said I'm going to get on and get on out and
14 go to the sheriff. And then he just grabbed me by my belt, and
15 he said, "Come on. You gone go with me."
16    I said, "No, I'm gone go talk to the sheriff because you
17 talking about killing me out here," you know.
18    And then he was like, "No, we gone go talk at the jail."
19 Q. Did you have an occasion to -- did you go straight to jail
20 with Officers Grasseree and Clanton or did you go talk to the
21 sheriff in the courthouse at this time?
22 A. They put me in the patrol car.
23 Q. And took you where?
24 A. To the jailhouse.
25 Q. And what, if anything, did Deputy Sheriff Grasseree say to

Page 31

1 you during the -- at the time when you reached the Noxubee
2 County jail?
3 A. Okay. When I was -- when they put me in the patrol car,
4 they stand out there and talk for a while. Then he got in the
5 car, and he said, "Motherfucker, you just don't know. I'm
6 going to put a felony on your ass. You're not getting no
7 government job or no law enforcement."
8 Q. Just slow down.
9 A. When they put me in the back of the patrol car, they stood
10 out there and talked for a little while. And when they jumped
11 in, they started proceeding to take me to the jail. And he was
12 saying, like, "Motherfucker, you just don't know. I'm going to
13 put a felony on your ass. You're not getting no kind of
14 government job or no law enforcement job." And so when we got
15 to the jail, he was like, motherfucker, you better not say a
16 motherfucking word in my jail. I said, "Man, you can't do
17 nothing but charge me and let me go.
18 Q. Who said the last profanities that you testified to? Was
19 that Mr. Clanton or was it Mr. Grasseree?
20 A. No, sir. It was Deputy Grasseree. John Clanton really
21 wasn't saying nothing.
22 Q. And were you later that day able to make a bond and be
23 released?
24 A. Yes, sir. An appearance bond.
25 Q. How long did you have to stay at the jail?

Page 32

1 A. I went to jail around about 9. I got out around about
2 3:30.
3 Q. That afternoon?
4 A. Yes, sir.
5 Q. Did your father come down to the jail?
6 A. Yes, sir. My father had to sign with me with that
7 appearance bond.
8 Q. Did you subsequently have a conversation with Sheriff
9 Albert Walker about Grasseree's behavior?
10 A. Yes, sir, I did.
11 Q. When did that conversation take place?
12 A. When I got out of the jail around about three something,
13 going on four o'clock.
14 Q. And what -- tell us about that conversation.
15 A. Me and my fiancee and my future mother-in-law went down
16 there. She said, "Well, let's go talk with him and see." When
17 we got there, you know, we sat in his office. We're at the
18 front part where the clerk sit at. And I asked him -- I mean,
19 the way Terry was going on, his behavior, he said he didn't
20 have nothing to do with chief deputy's behavior. Then I was
21 like, you know, "Well, they saying you wanted to see me. Why
22 you want to see me?" He said, "Well, I had a check for you.
23 And see, you're still going to work part-time security at the
24 courthouse."
25 Q. Did he give you the check?

Page 33

1  A. He said he returned it back in on the 11th.
2  Q. Well, did you ever receive the check?
3  A. No, sir.
4  Q. And when the sheriff said that he had returned the check
5  back in, did you understand what he was referring to?
6  A. He said -- basically he was saying like he returned the
7  check back in on the 11th upstairs to the accountant.
8  Q. The accountant for the?
9  A. For the courthouse. For the county.
10 Q. Noxubee County?
11 A. Yes, sir.
12 Q. Okay. Now, during the time that you worked -- aside from
13 how word was passed to you on July 15th, 2005, had you ever had
14 an occasion for the sheriff or anyone from the sheriff's
15 department to need to contact you about employment or anything
16 else?
17 A. Well, anytime they need me, I know they have the clerk to
18 call me.
19 Q. And who was the clerk?
20 A. Lashanda Beemer.
21 Q. And just briefly tell us: What would be some of the things
22 that Ms. Beemer would call you about during the time that you
23 worked for the sheriff's department?
24 A. Basically, when she called me, it's going to be a meeting
25 coming up or pick up a check or work security at the

Page 34

1  courthouse.
2  Q. And did Ms. Beemer or anyone else from the sheriff's
3  department have an occasion to call you about Sheriff Walker's
4  desire to see you before ten o'clock on July 15th, 2005?
5  A. No, sir.
6  Q. Now, let me ask you one question about your work as a
7  security guard. Did you ever have an occasion to observe Terry
8  Grasseree serving in his capacity as a member of the Democratic
9  Executive Committee in Noxubee County?
10 A. Yes, sir.
11 Q. And do you remember specifically or approximately during
12 what time period you're talking about?
13 A. I don't know the dates.
14 Q. Okay. And how did you have an occasion to see
15 Mr. Slaughter serving in his capacity as chairman of the
16 Democratic Executive Committee?
17 A. Grasseree?
18 Q. Grasseree. I'm sorry.
19 A. Yes, sir. They called me up Saturday morning and wanted me
20 to do the security work at the courthouse.
21     MR. COLOM: Excuse me, Your Honor. I thought you
22 referred to him as chairman? Is that correct?
23     MR. COATES: If I did, I didn't mean to. Let me
24 strike and reask the question if there was confusion about it.
25 BY MR. COATES:

Page 35

1  Q. Did you have an occasion to see Mr. Grasseree serve in his
2  capacity as a member -- not chairman, but as a member of the
3  Democratic Executive Committee?
4  A. Yes, sir.
5  Q. And this was when you did security at the courthouse?
6  A. Yes, sir.
7      MR. COATES: No further direct, Your Honor.
8      THE COURT: Cross-examine.
9      MR. MURRAY: Your Honor, if the Court please, we have
10 just a few questions, if we might, before we cross-examine.
11     THE COURT: Okay. Go ahead.
12           DIRECT EXAMINATION
13 BY MR. MURRAY:
14 Q. Kendrick, I just want to cover a couple of things that the
15 government may not have gone over. What are you charged with,
16 Kendrick?
17 A. Disorderly conduct, reckless driving, failure to yield from
18 blue lights, wrong side of the road.
19 Q. And do you know what courthouse that's going to be in,
20 Kendrick?
21 A. Repeat, that, sir.
22 Q. Do you know what courthouse you're going to be in?
23 A. Noxubee County courthouse.
24 Q. Okay. Do you have any reason, Kendrick, to believe that
25 you might not get a fair jury in this trial?

Page 36

1  A. Yes.
2  Q. What reason is that?
3  A. Well, basically, Ike Brown have control over the jury.
4  Q. Could you explain that a little bit for me?
5  A. Basically, I saw him talking to the jury one time.
6      THE COURT: Just a moment.
7      MR. COLOM: Your Honor, I object. That's gross
8  speculation.
9      THE COURT: He will be subject to cross-examination on
10 what he testifies about.
11 A. The counsel was that -- yes, he he deal with -- he
12 basically like pick the jury, tell them -- he got influence
13 with the people at the courthouse.
14 BY MR. MURRAY:
15 Q. Do you have any first-hand knowledge of this occurring?
16 A. Yes, sir.
17 Q. Could you please tell the Court?
18 A. I know the supervisor got a DUI. And they picked a jury,
19 and Mr. Ike Brown was the one that basically picked the jury.
20 And then I saw him talking with one lady about the situation,
21 and the supervisor found not guilty of DUI.
22 Q. Did you say Juanita?
23 A. No.
24 Q. What was that?
25 A. I think it was Mechan Ballard. I think her last name was

Page 37

1 Ballard. Demetrius -- Demetrius Ballard.
2 Q. And who was that?
3 A. It was a young lady from Macon.
4 Q. Okay. I want to go into an experience or an altercation
5 you had with Ike Brown in regards to an election you were
6 running. Were you ever asked to falsify your address so you
7 could run for an election?
8 A. Yes, sir.
9 Q. Could you please explain that to the Court?
10 A. Well, Ike Brown came to me and said that I wish -- before
11 you even qualify for Ward 4, I wanted you to put your name --
12 your address at your sister's house so you can run against
13 Mr. James Watts. It's a white guy.
14 Q. Your sister is in another ward?
15 A. Yes.
16 Q. What ward would your sister be in? Do you know?
17 A. I'm thinking she in Ward 2. Mr. James Watts.
18 Q. Okay. Do you know who is going to be the judge that's
19 going to be presiding over your criminal trial?
20 A. Yes.
21 Q. Could you state that name?
22 A. Gerald Dixon. Dirk Dixon.
23 Q. Do you know if Judge Dixon has any affiliation with
24 Mr. Brown?
25 A. Yes, sir.

Page 38

1 Q. What is that affiliation?
2 A. Well, I know Ms. Reesey Dixon and Ike Brown is like
3 buddies, and Ms. Reesey Dixon's son is Dirk Dixon. He's the
4 judge.
5 Q. Does Mr. Brown support Judge Dixon or maybe Judge Dixon's
6 wife in any of their political endeavors?
7 A. Yes, sir. He support his mom, Reesey Dixon. His wife ran
8 against James Watts; and plus, Dirk Dixon, he's the judge --
9 justice court judge.
10 　　MR. MURRAY: I have no further questions.
11 　　THE COURT: Cross-examine.
12 　　　　　CROSS-EXAMINATION
13 BY MR. COLOM:
14 Q. Mr. Slaughter, you made a statement about Mr. Brown
15 suggesting that you register -- or you qualify at your sister's
16 address.
17 A. Yes, sir.
18 Q. Where were you physically when that happened?
19 A. When he had told me that?
20 Q. Yeah.
21 A. It was at the courthouse also.
22 Q. Are you sure it wasn't at his house?
23 A. No, sir.
24 　　THE COURT: You are sure or not sure? Your answer was
25 no, but it could have been --

Page 39

1 A. Oh, I'm sure it wasn't at his house.
2 BY MR. COLOM:
3 Q. When he suggested that to you, was that after you had lost
4 the election?
5 A. No, sir. It was right after I qualified to get -- to be
6 qualified to run.
7 Q. And so you had already qualified, and you were having a
8 conversation with Mr. Brown and he said to you he had wanted
9 you to qualify in another district?
10 A. He said, "I wish I could have got you before you qualified
11 so you can qualify at your sister's address to run against
12 James Watts."
13 Q. How old are you?
14 A. I'm 32.
15 Q. Where do you live?
16 A. 608 Purvis Street, Macon, Mississippi.
17 Q. Whose home is that?
18 A. My father's.
19 Q. And have you lived there all your life?
20 A. Yes, sir.
21 Q. Okay. And do you sleep there every night?
22 A. Yes, sir.
23 Q. Okay. Have you stayed at your sister's house as well as
24 your father's house?
25 A. No, sir. Since she bought that new house there, no, sir.

Page 40

1 Q. No, sir, her old house.
2 A. Well, she was living in an apartment then.
3 Q. Okay. Now, did Mr. Brown say he thought you would have a
4 better chance of winning in the other ward?
5 A. Yes, sir. He stated that since the way I worked it hard,
6 he -- you know, out there campaigning, he know that I would
7 whup James Watts.
8 Q. I think my question was, was he not telling you you had a
9 better chance of winning in the other ward?
10 A. Yes, sir. He said I would have a better chance of winning
11 in that ward.
12 Q. Okay. Now, after you left the sheriff's department this
13 year and you applied for a position in Aberdeen, did you not
14 use Mr. Ike Brown as a reference?
15 A. No, sir.
16 Q. You made no reference to Ike Brown to anyone when you
17 applied for that position?
18 A. No, sir.
19 Q. Did Mr. Brown talk to you about applying in Aberdeen?
20 A. Well, he told me to go ahead and apply in different places.
21 Q. So after you lost your job with the sheriff's department,
22 you had conversations with Mr. Brown about new employment?
23 A. Yes, sir. He came up to me and told me to apply.
24 Q. He had worked in campaigns in Aberdeen. Isn't that
25 correct?

Page 41

1  A. I heard. I don't know for sure, but I heard, yeah.
2  Q. And did he not tell you that some of his friends had won
3  the election in Aberdeen?
4  A. No, sir, he didn't.
5  Q. Did he not suggest Aberdeen as a place for you to apply?
6  A. He probably did. I just -- you know, he probably did.
7  Q. Okay. After the runoff election you referred to where you
8  said you saw representatives of the Justice Department, do you
9  know if Mr. Brown saw you speaking to anyone?
10 A. Oh, he was out there.
11 Q. He was there?
12 A. Yes, sir. Yes, sir.
13 Q. All right. But did he even know who they -- does he even
14 know who they are?
15 A. I can't recall. I don't know.
16 Q. When you walked up and spoke to them, did you know who they
17 were before you spoke to them?
18 A. Say that again.
19 Q. Did you know who the Justice Department attorneys -- did
20 you know who they were before you spoke with them?
21 A. Yes, sir.
22 Q. You did? You had already met them?
23 A. Oh, no, sir. No, sir. I just -- basically, I'm saying
24 that's the Justice Department people. So from that day I met
25 them, but before, no, sir, I didn't.

Page 42

1  Q. They were there as observers. Is that not correct?
2  A. Correct.
3  Q. There's observers from the Justice Department at just about
4  every election in Noxubee County. Isn't that true?
5  A. Say that again.
6  Q. There's observers from the Justice Department in virtually
7  every election in Noxubee County?
8  A. I don't know.
9  Q. Do you know of an election where it has only been
10 observers?
11 A. I don't know.
12 Q. Now, Mr. Brown at the city election that you referred to
13 this year, he was a poll worker, was he not?
14 A. He was running in and out, so I don't know what he was. I
15 know he was running in and out.
16 Q. Was he not a poll worker for Bob Boykin.
17 A. He was running in and out. I can't say he was.
18 Q. Do you know Bob Boykin?
19 A. Yes, sir.
20 Q. Is he white?
21 A. Yes, sir.
22 Q. Now, you said that Mr. Grasseree was on the Democratic
23 Executive Committee. Have you ever seen him attend a meeting?
24 A. Yes, sir.
25 Q. Of the Democratic Executive Committee?

Page 43

1  A. Yes.
2  Q. Were you there?
3  A. I was security at the courthouse.
4  Q. All right. Was that an election or at a Democratic
5  Executive Committee?
6  A. They was having a meeting.
7  Q. You were present and Mr. Grasseree was....
8  A. Correct. Grasseree, Ike Brown, Betty Roberts, and a couple
9  of more peoples.
10 Q. All right. And it's your testimony that the sheriff's
11 department provides security for Democratic Executive Committee
12 meetings?
13 A. I don't know what they provide, but they called me to stand
14 by that Saturday morning.
15 Q. When Mr. -- you said that Mr. Grasseree asked you to do
16 security for something in connection with the Democratic
17 Executive Committee. Exactly what was it?
18 A. Say that again, sir.
19 Q. You said that he asked you to do security --
20 Mr. Grasseree -- in connection with some Democratic Executive
21 Committee activity. I'm trying -- I'm asking you exactly what
22 activity was it?
23 A. Well, basically, he just called me up and told me to come
24 down to the courthouse and to stand by for security.
25 Q. Okay. Doesn't the chief deputy normally do that whether or

Page 44

1  not it's -- whether it's court or for chancery court or circuit
2  court or any other activity at the --
3  A. Yes, sir, he do, but he was sitting behind a table with Ike
4  Brown. He was a part of them. That's why he can do security.
5  That's why they call me, to do security.
6  Q. Okay. Now, did you talk to Ike Brown after you were
7  arrested by Mr. Grasseree this last time and the charges were
8  leveled against you?
9  A. No, sir.
10 Q. Did Mr. Brown say anything to you?
11 A. No, sir.
12 Q. Has he asked you to do anything?
13 A. No, sir.
14 Q. Has he asked you not to talk to anybody in connection with
15 the government?
16 A. Ike Brown?
17 Q. Yes, right.
18 A. No, sir.
19 Q. Has he threatened you in any way?
20 A. No, sir.
21 Q. Has he harassed you in any way?
22 A. No, sir.
23 Q. Do you have any reason -- any reason to believe that
24 Mr. Brown caused Mr. Grasseree to arrest you?
25 A. I can't answer that.

11 (Pages 41 to 44)

## Page 45

1 Q. But do you have any facts that support --
2 A. I don't, no, sir.
3 Q. Now, did you not have a dispute going on with the sheriff's
4 department about the return of some equipment?
5 A. No, sir.
6 Q. What about -- there was no dispute -- was there no dispute
7 between you and the sheriff's department about the return of a
8 gun?
9 A. No, sir.
10 Q. Did you ever -- did you ever turn in your weapon?
11 A. Yes. My brother turned it in.
12 Q. When did he turn it in?
13 A. The same day they took me to jail.
14 Q. All right. So isn't it true, Mr. Slaughter, that
15 Mr. Grasseree told you that the sheriff wanted to see you about
16 turning in your weapon?
17 A. No, sir.
18 Q. Now, had you not previously had issues with governmental
19 bodies about turning in governmental supplies?
20 A. I was working a little auxillary also in Brooksville.
21 Q. And did you not encounter problems with them about turning
22 in your uniform and some other equipment?
23 A. No, sir. It was a badge.
24 Q. Well, it was -- it took several months for them to get you
25 to turn in your uniform. Wasn't that correct?

## Page 46

1 A. No, sir.
2 Q. How long did it take them?
3 A. Once I left, I gave them to them then.
4 Q. So it's your testimony that immediately when you left you
5 turned in everything but the badge?
6 A. I turned everything in -- everything in, including the
7 badge.
8 Q. The day you left?
9 A. No, sir. About a week later.
10 Q. You turned in the badge about a week later?
11 A. Yes, sir.
12 Q. Isn't it true that you were charged with a felony?
13     MR. WAIDE: Your Honor, if the Court please, this is
14 totally irrelevant to what happened at Brooksville; and, of
15 course, a charge has no bearing on anything.
16     THE COURT: What's your response to the objection?
17     MR. COLOM: Your Honor, this shows that he -- there's
18 an issue about the return of a gun to the sheriff's department
19 and we will present evidence to show that he has encountered
20 this same kind of problem in the past about turning in
21 equipment after he leaves the position.
22     THE COURT: The objection is sustained.
23 BY MR. COLOM:
24 Q. Have you ever been charged with a felony?
25     MR. WAIDE: Your Honor, that's totally irrelevant.

## Page 47

1     THE COURT: Unless it's connected, without a
2 foundation that would show a bias or for impeachment, it's not
3 admissible.
4     MR. COLOM: Thank you.
5     MR. WALKER: Your Honor, may I be allowed to ask one
6 question?
7     MR. WALKER: The sheriff's department has informed me
8 for the limited purposes of trying to clarify the record that
9 they wanted to clear up his status as a deputy.
10     THE COURT: All right.
11     MR. WALKER: If I may, I'd like to ask that at this
12 time.
13         CROSS-EXAMINATION
14 BY MR. WALKER:
15 Q. How were you working for the Noxubee County Sheriff's
16 Department?
17 A. Auxillary deputy and part-time security and dispatch when
18 somebody be out.
19 Q. So you were not a full-time, regularly paid deputy or
20 employee of the county?
21 A. Okay. On that application, it's got full-time auxillary
22 deputy.
23 Q. Well, I'm just asking, how were you paid?
24 A. I was getting paid -- like the dispatcher be out or either
25 at the courthouse working security.

## Page 48

1 Q. So would you consider yourself a volunteer deputy or an
2 auxillary deputy?
3 A. Auxillary deputy.
4     MR. WALKER: That's all I have, Your Honor.
5     MR. WAIDE: Your Honor, I have two questions on
6 redirect.
7     THE COURT: All right, sir.
8         REDIRECT EXAMINATION
9 BY MR. COATES:
10 Q. Mr. Slaughter, you mentioned Reesey Dixon when you were
11 testifying earlier.
12 A. Yes, sir.
13     MR. COLOM: Your Honor, I didn't ask any questions
14 about -- this is beyond proper scope.
15     MR. COATES: Mr. Slaughter's attorney asked, and I
16 just wanted to clarify for the record as to who Ms. Dixon is.
17     THE COURT: Okay. I'll overrule the objection.
18 BY MR. COATES:
19 Q. Ms. -- were you referring to state representative Reesey
20 Dixon?
21 A. Yes, sir.
22 Q. And how is she related to Dirk Dixon?
23 A. That's her son.
24 Q. And your testimony was that Dirk Dixon is the judge in your
25 case?

Page 49

1  A. Yes, sir.
2  Q. And do you know the relationship between Mr. Brown and
3  State Representative Dixon?
4  A. Yes, sir.
5  Q. What is that?
6  A. He basically support Ms. Dixon and Judge Dixon.
7  Q. Now, you testified that you ran from ward number 4.
8  Correct?
9  A. Yes, sir.
10 Q. Okay. And when you talked with Mr. Brown about
11 qualification after you had qualified, what ward was Mr. Brown
12 talking about?
13 A. Okay. When he came up to me, he was wanting me to run
14 in -- I'm thinking it was Ward 2, in Mr. James Watts' ward.
15 Q. Is Mr. Watts black or white?
16 A. White.
17 Q. And when you qualified -- did you qualify in Ward 4 rather
18 than Ward 2 because Ward 4 is your permanent residence?
19 A. Correct.
20 Q. And did you ever approach Mr. Brown and ask him to give you
21 assistance in your application for a job at Aberdeen?
22 A. No, sir.
23    MR. COATES: No further questions.
24    MR. MURRAY: Your Honor, I just have a couple.
25         REDIRECT EXAMINATION

Page 50

1  BY MR. MURRAY:
2  Q. Kendrick, you were asked about your meeting with Sheriff
3  Walker and a gun issue. When you met with Sheriff Walker after
4  you got out of the jail, was any mention of a gun or holster
5  made?
6  A. No, sir. He just said that he returned -- he had a check
7  that he returned on July 11 and still -- I'm going to still
8  work part-time security at the courthouse.
9  Q. While you were engaged in the dispute on that day,
10 July 15th, did Chief Deputy Grasseree ever reference this gun
11 or holster while he was chasing you?
12 A. No, sir, he never said nothing.
13 Q. When was the first time you heard about this gun or
14 holster?
15 A. When my brother came to the jail and said, "Where the stuff
16 at? Let me just turn it in." And I told him to go to the
17 house. It's laying on my bed.
18 Q. Why did you keep that gun and holster, Kendrick?
19 A. The sheriff wanted me to work -- still work security at the
20 courthouse.
21 Q. So your testimony is the sheriff never asked you to return
22 that gun and holster?
23 A. No, sir. But he specifically told me to hang onto the
24 equipment because he still wanted me to work part-time
25 security.

Page 51

1     MR. MURRAY: Thank you, Your Honor.
2     THE COURT: All right, sir. Mr. Slaughter, you may
3  stand aside. Whom do you have next?
4     MR. ADAMS: Your Honor, we'd like to call Mr. Bob
5  Hadaway who I believe is not in the courtroom right now.
6     THE COURT: All right.
7              BOB HADAWAY,
8  Having first been duly sworn, testified as follows:
9            DIRECT EXAMINATION
10 BY MR. ADAMS:
11 Q. Good morning, Mr. Hadaway.
12 A. Good morning.
13 Q. If you could state your full name for the Court, please.
14 A. Bobby Ray Hadaway, Jr.
15 Q. And your age?
16 A. Forty-one.
17 Q. And are you a resident of Macon, Mississippi?
18 A. Yes, sir.
19 Q. And currently what is your profession?
20 A. I am manager of a finance company.
21 Q. In Macon?
22 A. Right.
23 Q. And on July 15th, 2005, you were a witness to a portion of
24 an incident between Chief Deputy Terry Grasseree and
25 Mr. Kendrick Slaughter, were you not?

Page 52

1  A. That's right.
2  Q. Could you please tell the Court what you were doing when
3  you first saw Mr. Grasseree and Mr. Slaughter together?
4  A. I was travelling south on Washington Street, and I saw
5  Kendrick and a patrol car behind him pull out of North Street
6  onto Washington Street headed south.
7  Q. And you were in a vehicle at the time?
8  A. Right.
9  Q. And so when you first saw them, you were at 90-degree
10 angles?
11 A. That's correct.
12 Q. And you were approaching a stop sign at an intersection.
13 Is that correct?
14 A. Four-way stop.
15 Q. And which car was in front of the other?
16 A. Kendrick was in front of Terry.
17 Q. And was he stopped at a stop sign?
18 A. They were -- when I saw them, they were already coming on
19 out of the stop sign turning left, which would make them in
20 front of me.
21 Q. Would you characterize their driving at a high rate of
22 speed?
23 A. No, no.
24 Q. Would you characterize their driving recklessly?
25 A. No. I didn't see any of that.