Page 53

1 Q. How would you characterize it?
2 A. It was one car in front of the other one. Terry had his
3 blue lights on. That's what caught my attention.
4 Q. Why did it catch your attention?
5 A. Because he had his blue lights on.
6 Q. Did you find that peculiar that he had his blue lights on
7 and yet they were proceeding slowly?
8 A. Yes. I actually thought that they were on a call because I
9 thought Kendrick was still on the force or whatever. I
10 didn't -- I had no idea Terry was in pursuit of Kendrick.
11 Q. And when they turned south on Washington Street, at that
12 point you were both headed -- all three of you were headed in
13 the same direction?
14 A. Right.
15 Q. You were positioned behind them. Is that correct?
16 A. Directly behind them but probably three quarters of a block
17 back. I hadn't even got to the stop sign at Washington and
18 North Street yet.
19 Q. Three quarters of a block in Macon is how far?
20 A. Some blocks are bigger than others. Probably five or
21 600 feet probably.
22 Q. How far was this particular distance between yourself and
23 the two of them?
24 A. 700 feet maybe. Something like that.
25 Q. Now, at this point, did they begin to travel at a high rate

Page 54

1 of speed?
2 A. Not that I could tell. It's kind of -- it's hard to judge
3 speed when you're directly behind somebody as far back as I
4 was.
5 Q. And were they driving erratically?
6 A. No.
7 Q. Were any of them on the wrong side of the road?
8 A. No. They just -- one turned and the other one turned right
9 behind him.
10 Q. And they approached another stop sign?
11 A. Right.
12 Q. And what is that intersection?
13 A. That's at Pulaski -- Washington and Pulaski. It's a
14 four-way stop.
15 Q. And at this point, are you continuing to close the distance
16 between the two of them and yourself?
17 A. Yeah. It's a shorter distance from that stop sign where
18 they turned to the next one than it was between me and them.
19 Q. And at that point, all three of you were headed south on
20 the same street?
21 A. That's right.
22 Q. And do they approach another stop sign?
23 A. Yes.
24 Q. And what happened there?
25 A. I saw them brake at that stop sign.

Page 55

1 Q. Both of them?
2 A. Right.
3 Q. And stop?
4 A. I'm not 100 percent sure on stopping now, but it looked
5 like they braked three or four seconds probably. I can't swear
6 stopping exactly --
7 Q. And when they --
8 A. -- completely.
9 Q. When they proceed through that stop sign, did you see
10 Mr. Slaughter depart at a high rate of speed?
11 A. No, it looked normal. Like I say, it's hard to judge speed
12 when you're behind somebody that far.
13 Q. Did you see Mr. Slaughter spin his tires?
14 A. No.
15 Q. Did you see Mr. Slaughter drive erratically?
16 A. No.
17 Q. Did you see Mr. Slaughter drive on the wrong side of the
18 road?
19 A. No.
20 Q. And where was Mr. Slaughter headed at that point?
21 A. Well, they ended up at the courthouse. I just followed --
22 Officer Freshour passed me after they left the stop sign. He
23 come from behind me and passed me, so it was kind of hard for
24 me to see what was going on then; but I just kept going
25 straight, and they ended up at the courthouse -- back of the

Page 56

1 courthouse.
2 Q. And you saw Mr. Slaughter pull into the courthouse parking
3 lot?
4 A. Yeah. I could tell because the road is a little higher
5 from where they are, so I could see over it. And they pulled
6 in the courthouse.
7 Q. Did you notice anything unusual, driving erratically,
8 recklessly, turning into the courthouse parking lot?
9 A. It looked like they just pulled in right behind each other.
10 Q. And did he park in a parking spot?
11 A. It looked like he just pulled in a little ways and just
12 stopped. I don't believe he was in a parking spot.
13 Q. Two questions: Are you -- do you have personal knowledge
14 of the sheriff's office being in the courthouse?
15 A. Yes.
16 Q. And you don't have any vision problems or no problems with
17 your eyesight?
18 A. No.
19 Q. Do you wear glasses?
20 A. No.
21 Q. You could see fine?
22 A. Yes.
23     MR. ADAMS: Nothing further, Your Honor.
24         DIRECT EXAMINATION
25 BY MR. MURRAY:

Page 57

1 Q. Good morning, sir. How are you doing?
2 A. Fine.
3 Q. Just a couple questions. You said you were a manager of a
4 finance company. Correct?
5 A. That's correct.
6 Q. What is the name of that finance company?
7 A. Noxubee Finance.
8 Q. Who owns that?
9 A. Ricky Walker.
10 Q. Is that the same Ricky Walker who is in the courtroom
11 today?
12 A. It is.
13 Q. Did you inform Mr. Walker of any of this information what
14 you just told the Court today of what you saw?
15 A. I told him that -- that day that it looked like they were
16 arresting Kendrick Slaughter behind the courthouse.
17 Q. Did you tell him about any of the details of the events?
18 A. No.
19   MR. MURRAY: Thank you, Your Honor.
20   THE COURT: Cross-examine.
21       CROSS-EXAMINATION
22 BY MR. COLOM:
23 Q. In your capacity as operating a finance company, do you
24 frequently go to justice court?
25 A. Every now and then.

Page 58

1 Q. How many judges are there in justice court?
2 A. Two, I believe.
3 Q. And do you know their names?
4 A. Dirk Dixon and Stewart -- Ms. Stewart.
5 Q. Stewart. And when you file a matter in justice court,
6 either one of those two may hear the case?
7 A. That's correct, I believe.
8   MR. COLOM: Thank you.
9       REDIRECT EXAMINATION
10 BY MR. ADAMS:
11 Q. Briefly, Your Honor. You testified there were two
12 potential judges in justice court. Correct?
13 A. Yes.
14 Q. Are you familiar with Noxubee County being split into two
15 districts such that Mr. Dixon handles the northern part of
16 Noxubee County and the other justice court judge handles the
17 southern part?
18 A. I knew one handles one half, but I didn't know which one
19 was which.
20 Q. Are you aware that if an incident takes place in the
21 northern --
22   MR. COLOM: Your Honor, I object -- nothing, nothing.
23 I'll withdraw it.
24 BY MR. ADAMS:
25 Q. Which part of the county are you aware Mr. Dixon has as his

Page 59

1 jurisdiction?
2 A. I would think he's the north. I'm not sure.
3 Q. And which part of the county did this -- let me withdraw
4 the question. Did the incident that you have testified about
5 occur north of the courthouse or south of the courthouse?
6 A. North.
7 Q. And are you aware where the dividing line between the two
8 justice courts are?
9 A. No, I'm not aware of that.
10 Q. But you're aware that the incident took place north of the
11 courthouse?
12 A. North.
13 Q. And do you know which judge that case is assigned to?
14 A. No.
15 Q. Let me rephrase. Do you know which judge Mr. Slaughter's
16 charges are assigned to?
17 A. I have no idea.
18   MR. ADAMS: Nothing further, Your Honor.
19   THE COURT: That concludes your testimony, sir.
20 You're excused. Do you have anything further for the
21 plaintiffs?
22   MR. COATES: I think we can avoid the third witness
23 by -- I ask the defendants to stipulate that the initial
24 disclosures that contained the list of 110 people that the
25 United States had interviewed or found out about who we

Page 60

1 believed had or might have knowledge that was pertinent to
2 claims in the case that were provided under Rule 26A of the
3 Federal Rules of Civil Procedure were mailed from our office by
4 FedEx on June 11th, 2005, and received in Mr. Colom's office on
5 July 12th, 2005. If we can stipulate to that then the other
6 witness would not be necessary. Mailed on July 11th, 2005, and
7 received on July 12th, 2005.
8   MR. COLOM: Yes, sir. We would so stipulate. Can we
9 have that document presented by agreement?
10   MR. COATES: Sure.
11   THE COURT: Counsel for Mr. Slaughter said you might
12 have other witnesses. Do you?
13   MR. MURRAY: Your Honor, we're going to have one and
14 that will be it.
15   THE COURT: All right.
16   MR. MURRAY: We might have another depending on how
17 that one goes.
18   THE COURT: Okay. Well, call that witness, then.
19   MR. COLOM: Your Honor, I don't think it's available,
20 but we'd like to have the record supplemented with the actual
21 list that had Mr. Slaughter on it.
22   MR. COATES: It's filed with the Court. And if the
23 Court would take judicial notice of the fact that the docket in
24 this case shows that notice of the United States' filing of the
25 initial disclosures was filed. Notice of that filing was done

15 (Pages 57 to 60)

Page 61

1 on July 12th, 2005.
2     THE COURT: All right, sir.
3     MR. COATES: And then with the exception of the Peggy
4 Brown deposition, that would close our evidence.
5     THE COURT: All right.
6     MR. MURRAY: Your Honor, we would call Johnny
7 Slaughter to the witness stand.
8     JOHNNY SLAUGHTER,
9 Having first been duly sworn, testified as follows:
10     DIRECT EXAMINATION
11 BY MR. MURRAY:
12 Q. Good morning, sir. How are you doing today?
13 A. Good morning.
14 Q. Could you please state your full name for the record.
15 A. Johnny Slaughter.
16 Q. Slaughter: That sounds like a familiar name. Are you
17 related to Kendrick Slaughter?
18 A. My baby brother.
19 Q. Okay. Got you. Are you familiar, sir, with the events
20 that happened on July 15th, 2005?
21 A. Not really.
22 Q. Okay. Are you familiar -- let me ask you this: Did you
23 have an occasion to talk to Chief Deputy Grasseree about your
24 brother's criminal situation?
25 A. I did.

Page 62

1 Q. Okay. Could you explain to the Court what was said during
2 that conversation?
3 A. I went to Terry and asked Terry as a favor would he, you
4 know, leave this thing alone with my brother. And I asked him
5 as a favor. And he said, "You know, just talk to your brother
6 then." And so I went back to my brother, and I told him, Look,
7 I talked with Terry. Terry said he's going to leave it alone,
8 you know. And he said he wasn't going to leave it alone. And
9 I went back and told Terry a day or so later, "Well, Terry, I
10 appreciate your favor," and that's that.
11 Q. Now, when you say your brother wasn't going to leave it
12 alone, what did you mean?
13 A. He said he -- I asked him to leave it alone. I went to
14 Terry. "Terry, I need a favor. I know y'all got my brother
15 crossed up in this, and as a favor would you, you know, do me a
16 favor and just drop all of this here." And he said, "Well,
17 okay. I'll, you know, talk to him." He said, "When you talk
18 to Shaun, tell Shaun," you know. So I went to Shaun and told
19 Shaun, "Shaun, man, I talked to Terry. I talked to the judge.
20 They said they going to leave it alone, man, if you just" --
21 you know.
22 Q. Let me ask you this, Mr. Slaughter: Was there ever any
23 mention of a lawsuit mentioned during this?
24 A. No, sir. I don't know nothing about no lawsuit.
25 Q. So Chief Deputy Grasseree never told you that he --

Page 63

1 A. No, Terry say that I know your brother. He might have a
2 lawsuit against me if I don't get my paperwork right. Now,
3 that's what Terry said, just like that.
4 Q. Okay. But there was no mention by Deputy -- Chief Deputy
5 Grasseree that if a lawsuit wasn't filed he'd drop the charges?
6 A. No. I ain't -- I don't know nothing about that, now.
7 Q. But from your recollection of it, Chief Deputy Grasseree
8 wasn't taking these charges seriously?
9 A. I mean, I went to him as a favor and asked him, Terry,
10 you're my brother. Y'all -- you know what I'm saying? I work
11 with the city or whatever. And which all -- you know, he said,
12 "All right. You know, go talk to your brother." I said, "I
13 had already talked to the judge, and he told me as a favor, you
14 know, he'll, you know, be lenient and drop it".
15 Q. So from what you're telling us, Chief Deputy Grasseree had
16 already talked to Judge Dixon?
17 A. I don't know. I talked to Judge Dixon. I went to Judge
18 Dixon and talked to Judge Dixon. I said, "Judge, you know,
19 y'all -- I know he got to go in front of you." And he said,
20 "Well, you know, it's going to be up to the Terry. They gone
21 go to court, you know," whatever. And I said, "Look, can y'all
22 just drop your man and leave it alone?" And he said, "Well,
23 you need to talk to, you know, Terry or whatever." So when I
24 talked with Terry, I told Terry, "How about a favor? Let
25 me" -- you know, and he said, "Well, talk to your brother again

Page 64

1 and I'll, you know, be lenient," you know, because the judge
2 told me he said he was going to be lenient on him he said
3 because he wasn't bringing him to court because Terry got some
4 papers on it.
5 Q. That's fine. One last question: There was fear of a
6 lawsuit being filed from that conversation, though, from what
7 you take --
8 A. I mean, I don't know. Terry just said, I know your
9 brother. I know he's going to have a lawsuit against me or
10 whatever.
11 Q. Okay.
12     MR. MURRAY: No further questions.
13     THE COURT: Do you have cross-examination?
14     CROSS-EXAMINATION
15 BY MR. COLOM:
16 Q. You know Ike Brown, do you?
17 A. Yeah, I know Mr. Ike.
18 Q. Has Ike Brown always been friendly toward you?
19 A. Has he been what?
20 Q. Always been friendly toward you. Friendly.
21 A. Yeah.
22 Q. Has he always been friendly toward your family?
23 A. Yeah. You know, I ain't got no problem with him.
24 Q. Do you know about Ike helping your brother get a job in
25 Aberdeen?

16 (Pages 61 to 64)

Page 65

1  A. No. I don't know nothing about all that.
2  Q. Do you know that Ike was called about his --
3  A. I don't know nothing about that either.
4  Q. Okay. Did Ike -- did you ever hear Ike Brown say anything
5  disparaging about your brother or threaten him in any way?
6  A. No. I ain't know nothing about that.
7  Q. Okay.
8      MR. COLOM: Just one moment.
9      (Short Pause)
10 BY MR. COLOM:
11 Q. Now, when you talked to Judge Dixon, did Judge Dixon
12 express any hostility towards your brother?
13 A. No. I mean, we friends. I mean, me and the judge are
14 friends. I went to him with a favor. You know, I asked a
15 favor of him. That was it. He told me -- you know.
16 Q. Did you support Judge Dixon when he ran for office?
17 A. Yeah, I support him. I mean, he a friend. He's a friend
18 of mine.
19 Q. Did your brother support Judge Dixon when he ran for
20 office?
21 A. I don't know about all of that.
22     MR. COLOM: Okay. Thank you.
23     THE COURT: Mr. Slaughter, what was your understanding
24 as to why your brother had been arrested? You were going to
25 the deputy to ask about it. Why did you think he had been

Page 66

1  arrested?
2  A. I heard he -- I was at work. I had heard he had got
3  arrested. I think my baby sister called me and said that Shaun
4  was, you know, locked up. So I tried to go down there and get
5  him, you know, get him out of jail, you know, bond him out or
6  whatnot. But now it did come a couple days later when I asked
7  Terry about just -- you know, just let my brother go, asking
8  for a favor. Now, what he was locked up on -- what he was
9  locked up on, I think they said something about he had some
10 property that belonged to the county.
11     THE COURT: Who said that?
12 A. I mean, that's what -- I mean, that's what I think that he
13 got locked up on. They said he had some property that belonged
14 to the county.
15     THE COURT: Well, did you just think that or did
16 somebody tell you that?
17 A. No. I mean, I -- I mean, I heard it. I heard it that way.
18 I mean --
19     THE COURT: Where did you hear it?
20 A. That's what I'm saying, I'm not sure exactly what it was,
21 but I heard it was something like that, because I went to the
22 house and got his uniforms; and my baby sister watched me. And
23 I got them and carried them to the sheriff's department. Like
24 I say, I heard that he had property that belonged to the
25 county. That's what I heard.

Page 67

1      THE COURT: Did someone ask you to get the uniform, or
2  you went and got the uniform?
3  A. I was asked. He said he had property belonging to the
4  county. I went and I had -- I had asked -- I think I asked the
5  sheriff. I think I asked the sheriff, you know, what's the
6  problem, what it was. And he said that he had property that
7  belonged to the county. And I said, "What?" And he said like
8  his uniform. He hadn't turned his uniform in and his gun belt
9  or something -- you know, just like that.
10     THE COURT: You thought that was the reason he was
11 arrested?
12 A. That's what I thought was the reason, now.
13     THE COURT: You thought that but nobody told you that?
14 A. Sir?
15     THE COURT: Did anybody tell you that, or you just
16 thought that when the sheriff told you that --
17 A. That he had property that belonged to the county, yes, sir.
18     THE COURT: When your brother said he wasn't going to
19 drop it, what did you understand he meant by that?
20 A. He said he wasn't going to drop it. I went to Terry and
21 asked Terry a favor. Terry told me -- he said, "Okay, man.
22 You need to talk to your brother and we'll just drop it." You
23 know, he didn't say because -- you know, he didn't say nothing
24 about dropping the whole thing or we wasn't going to court.
25     THE COURT: Well, from what you understood, the

Page 68

1  charges were against your brother. So what was it that you
2  understood that your brother wasn't going to drop?
3  A. He just said he wasn't going to drop it. He just said,
4  "I'm not dropping nothing. They got me wrong," or whatever,
5  you know. That was that.
6      THE COURT: All right. You're excused. Do you have
7  one more witness?
8      MR. WAIDE: Yes, Your Honor, Deputy John Clanton.
9  Your Honor, while this witness is coming, we'd like to put into
10 evidence the affidavits, the criminal charges. I don't think
11 those were ever introduced.
12     THE COURT: What numbers are they? How many of them?
13     MR. WAIDE: P-1 through 5.
14     THE COURT: All right. Those five affidavits will be
15 received into evidence as Exhibits P-1 through 5 inclusive.
16   (Exhibit P-1 through P-5 marked)
17     MR. COLOM: Your Honor, I just want to point out for
18 the record, I did not attempt to cross-examine that last
19 witness on behalf of the county defendants. I just want to
20 note that it appeared to be no one representing the county in
21 this hearing -- I mean in this matter.
22     THE COURT: I think your cross-examination was for
23 very limited purposes, isn't it?
24     MR. WALKER: Correct.
25     THE COURT: All right.

Page 69

1   JOHN CLANTON,
2   Having first been duly sworn, testified as follows:
3       DIRECT EXAMINATION
4   BY MR. WAIDE:
5   Q. Sir, would you state your name, please?
6   A. John Clanton.
7   Q. Do you work as a deputy sheriff in Noxubee County,
8   Mr. Clanton?
9   A. Yes, sir.
10  Q. How long have you worked as a deputy sheriff?
11  A. Oh, probably about 15 -- probably about 16 years.
12  Q. Who is the sheriff in Noxubee County?
13  A. Albert Walker.
14  Q. Has he been the sheriff the whole time you were working as
15  a deputy?
16  A. Yes, sir.
17  Q. Who is the chief deputy?
18  A. Terry Grasseree.
19  Q. You're saying Grasseree, and it's spelled
20  G-R-A-S-S-E-R-E-E. You were saying that Mr. Terry Grasseree is
21  the chief deputy?
22  A. Yes.
23  Q. Is this Mr. Grasseree that's seated over here in the white
24  shirt?
25  A. That's him.

Page 70

1   Q. And who is the gentleman seated next to him?
2   A. That's the sheriff.
3   Q. Sheriff Walker?
4   A. Yes, sir.
5   Q. Now, are they your bosses?
6   A. Yes, sir.
7   Q. Have you talked to either one of them about Mr. Slaughter?
8   A. No.
9   Q. How did you get up here today?
10  A. I came up here with Douglas Triplett. That's another
11  deputy.
12  Q. That's another deputy sheriff. Now, you were with
13  Mr. Grasseree when he arrested Kendrick Slaughter, weren't you?
14  A. Yes, I was.
15  Q. Did he ever tell you what charges he was arresting him on?
16  A. I didn't ask.
17  Q. My question was, did he ever tell you what charges he was
18  arresting him on?
19  A. No, we never talked about it.
20  Q. All right, sir. Now, you were with him when he went out
21  and saw him out on Highway 45, weren't you?
22  A. Yes, I was.
23  Q. And didn't some other deputy call -- or call the dispatcher
24  and say they'd seen him out on Highway 45?
25  A. I reckon. The only thing I know, the dispatcher called

Page 71

1   him, but I don't know where he got the information from.
2   Q. The dispatcher called and reported what?
3   A. That another deputy had called him that Slaughter was out
4   on the highway coming into town.
5   Q. And did y'all go out after Mr. Slaughter at that time?
6   A. We went up 45.
7   Q. Now, when y'all went out there, did y'all have any kind of
8   warrant for his arrest?
9   A. No.
10  Q. Had anybody made any criminal complaint against him, to
11  your knowledge, made any charge against him?
12  A. No.
13  Q. And when you went out there, did you see him driving out on
14  Highway 45?
15  A. Did I see him driving?
16  Q. Mr. Slaughter: Did you see him driving a vehicle?
17  A. He was driving his truck.
18  Q. Did you observe any laws that he was violating when he was
19  driving his car?
20  A. When he was coming down the highway?
21  Q. Yes, sir.
22  A. No.
23  Q. And at that point did y'all get in behind Mr. Slaughter?
24  A. We went up the highway and turned around and got behind,
25  and they turn off 45 on Magnolia Drive.

Page 72

1   Q. All right. Does Magnolia Drive intersect Highway 45?
2   A. It enters into 45.
3   Q. And does Magnolia Drive head back down toward the town of
4   Macon? Is that the direction it goes?
5   A. That's right.
6   Q. And so y'all got in behind him?
7   A. That's right.
8   Q. And did y'all signal to him in any way to get him to stop?
9   A. Yeah. To my recollection, he blinked the lights, and I
10  think he might have hit that horn one time; and he pulled
11  over -- he pulled over to the side.
12  Q. He pulled over when you hit the horn or blinked the lights?
13  A. I think. I think that's what -- I ain't for sure. I think
14  that's what happened. I ain't for sure.
15  Q. But --
16  A. But I know he stopped.
17  Q. Were you driving or was Mr. Grasseree driving?
18  A. Grasseree was driving.
19  Q. All right. At that point, had Mr. Slaughter committed any
20  crime or committed any traffic offense that you could see at
21  that time when y'all stopped him?
22  A. Talking about when we stopped him?
23  Q. Yes, sir.
24  A. No. He ain't did anything when we stopped him.
25  Q. I take it that you worked with Mr. Slaughter for several

18 (Pages 69 to 72)

Page 73

1 years -- right? -- when he was the deputy sheriff?
2 A. Yeah.
3 Q. At that time, did you have any problems with him? Was he
4 the type of fellow that would violate the law or reckless drive
5 or do stuff like that?
6 A. I ain't had no problem with him.
7 Q. Did you do any of the talking after y'all got to the car?
8 Is that right?
9 A. No.
10 Q. And when you got to the car, was there some conversation
11 about Mr. Grasseree telling Mr. Slaughter he needed to go see
12 the sheriff? Was there some conversation like that?
13 A. Yes.
14 Q. What did Mr. Slaughter say when he told him he needed to go
15 see the sheriff?
16 A. He told him he was going to go see him, but he wasn't going
17 to go see him right then because he had something else to do.
18 Q. He refused to go see him right then?
19 A. He refused to go see him right then, but he told him he was
20 going to go see him but he wasn't going right -- right at that
21 minute he wasn't going.
22 Q. All right. Would you tell Judge Lee just as best you can
23 recall -- just tell Judge Lee about the conversation that --
24 first of all, did you get out of the car so you could hear what
25 was being said, or did you stay in the car?

Page 74

1 A. I got out.
2 Q. So you could hear what was being said by Mr. Slaughter and
3 by Mr. Grasseree?
4 A. Yeah, I could hear them.
5 Q. All right. If you would, just tell Judge Lee as best you
6 can what happened. What was the conversation? Who said what
7 to who?
8 A. The conversation, I can't remember exact words of what
9 either one of them said. Like I said, that's been a few days.
10 But what we stopped him from, Terry told him that the sheriff
11 needed to see him. And Slaughter said, "Well, I'm going to go
12 by and see him, but I can't do it now because I've got
13 something else to do. I'm taking care of my business."
14   And then Terry asked him, "Well, give me a time so I can
15 tell the sheriff when you're coming by."
16   And Slaughter said, "Well, I don't know when I'm coming by,
17 but I'm going to take care of my business and then I'll go
18 check with him."
19   And Terry said, "Well, I need to have a time." And then
20 from one word to another one, what was said then, I can't
21 remember all of what was said.
22   And then Slaughter said, "Well, I ain't got time for this."
23 So he took off.
24 Q. Slaughter took off. All right. And who drove your vehicle
25 after Mr. Slaughter took off?

Page 75

1 A. Terry. He was driving. I was sitting on the passenger
2 side.
3 Q. And did y'all follow Mr. Slaughter?
4 A. Yeah, we followed him.
5 Q. How close did you follow him?
6 A. Well, he had pulled off. He had got up a good piece from
7 us. And then we took off behind him. And then we throwed the
8 lights on him, and still he wouldn't stop. And then we throwed
9 the siren on him, and he didn't stop. And then he turned and
10 went behind the hospital and went straight then towards the
11 courthouse.
12 Q. All right. Now, you said you throwed the lights on him and
13 he wouldn't stop. Here's the question I have for you: Before
14 you throwed the lights on him, what crime had Mr. Slaughter --
15 A. The first time we stopped him, we didn't throw the lights
16 on him.
17 Q. I know you didn't. But I'm talking about after he took
18 off, after he left, after he said he would only see the sheriff
19 after he took care of some other business and he took off, then
20 you said after that, y'all throwed the lights on him. Right?
21 A. Yeah. He was trying to stop him to see what -- they was --
22 what time was he coming to see the sheriff, and he never did
23 give an answer.
24 Q. Here's my question, sir: Before you throwed the lights on
25 him, before y'all turned the lights on, the blue lights, what

Page 76

1 crime had you seen Mr. Slaughter commit?
2 A. No more than he wouldn't tell us what time he was going to
3 come see the sheriff.
4 Q. I see. But now you've been a deputy sheriff for 15 years.
5 Right?
6 A. Yeah.
7 Q. And you never have seen anything in the law books that says
8 it's a crime not to tell the sheriff what time you're coming to
9 see him, have you? You never have seen anything that says
10 that's a crime?
11 A. I ain't never read -- I don't know.
12 Q. I mean, I never have seen it in a law book. Have you seen
13 it?
14 A. I ain't never looked before.
15 Q. Okay. Now, when y'all got up to the -- when he got up to
16 the courthouse, he locked himself in the car initially, didn't
17 he -- Mr. Slaughter?
18 A. Yeah, he hit the lock.
19 Q. Do you know why he was locking himself in the car?
20 A. No. I didn't ask him.
21 Q. But you told him to come on out, didn't you?
22 A. Yeah, he come out. He opened the door up. And then he
23 come out and told him he was under arrest, and they started
24 swapping words there. Then I told Slaughter just hush and go
25 on and get in the car. And then he got him and put him in the

Page 77

1  car and carried him on to the jail, and that's all I know.
2  Q. Except for the fact that he didn't stop for the blue
3  lights, did you observe any other crime that Mr. Slaughter
4  committed?
5  A. No more than just going straight -- going down through town
6  and wouldn't stop for the blue lights.
7  Q. That's what I said. Except for the fact he wouldn't stop
8  for the blue lights, do you know of any other crime that you
9  saw he committed?
10 A. No.
11 Q. While you were there, did Mr. -- Chief Deputy Grasseree,
12 your boss, did he ever tell you what crimes he was arresting
13 him for? Did he ever say, I'm arresting him for this, that, or
14 the other thing or what he's arresting him for?
15 A. No, sir.
16 Q. Do you know yet what crimes he arrested him for?
17 A. No, I didn't even look. I don't even know.
18     THE COURT: Mr. Waide, do you need a few more minutes
19 of examining him?
20     MR. WAIDE: Your Honor, I would request that we take a
21 break.
22     THE COURT: We're going to break for at least ten
23 minutes.
24   (Recess)
25     THE COURT: Let Mr. Clanton come back to the witness

Page 78

1  box. Do you have any additional questions?
2     MR. WAIDE: No, Your Honor.
3     THE COURT: All right. Conduct cross-examination,
4  Mr. Colom.
5         CROSS-EXAMINATION
6  BY MR. COLOM:
7  Q. Officer, did you know why the sheriff needed to see
8  Mr. Slaughter on that day?
9  A. Yes, sir.
10 Q. What was the reason?
11 A. To get his equipment back.
12 Q. What equipment was that?
13 A. The equipment, which is like your gun and your belt; and I
14 can't think of what else all the other stuff was. Handcuffs.
15 Q. Okay. In Noxubee County, is there more than one judge?
16 A. Judge?
17 Q. Yes. Justice court judge.
18 A. Two.
19 Q. Now, they are elected from the northern and the southern
20 part of the county. Is that correct?
21 A. Sir?
22 Q. One is elected from the northern part of the county and one
23 is elected from the southern part.
24 A. Right.
25 Q. Are there any restrictions on where they can hear cases

Page 79

1  from? Can a judge elected from the southern part of the county
2  hear a case from the northern part of the county?
3  A. They can hear either part of the county.
4  Q. They have elections subdistrict, but that doesn't restrict
5  their power?
6  A. No.
7     MR. COATES: Objection, Your Honor. No foundation to
8  show that this witness shows the jurisdiction of the various
9  justice court judges in Noxubee County.
10    THE COURT: If you can develop a foundation for it, he
11 can answer.
12 BY MR. COLOM:
13 Q. Are you an auxillary police officer?
14 A. Auxillary.
15 Q. And you get warrants and other writs issued by judges. Is
16 that correct? Justice court judges.
17 A. Yes.
18 Q. Is there any restrictions on the places in which -- in the
19 county where a justice court judge can exercise his authority?
20 A. Okay. What you're asking me, if something happens in the
21 county -- north end, could I get any one of the judges to sign
22 it?
23 Q. Yes.
24 A. That's what you're asking me?
25 Q. Yes.

Page 80

1  A. That's correct.
2     MR. COLOM: Nothing further, Your Honor.
3     THE COURT: Redirect.
4         REDIRECT EXAMINATION
5  BY MR. WAIDE:
6  Q. Sir, Mr. Colom asked you some questions about the gun and
7  the holster -- right? -- just now. Had you talked to
8  Mr. Colom before you testified today?
9  A. I haven't seen him, sir.
10 Q. Have you talked to Mr. Ike Brown?
11 A. I haven't talked to Ike Brown.
12 Q. I see. When was it that the sheriff -- strike that. Who
13 told you that we're after Mr. Slaughter because of his gun and
14 his holster? Who told you that?
15 A. When the sheriff said that he just wanted to see Slaughter
16 and get him to come by and see him because he wanted him to
17 bring his -- either his personal stuff that he had, of course,
18 from the sheriff's department and he needed that -- for
19 Slaughter to come by and talk to him. And that's how I found
20 it out.
21 Q. In other words, the sheriff told you that himself?
22 A. He said he wanted to see -- he wanted to see Slaughter by
23 his office. He needed to talk to him.
24 Q. My question is, is it the sheriff that told you that,
25 Sheriff Walker?

Page 81

1. A. Yes.
2. Q. Did he call all of y'all in together and tell you that or
3. just you?
4. A. No. No, he didn't call all of us in together.
5. Q. He just told you yourself?
6. A. When he -- when he was telling -- when he told the chief
7. that he wanted Slaughter to come by his office, he needed to
8. talk to him, but he never did come by his office.
9. Q. No, sir, here's my question: Did the sheriff call you in
10. and say to you, "I want you to go get Mr. Slaughter" --
11. A. No.
12. Q. -- "and get him" --
13. A. No.
14. Q. -- "because he's got the gun and the holster," he never
15. told you that?
16. A. No, no, no. You're putting words in my mouth. He didn't
17. tell me that.
18. Q. What did the sheriff tell you about Mr. Slaughter?
19. A. He just said he needed to talk to Slaughter. I need
20. Slaughter to come in. He needed to talk to him.
21. Q. He never told you anything other than that?
22. A. About what?
23. Q. Well, what I was trying to ask you about is the gun and the
24. holster; and you were telling Mr. Colom, I thought, that the
25. sheriff wanted to get the gun and the holster back.

Page 82

1. A. He wanted to get the stuff back that he had if he wasn't
2. going to work anymore. He needed that stuff back.
3. Q. All right. Well, my question was, did the sheriff tell you
4. that?
5. A. I didn't tell Slaughter that.
6. Q. Did the sheriff ever say to you, "I want you to get ahold
7. of Mr. Slaughter and get the gun and the holster back"?
8. A. No, not the gun and the holster. He just told me -- he
9. said, "I need to get up with Slaughter."
10. Q. He just told you to get up with Slaughter?
11. A. And tell him he needed to talk to him. Come in.
12. Q. Where did you get this testimony you're giving us about the
13. gun and the holster? Who told you that?
14. A. Because I know that that's what -- that's what we have.
15. And if we ain't going to work, we have to turn that back in.
16. Q. Where did you get that idea that that's the reason you
17. wanted to stop him? Where did you get that from? Who told
18. you?
19. A. That ain't the reason I wanted to stop him.
20. Q. Well, who told you that, that we're stopping him on account
21. of the gun and the holster?
22. A. That's my point of view, what I thought.
23. Q. Oh, that's what you just thought?
24. A. Yes, that's my point of view. Now, I know the sheriff told
25. him -- he said he wanted to talk to Slaughter.

Page 83

1. Q. But he never told you what about?
2. A. He just wanted -- I guess he wanted to talk to him to see
3. was he going to come in and work.
4. Q. I see. You thought he was wanting to talk to him about
5. whether he was going to come in and work?
6. A. I know that's what he wanted to talk to him about.
7. Q. I see. Well, he had been working security, hadn't he?
8. A. He had, but he didn't show up -- he didn't show up the day
9. me and him was supposed to have been working. He didn't show
10. up.
11. Q. But he had been working security?
12. A. Yeah.
13. Q. Didn't the sheriff have a check for him?
14. A. I don't know nothing about that.
15. Q. Wouldn't he use the gun and the holster when he was working
16. security?
17. A. Yeah. I don't know nothing about no check.
18. Q. But he would use the gun and the holster when he was
19. working security?
20. A. Yeah.
21. Q. And you thought the sheriff was wanting to talk to him
22. about coming in to work?
23. A. Coming in -- talking about the way he did. He wasn't
24. coming to work. But he didn't come that day.
25. Q. All right. But on the day y'all stopped him, did you think

Page 84

1. that day the sheriff was wanting to talk to him about coming in
2. to work?
3.     MR. COLOM: Your Honor, I'm just a bit confused
4. because he keeps referring to that day coming in to work. Do
5. we know what day we're talking about?
6.     THE COURT: The day he stopped him.
7. BY MR. WAIDE:
8. Q. On July 15th.
9. A. Well, I don't know the date. But the day they stopped him,
10. I don't know did they want to talk to him about work or not --
11. about coming in to work that day, because he couldn't because
12. we wasn't having court that day.
13. Q. I understand. But you're not the man -- it's Mr. Grasseree
14. that actually stopped him. Right? That wasn't your decision
15. to stop him. That was Mr. Grasseree.
16. A. That's right.
17. Q. And Mr. Grasseree never did tell you why he was wanting to
18. stop him?
19. A. I knew why -- I knew why he wanted to stop him, to tell him
20. what the sheriff said. I already knew why.
21. Q. I see. But the sheriff wanted to see him?
22. A. I knew that.
23. Q. Okay. Well, just to be clear --
24.     MR. WAIDE: And, Your Honor, I apologize if I'm being
25. repetitive.

Page 85

1  BY MR. WAIDE:
2  Q. -- there never was a time when the sheriff in your presence
3  said, "I want you to go stop Mr. Slaughter and get back the gun
4  and the holster." That never happened?
5  A. No, never happened.
6      MR. COLOM: Your Honor, could I ask just a couple of
7  questions for clarification.
8      THE COURT: Okay.
9              CROSS-EXAMINATION
10 BY MR. COLOM:
11 Q. You stated that there was a day that Mr. Slaughter did not
12 show up for work for the county?
13 A. We was doing security and we was having chancery court, and
14 I worked and he supposed to have been worked that day but he
15 didn't show up.
16 Q. Where was -- when was this in relationship to the day that
17 he was stopped?
18 A. That was -- that happened -- I don't know if it was
19 after -- like I said, I'm getting confused on that because I
20 don't know if that happened before or it happened after, but I
21 know he supposed to have come in and he didn't. He didn't come
22 in. But the days, I don't know.
23 Q. So, to your knowledge, even the day that he was stopped
24 that you and Officer Slaughter stopped him, the sheriff was
25 still using him as an auxillary or as a part-time deputy?

Page 86

1  A. Now, that's something I can't answer because I don't know.
2  Q. Okay. Thank you.
3      THE COURT: All right, sir. That concludes your
4  testimony. It's ten minutes until twelve. We'll take a recess
5  for one hour until ten minutes until one o'clock.
6    (Recess)
7      THE COURT: Are you ready to proceed, Mr. Colom?
8      MR. COLOM: Yes, sir.
9      THE COURT: All right, sir.
10     MR. COLOM: Mr. Ike Brown.
11     MR. WAIDE: If the Court please, we would like to make
12 the warrants an exhibit. Also Your Honor let us mark the
13 affidavits, but we failed to mark the warrants. They would be
14 6 through 9. We have only got four warrants.
15    (Exhibit P-6 through P-9 marked)
16              IKE BROWN,
17 Having first been duly sworn, testified as follows:
18              DIRECT EXAMINATION
19 BY MR. COLOM:
20 Q. State your complete name for the record.
21 A. Ike Brown.
22 Q. Mr. Brown, you are a defendant in a civil action being
23 brought by the United States. Is that correct?
24 A. That's correct.
25 Q. And you are currently the chairman of the Democratic

Page 87

1  Executive Committee in Noxubee County?
2  A. That's correct.
3  Q. Do you know Mr. Slaughter?
4  A. I do.
5  Q. How have you known him?
6  A. Well, I've been knowing him for years. I just been knowing
7  his family for a long time.
8  Q. Have you ever been on friendly relationships with his
9  family?
10 A. All the time.
11 Q. And with him as well?
12 A. Yes.
13 Q. Now, let's go back to something, an earlier event where you
14 were -- it's alleged that you discussed with him where he
15 should qualify to run for a city council position. Do you
16 recall that conversation?
17 A. I do.
18 Q. And do you know approximately when that conversation
19 occurred?
20 A. Either April or May of -- probably May of 2005.
21 Q. And tell the Court where that conversation took place and
22 if you can your best recollection.
23 A. It took place at my house.
24 Q. And how did it take place? Did he come there?
25 A. Yes, he did.

Page 88

1  Q. And why did he come?
2  A. They had something to do with -- it was runoff between Bob
3  Boykin and the Mayor Hines, and he had talked to Boykin -- I
4  assume he had talked to Boykin about supporting him. And, you
5  know, he came by to talk to me about it, and that's when I
6  discussed with him about the fact that -- his future, you know,
7  we discussed Ward 2. We discussed the supervisor District 2
8  and alderman-at-large.
9  Q. Now, at the time you talked with him, he had already lost
10 his race for city alderman?
11 A. He had.
12 Q. And he was discussing with you the mayoral race, there was
13 a runoff in the mayor's race?
14 A. Well, he came, but, really, we mostly talked about William
15 Rice who was in the runoff for the alderman-at-large. And we
16 talked about it, and I wanted him to support William Rice. And
17 he said he had no problem with that because William Rice had
18 practically raised him and that he would help William Rice.
19 That was my primary concern, was William Rice.
20 Q. What did you say to him about -- so you talked -- strike
21 what I said. You talked about a number of races: Supervisor
22 District 2.
23 A. Yes. I discovered him -- I told him, I said, "I believe
24 you in the wrong race, Man, as hard as you work." And we had a
25 rather sorry candidate in Ward 2. And I said, "Look, if you

Page 89

1 ever run in Ward 2, as hard as you work you probably would have
2 won." And I said, "We have got future races coming up,"
3 because I doubt very seriously Mr. Rice, win, lose, or draw,
4 would run again even if he won. And then I mentioned about
5 Mr. Oliver because he's a supervisor in District 2. I said,
6 "You know, you might run against him." I said, "There's a lot
7 of things out there because you're young and you worked real
8 hard in your race."
9 Q. So you were talking to him in a supportive way about what
10 he could do in the future?
11 A. That's right.
12 Q. Did you ever discuss with him where he should qualify from?
13 A. No. What we talked about was his future. Now, I just
14 mentioned to him, I said, "Look that's four years away in Ward
15 2 and, you know, you really don't have a permanent residence.
16 You would need to move," because he lived with his father, and
17 his sister lived over there. "In four years, you could have
18 been bought some property and got over there in Ward 2." You
19 know, that was just one of the options, you know, along with
20 alderman-at-large and along with supervisor. I was just giving
21 him a scenario, you know, since he wasn't nailed down anywhere
22 that if he wanted to, you know, move over there and buy him a
23 house or whatever and get in Ward 2, I didn't see where it was
24 a big problem.
25 Q. Did you have any relationship with him or contact with him

Page 90

1 regarding his job in Aberdeen?
2 A. Yes.
3 Q. Could you tell the Court about that?
4 A. I was at my little store. It was in July.
5 Q. Of this year?
6 A. This year. And the phone rang. And they said, "Somebody's
7 looking for you," because most of the time when the phone rang
8 it would be for one of the people that work. And so I took the
9 phone, and it was Chief Sykes from the Aberdeen Police
10 Department who was the chief. And he said, "I need to ask you
11 about somebody from down there." And I said, "Who?" And he
12 said, "Well, Kendrick Slaughter." He said, "He's applied for a
13 job," and asked me what I thought about him. And I said, "I
14 believe it would help him to get out of Macon because, you
15 know, he had some problems down here, but I believe if, you
16 know, you give him a chance up there he'll work out pretty
17 well."
18 Q. Now, were you active in the election in Aberdeen?
19 A. I was.
20 Q. Did you give him a favorable reference?
21 A. I did.
22 Q. Do you know -- was this early July?
23 A. Yes.
24 Q. Now, there was a witness list provided by the government to
25 your attorneys. Did you ever see that witness list?

Page 91

1 MR. COATES: Objection, Your Honor. That's a
2 mischaracterization. It's not a witness list. It is a list
3 under Rule 26 of anyone who the government knew or believed had
4 information relevant to the claims in the case.
5 THE COURT: All right. With that clarification.
6 BY MR. COLOM:
7 Q. With that clarification.
8 A. No, I did not.
9 Q. Have you ever seen any list or anything that described
10 people who may have information regarding this case?
11 A. No, I have not.
12 Q. When did you find out that Mr. Slaughter had been listed as
13 one person who had information about the United States' case
14 against the Democratic party and you?
15 A. Well, truthfully, I don't know it to this day, because I
16 just saw what I saw in the newspaper; and I was told they filed
17 a restraining order, but to this day I still haven't seen the
18 list.
19 Q. Between the first of June and the time of the arrest of
20 Mr. Slaughter, did you ever have any conversation with
21 Mr. Grasseree at all?
22 A. No. You're talking about Terry Grasseree?
23 Q. Yes.
24 A. Okay. No.
25 Q. Have you ever asked him to talk to Mr. Slaughter or to do

Page 92

1 anything to Mr. Slaughter in connection with his information to
2 the United States government?
3 A. No, because I didn't know he had none.
4 Q. Now, there was also testimony that the city -- that the
5 city elections in May -- that justice department officials were
6 there and that during that period of time they spoke with
7 Mr. Slaughter. Did you ever see Mr. Slaughter speaking with
8 any Justice Department official?
9 A. No one that I recognized as a Justice Department official
10 because, really, to tell you truth, I don't remember really
11 seeing Mr. Slaughter.
12 Q. Mr. Brown, there's allegations here that you were trying to
13 harass or intimidate witnesses in connection with this case.
14 Do you have -- have you harassed or intimidated any witness?
15 A. No, because I don't know who they are.
16 Q. I'd like for you to tell the Court what is your attitude
17 about the Justice Department's case?
18 A. I consider it to be -- I wouldn't use the word "bogus" but
19 a weak case because the allegations were things that not only
20 were not true but a violation of Mississippi law, and I pointed
21 that out to them on numerous occasions, that things that they
22 brought against us either were moot or impossible because of
23 state law. And I haven't -- I mean, it wasn't no big deal with
24 me.
25 Q. You asked to sign a consent degree and you didn't sign it.

Page 93

1  A. That's correct.
2  Q. Now, some other county officials did sign that consent
3  decree. Is that correct?
4  A. That's correct.
5  Q. Are you concerned about that consent decree? Do you really
6  have any strong objections to it?
7  A. My attitude about the consent decree was I could resign
8  tomorrow and be out of it, but, you know, I stayed in because I
9  believe in doing what's right and also I believe they were, you
10. know, unfair; but as far as the consent decree, it wasn't
11  anything that particularly bothered me. I just don't like
12  people trying to run over me.
13  Q. So if the consent degree was granted, do you have any -- do
14  you feel any strong feelings about it either way?
15  A. I'd just resign.
16  Q. That's what you can do if you don't like what --
17  A. Yeah. I could just resign.
18  Q. Why would you not agree to sign the consent decree?
19  A. Because it contains inaccuracies, and it also contains
20  information where, quote, I would be held responsible for
21  somebody else's conduct; and I would never sign a paper being
22  responsible for what somebody else did.
23  Q. If the government's decree is granted, would it affect you
24  in any way personally?
25  A. No.

Page 94

1       MR. COLOM: Nothing further.
2       THE COURT: Cross-examine.
3              CROSS-EXAMINATION
4  BY MR. COATES:
5  Q. Good afternoon, Mr. Brown.
6  A. Good afternoon.
7  Q. Now, it's your testimony that you had not been provided a
8  list of the people that the United States claimed to have
9  information about that case. Correct?
10  A. I have not.
11  Q. And you graduated from Jackson State University, did you
12  not?
13  A. That's correct.
14  Q. And you attended a year of law school at the Mississippi
15  College of Law here in Jackson.
16  A. That's correct.
17  Q. And you have been active in the Mississippi Democratic
18  party, have you not, for the last 10 or 15 years?
19  A. That is not correct.
20  Q. Have you been -- how long have you been active in the state
21  party?
22  A. On and off, it would be hard to guess, because, see, when I
23  wasn't on the committee, I played both sides.
24  Q. Well, how long have you been active in the Democratic --
25  the state Democratic party? Let me withdraw that question and

Page 95

1  ask it this way: How long have you been an officer with the
2  Mississippi State Democratic party?
3  A. I'm not an officer now. I'm on the committee.
4  Q. On the committee. You're a committee member. How long
5  have you been a committee member with the Mississippi State
6  Democratic party?
7  A. I had a four-year term in '76 and then a four-year term
8  in -- I believe it was -- no, it wasn't '88. Maybe '92. And
9  then, you know, I was replaced before the term was up. And
10  then --
11  Q. Because of the federal conviction?
12  A. That's correct. And then in 2000 until now. So I guess
13  that would be about 11 or 12 years.
14  Q. And you've served of the chairman of the Noxubee County
15  Democratic Executive Committee since 2000, have you not?
16  A. Yes, that's correct.
17  Q. And you've also served as an officer in the Noxubee County
18  NAACP, have you not, in the past?
19  A. Well, that was a long time ago. I was vice president way
20  back in the '80s.
21  Q. And have you also served as a chairman of the East
22  Mississippi Voters League?
23  A. That's correct.
24  Q. And have you served as a chairman of the Noxubee County
25  Voters League --

Page 96

1  A. That's correct.
2  Q. -- in the past?
3  A. Yes.
4  Q. And you have been active and in political campaigns in
5  places other than Noxubee County, have you not?
6  A. Oh, yes.
7  Q. Aberdeen is one.
8  A. Yeah.
9  Q. And recently in Houston, Mississippi.
10  A. No, I wouldn't say a political campaign in Houston.
11  Q. But you were involved in an election contest over there,
12  were you not?
13  A. Oh, yes, that's correct.
14  Q. Now, in this particular case where you are the first named
15  defendant, you have participated vigorously in the defense of
16  the case, have you not?
17  A. Well, I attended the depositions.
18  Q. We've had nine depositions in the case including your own
19  so far. Right?
20  A. That's right.
21  Q. And do you remember Peggy Brown being deposed?
22  A. Yes.
23  Q. And Ms. Brown is not a member of the Democratic Executive
24  Committee, is she?
25  A. No, she's not.

24 (Pages 93 to 96)

### Page 97

1  Q. And you attended her deposition --
2  A. That's correct.
3  Q. -- and sat right beside her during the deposition.
4  A. That's the only seat.
5  Q. And Bob Boykin, the present mayor of Macon, has been
6  deposed, has he not?
7  A. He has.
8  Q. And you attended that deposition.
9  A. I have.
10 Q. And Mr. Boykin was not a member of the Democratic Executive
11 Committee. Correct?
12 A. I believe not.
13 Q. And you sat beside Mayor Boykin during his deposition.
14 A. Yes, the only seat.
15 Q. And you also attended the deposition of Carrie Kate
16 Windham, did you not?
17 A. Yes.
18 Q. And she's a woman who has worked for you and other people
19 in collecting absentee ballots in Noxubee County elections.
20 Correct?
21 A. Sometimes.
22 Q. And Ms. Windham is not a member of the Democratic Executive
23 Committee, is she?
24 A. She is a member.
25 Q. She is a member. And you attended her deposition.

### Page 98

1  A. Correct.
2  Q. And you sat right beside her, did you not?
3  A. The only seat.
4  Q. And Mr. Grasseree has had his deposition -- Deputy Chief
5  Grasseree taken in this case. Correct?
6  A. Yes.
7  Q. And Mr. Grasseree is a former member of the Democratic
8  Executive Committee but is not presently a member. Right?
9  A. That's right.
10 Q. Okay. And you attended his deposition.
11 A. Yeah.
12 Q. And sat right beside Deputy Grasseree during his
13 deposition. Correct?
14 A. Only seat.
15 Q. And you attended the deposition of circuit clerk Carl
16 Mickens, did you not?
17 A. Correct.
18 Q. Is Mr. Mickens a present member of the Democratic Executive
19 Committee?
20 A. No, he's not.
21 Q. And you sat right beside Mr. Mickens during his deposition.
22 A. The only seat.
23 Q. Correct?
24 A. The only seat.
25 Q. Well, there were other chairs in the room, were there not?

### Page 99

1  A. No. When I come in, the lawyers been took their chairs and
2  you all been took y'all chairs, the court reporter, and there
3  was one seat left. That's the one I had to wind up getting.
4  Q. Do you remember at one of the depositions you had one of
5  your lawyers move so you could sit beside the deponent? Isn't
6  that correct?
7  A. That's because the lawyer wanted to move; otherwise, I
8  would have been in the position where the lawyer would have
9  been sitting next to the person and not between.
10 Q. And that was Ms. Woodrick, Ms. Carrie Woodrick, who works
11 in Mr. Colom's firm. Right?
12 A. I'm not sure about that. I don't know whether it was her
13 or the lady that was working for Ellis Turnage. I believe it
14 was her because her coat was on the chair.
15 Q. When you came into the deposition room, the lawyer got up
16 and moved so you could sit beside the deponent. Right?
17 A. I don't know about that, now.
18 Q. Well, you said that the lawyer decided to move. Right?
19 A. Yeah.
20 Q. And when the lawyer moved, it made it possible for you to
21 sit beside the deponent. Correct?
22 A. It made it possible for me to have a seat.
23 Q. Beside the deponent. Correct?
24 A. Yeah.
25 Q. Did you attend the deposition of Ms. Freida Phillips?

### Page 100

1  A. Yeah.
2  Q. And Ms. Phillips is the deputy clerk for Mr. Mickens in the
3  circuit clerk's office. Correct?
4  A. Yeah.
5  Q. And Ms. Phillips is not a member of the Democratic
6  Executive Committee.
7  A. No, she's not.
8  Q. But you attended her deposition, did you not, and sat right
9  beside her. Right?
10 A. May I make a correction --
11 Q. Yes.
12 A. -- to save you a lot of trouble. Your Honor, before the
13 deposition began, my attorney advised me that I had to be at
14 all of them. That's why I was there.
15 Q. He advised you to be at all the depositions?
16 A. Yes, he did. Yes.
17 Q. Okay. So you were there at Ms. Phillips'?
18 A. Yes.
19 Q. We took the deposition of Mr. George Robinson, a member of
20 the board of supervisors. Correct?
21 A. Yes.
22 Q. You were there.
23 A. Yes.
24 Q. Mr. Robinson is not an member of the Democratic Executive
25 Committee.